IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| QUANTUM ENTERTAINMENT LIMITED, a New Mexico limited liability company, 102 Rabbit Road Sante Fe, NM 87508 | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Case No: |
| UNITED STATES DEPARTMENT OF THE INTERIOR BUREAU OF INDIAN AFFAIRS; 1849 C Street NW Washington, D.C. 20240 Mail Stop 4140 | ) ) ) ) ) ) | Judge: Deck Type:  Administrative Agency Review |
| Defendant. | ) ) ) | |

## COMPLAINT FOR JUDICIAL REVIEW OF FEDERAL AGENCY ACTION, AND INJUNCTIVE AND OTHER RELIEF

For its complaint, Plaintiff Quantum Entertainment Limited ("QEL"), by its undersigned counsel, alleges as follows:

### PARTIES

1.     At the time that the facts giving rise to this Complaint occurred, QEL was a limited liability corporation formed under the laws of New Mexico, was located in Albuquerque, New Mexico, and provided management and consulting services for gas distribution businesses located in New Mexico.

2.     The Bureau of Indian Affairs ("BIA") is an agency of the Defendant United States Department of the Interior ("Department").

### JURISDICTION AND VENUE

3.      QEL's right of review arises under the federal Administrative Procedure Act, 5 U.S.C. §§ 701 to 706, which grants parties a right of review of final agency actions.

4.      This complaint arises under federal law, making jurisdiction in this Court proper under 28 U.S.C. § 1331.

5.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e) (1) which allows a party to bring suit against an agency of the United States in the district in which the defendant resides.  For purposes of this venue provision, federal agencies are deemed to reside in Washington, D.C.

### LEGAL BACKGROUND

6.      For the purpose of approving or disapproving certain types of agreements, the BIA determines whether agreements between an Indian tribe, a pueblo or a federally chartered Indian corporation and a non-Indian entity or party are subject to 25 U.S.C. § 81 ("Section 81"). With regard to the issue in this Complaint, the scope of the BIA's authority, and the types of agreement that require Secretarial approval, are set forth in Section 81.

7.      Courts have observed that Section 81 was originally adopted in 1871, particularly because of claims agents and attorneys working on contingency fees who routinely swindled Indians out of their land, accepting it as payment for prosecuting dubious claims against the federal government.

8.      While Section 81 was amended piecemeal prior to 2000, in 2000 Congress adopted the Indian Tribal Economic Development and Contract Encouragement Act of 2000, Pub. L. No. 106-179, 114 Stat. 46 (2000) ("Contract Encouragement Act"), which effectively repealed Old Section 81 and substituted New Section 81. (Hereinafter pre-2000 Section 81 may

be referred to as "Old Section 81" and Section 81 as amended in 2000 may be referred to as "New Section 81" or "Section 81").

9.    Old Section 81 required, among other things, that the Secretary approve contracts for "services for ... Indians relative to their lands." If such approval was not obtained, Old Section 81 provided that the contract was "null and void" and that the money paid by the tribe to the contracting party could be recovered in a *qui tam* action. Old Section 81 provided that half of the money so recovered would be paid to the plaintiff in the *qui tam* action and the other half would be paid to the United States for the use of the tribe with whom the contract was made.

10.    New Section 81 is aimed at promoting contracting with Indian tribes by clarifying and limiting which agreements require BIA approval and eliminating harsh penalties. Among other things, New Section 81 clarified that the statute applies only to contracts that "encumber[] Indian lands for a period of 7 or more years," eliminated the *qui tam* action provision, and eliminated the disgorgement provision.

11.    The genesis of this action lies in determinations by the Acting Regional Director of the Southwest Region of the BIA ("Regional Director"), made on or about October 23, 2003, ("Regional Director's Decision") that (i) a management agreement between QEL and Kewa Gas Limited, required BIA approval under Old Section 81 and (ii) because such approval was never sought by the parties, the agreement was never legally valid. The Regional Director's Decision is attached hereto as Exhibit A.

12.    On November 21, 2003, QEL timely filed an appeal of the Regional Director's determination to the Interior Board of Indian Appeals (IBIA").

13.    Following briefing by the parties and numerous procedural delays, on or about March 27, 2007, the IBIA issued a decision (IBIA Decision") affirming a portion of the Regional

Director's determinations, abstaining from making a decision regarding a portion of the Regional

Director's determinations, and dismissing a portion of QEL's appeal. The IBIA Decision is

attached hereto as Exhibit B.

## FACTUAL BACKGROUND

### Kewa Gas Limited: Distribution Business and the Management Agreement

14.    On or about August 14, 1996, the Santo Domingo Pueblo ("Santo Domingo" or

"Pueblo") chartered and established, pursuant to Pueblo law, the corporate entity Kewa Gas

Limited ("Kewa"). Kewa was formed to operate the Pueblo's retail gasoline station, a gasoline

distribution business ("Distribution Business") and other related businesses.

15.    At the time that the facts giving rise to this Complaint occurred, the Pueblo was

the sole shareholder of Kewa.

16.    At the time that Kewa was formed, the majority of the members of its Board of

Directors were not members of the Pueblo's tribal council.

17.    Kewa registered with the State of New Mexico to do business as a foreign

corporation.

18.    At the time that the facts giving rise to this Complaint occurred, New Mexico's

Gasoline Tax Act, NMSA 1978, §§ 7-13-1 to -18 (1971), as amended, presented an economic

development opportunity for pueblos and tribes in New Mexico. Typically, when a bulk

distributor purchased fuel at an origination point in New Mexico (at a refinery or the delivery

point of a pipeline), the distributor became liable for a 17 cents per gallon excise tax for every

gallon purchased. A means of eliminating this tax arose when a sale to a "Registered Indian

Tribal Distributor" ("RITD") took place. If a bulk distributor sold fuel to a RITD, the bulk

distributor became eligible for a deduction for the full amount of the excise tax for every gallon

sold to the RITD. Once the sale to an RITD took place, the bulk distributor could repurchase the fuel from the RITD for a slightly higher price, which allowed the distributor to sell the fuel for a lower price than its competitors and to make a profit. Because of the volume of fuel sales involved, the revenue to a RITD could be significant.

19.    Kewa was approved to operate as a RITD. Santo Domingo Pueblo was not eligible to become, and has never been, a RITD.

20.    Neither Santo Domingo Pueblo, Kewa nor QEL sought Secretarial approval of the management agreement ("Management Agreement") pursuant to 25 U.S.C. § 81.

21.    The Distribution Business, which at all relevant times was owned by Kewa, was located within the geographic boundaries of the Santo Domingo Pueblo on real property that was leased by Kewa from the Pueblo ("Lease"). QEL did not establish a place of business on the leased land, or on any other portion of the Pueblo's land.

22.    QEL was not a party to the Lease.

23.    The Lease contemplates that Kewa will operate a gasoline distributorship, a gift shop, a retail gas station and other businesses on the leased premises. The Lease requires a Guaranteed Minimum Monthly Rental to be paid to Santo Domingo by Kewa, as well as a percentage of the estimated net income to Kewa from "all businesses operated on the Leased Premises." Kewa is required to perform an annual accounting of its Lease-related income, for the benefit of Santo Domingo; to maintain the leased premises in good order, at Kewa's expense, and to post a corporate surety bond to guarantee its obligations under the Lease. The Lease prohibits Kewa from encumbering the leased premises without Santo Domingo's approval. The Lease requires that Kewa carry a variety of insurance in connection with the leased premises, and

provides Santo Domingo with a host of remedies against Kewa in the case of a default by Kewa, including the collection of attorneys' fees incurred by Santo Domingo in enforcing its rights.

24.    It is the Management Agreement that sets forth the relationship between Kewa, Santo Domingo and QEL with respect to the Distribution Business.

25.    The Management Agreement sets forth certain day-to-day responsibilities of QEL, along with restrictions that required QEL to regularly report to and consult with Kewa on financial and Distribution Business condition matters.

26.    The Management Agreement recites that Kewa owns the Distribution Business and that Kewa desires to engage QEL to manage the Distribution Business. The Management Agreement delineates QEL's duties, all of which relate to "manag[ing] the day-to-day- operation of the Gas Distribution Business" owned by Kewa. Those duties include directing and supervising Kewa's operations related to purchasing, marketing, sales and delivery of fuel; selecting and training personnel to operate Kewa's Distribution Business; maintaining and operating equipment used in Kewa's Distribution Business; paying operating expenses of the Distribution Business out of Kewa's funds; marketing the Distribution Business on Kewa's behalf; maintaining books and records for the Distribution Business; filing with appropriate authorities on Kewa's behalf various papers related to the Distribution Business, and preparing budgets for the Distribution Business subject to Kewa's approval or disapproval.

27.    The Management Agreement requires QEL to report to and consult with Kewa regarding management decisions and operations. Specifically, QEL must: (i) "regularly" consult with Kewa's Board of Directors about QEL's management operations; (ii) provide Kewa's Board of Directors with copies of any written financial statements or other reports dealing with the Distribution Business, and forward to Kewa's Board of Directors "at least monthly" a written

report summarizing the activity of the Distribution Business during the preceding month; and (iii) designate a representative to attend meetings of Kewa's Board of Directors in order to report on and discuss the Distribution Business.

28.    Real property is not mentioned in the Management Agreement.

29.    There is no legal description of real property referenced in or attached to the Management Agreement.

30.    The Management Agreement does not divest Kewa of its ownership of the Distribution Business, any other of the businesses on the leased premises, or of its leasehold interest under the Lease. There is no lease or other conveyance of real property or of a real property interest to QEL. The Management Agreement does not provide QEL with any right to acquire, control or encumber any Indian land under any circumstances. Nor does the Management Agreement vest Kewa with any authority to dispose of, pledge or otherwise encumber real property of Santo Domingo.

31.    QEL acquires no tribal property rights under the Management Agreement, and no right to dispose of or encumber any real property rights of Kewa or of Santo Domingo.

32.    The Management Agreement did not divest Kewa, either directly or through any type of default mechanism, of Kewa's ownership or control of the Distribution Business. Nor did the Management Agreement involve a transfer of Kewa's leasehold interest in tribal land to QEL.

33.    QEL's status with respect to tribal land, at all relevant times, was that of a business invitee.

34.    Kewa and QEL operated under the terms of the Management Agreement for approximately seven years.

## BIA's Review of the Management Agreement

35.    On or about March 28, 2003, the Governor of Santo Domingo, Everett Chavez, requested that the Superintendent of the BIA review the Management Agreement. The Governor complained that "the management contract [is] far too lucrative for [QEL], which impacts the tribe adversely, but moreover, financially."

36.    On or about October 23, 2003, the Acting Regional Director of the Southwest Region of the BIA ("Regional Director"), determined that the Management Agreement was subject to approval under Old Section 81, that it had not been approved, that the contract "has never been legally valid and any monies received by QEL pursuant to these agreements were unauthorized."

37.    The Regional Director further concluded that it was not in the best interest of the Pueblo to approve the Management Agreement retroactively.

38.    The Regional Director ordered QEL (i) to vacate the premises on which the Distribution Business is operated and to return all petty cash, keys and other items to Governor of Santo Domingo, (ii) arrange for the transfer of "the books and records of the business to the Pueblo" and (iii) return all proceeds of the Distribution Business "generated under" the Management Agreement.

39.    The Regional Director, applying Old Section 81, concluded, in relevant part, that the Management Agreement required Secretarial approval. This conclusion was erroneously based on the premises that: (1) Old Section 81, as opposed to New Section 81, should have been used in evaluating whether the Management Agreement was subject to the statute; (2) the Management Agreement was "'with an Indian tribe' for the purposes of Section 81;" and (3) the

Management Agreement was "relative to Indian lands" under the analysis set forth in <u>Altheimer</u> <u>& Gray v. Sioux Mfg. Corp.</u>, 983 F.2d 803, 810 (7th Cir. 1993).

40.     Because the allegedly requisite approval had never been sought, the Regional Director concluded that the Management Agreement had never been legally valid and ordered various forms of relief, including disgorgement of the management fees that QEL had earned under the Management Agreement.

41.     QEL timely filed and litigated an administrative appeal of the Regional Director's Decision. On or about March 27, 2007, the IBIA entered an order wherein it:

> (a) Determined that QEL had standing to challenge the Regional Director's decision that (i) the Management Agreement should be evaluated under Old Section 81, as opposed to New Section 81, (ii) Old Section 81 required that the Management Agreement be approved, and (iii) the Management Agreement was invalid and the proceeds from it unauthorized;

> (b) Determined that QEL did not have standing to appeal the Regional Director's decision not to retroactively approve the Management Agreement;

> (c) Determined that the Management Agreement should be evaluated under Old Section 81, as opposed to New Section 81;

> (d) Allowed the Regional Director's Decision to become final by (i) affirming the Regional Director's decision that the Management Agreement was with an Indian tribe for the purposes of Section 81 and (ii) refusing to make a decision on the issue of whether the Management Agreement was related to tribal land;

> (e) Determined that the Regional Director had the authority to declare that the Management Agreement was invalid and to declare that the proceeds from the Management Agreement were unauthorized;

> (f) Declined to rule on the issue of whether the BIA had the authority to order a remedy against QEL, declaring the issue to be moot;

> (g) Determined that QEL had not been denied due process; and

> (h) Declined to rule on the issue of whether disgorgement of all monies under the Management Agreement was a proper remedy, determining that the issue is not yet ripe.

42.    Pursuant to 25 C.F.R. § 6 the IBIA Decision constitutes final agency action for purposes of judicial review.

## COUNT I
## JUDICIAL REVIEW OF AGENCY ACTION

43.    QEL incorporates by reference the allegations set forth in paragraphs 1 through 42 as if fully set forth herein.

44.    The Regional Director's refusal to, and determination not to, retroactively approve the Management Agreement was arbitrary, capricious and contrary to law.

45.    The IBIA's determination that QEL did not have standing to appeal the Regional Director's Decision not to retroactively approve the Management Agreement was arbitrary, capricious and/or contrary to law.

46.    The IBIA's determination that QEL did not have standing to appeal the Regional Director's Decision not to retroactively approve the Management Agreement denied QEL due process of law.

47.    The Regional Director's and the IBIA's determinations that the Management Agreement should be evaluated under Old Section 81, as opposed to New Section 81, was arbitrary, capricious and/or contrary to law.

48.    The Regional Director's and the IBIA's determinations that the Management Agreement should be evaluated under Old Section 81, as opposed to New Section 81, denied QEL due process of law.

49.    The Regional Director's determination that the Management Agreement was subject to Section 81, and required Secretarial approval, was incorrect as a matter of law, and was arbitrary and capricious.

50.    The Regional Director's and the IBIA's determinations that the Management Agreement was with a tribe for the purposes of Section 81 were arbitrary, capricious and/or contrary to law.

51.    The Regional Director's determination that the Management Agreement was related to tribal land was arbitrary, capricious and/or contrary to law.

52.    The Regional Director denied QEL due process of law in rendering his Decision, determinations and orders, including without limitation his determination that the Management Agreement was related to tribal land.

53.    The IBIA's refusal to address the issue of whether the Management Agreement was related to tribal land was arbitrary, capricious and/or contrary to law.

54.    The IBIA allowing the Regional Director's Decision to become final without addressing the issue of whether the Management Agreement was related to tribal land denied QEL due process of law.

55.    The IBIA's refusal to address the issue of whether the Management Agreement was related to tribal land was a tacit approval of the Regional Director's decision regarding same and was arbitrary, capricious and/or contrary to law.

56.    The IBIA allowing the Regional Director's Decision to become final without addressing the issue of whether the Management Agreement was related to tribal land was a tacit approval of the Regional Director's decision regarding same and denied QEL due process of law.

57.    Neither the Regional Director nor the IBIA had the authority under either New Section 81 or Old Section 81 to declare that the Management Agreement invalid.

58.     Neither the Regional Director nor the IBIA had the authority under either New Section 81 or Old Section 81 to declare that monies received by QEL under the Management Agreement or otherwise were unauthorized.

59.     The Regional Director's declaration that the Management Agreement was invalid and that the proceeds from the Management Agreement were unauthorized was arbitrary, capricious and/or contrary to law.

60.     The Regional Director's declaration that the Management Agreement was invalid and that the proceeds from the Management Agreement were unauthorized denied QEL due process of law.

61.     The IBIA's determination that the Regional Director had the authority to declare that the Management Agreement was invalid and to declare that the proceeds from the Management Agreement were unauthorized was arbitrary, capricious and/or contrary to law.

62.     The IBIA's determination that the Regional Director had the authority to declare that the Management Agreement was invalid and to declare that the proceeds from the Management Agreement were unauthorized denied QEL due process of law.

63.     Neither the Regional Director nor the IBIA had the authority under either New Section 81or Old Section 81 to order that QEL (i) vacate the premises, (ii) return petty cash and other items, (iii) arrange for the transfer of books and records to Kewa, (iv) return all proceeds generated under the Management Agreement, (v) place certain bank accounts in the name of Kewa and the Pueblo, (vi) refrain from withdrawing money from such bank accounts, (vii) repay to the Pueblo management fees, or (viii) grant any other relief.

64.     The Regional Director's ordering of a remedy against QEL and in favor of Kewa and/or the Pueblo was not authorized and was arbitrary, capricious and/or contrary to law.

65.     The Regional Director's ordering of a remedy against QEL and in favor of Kewa and/or the Pueblo was not authorized and denied QEL due process of law.

66.     The IBIA's determination not to rule on the issue of whether the BIA had the authority to order a remedy against QEL, declaring the issue to be moot, was arbitrary, capricious and contrary to law.

67.     The IBIA's determination not to rule on the issue of whether the BIA had the authority to order a remedy against QEL, declaring the issue to be moot, denied QEL due process of law.

68.     The Regional Director denied QEL due process of law and the IBIA perpetuated that denial.

69.     The IBIA's determination not to rule on the issue of whether disgorgement of all monies under the Management Agreement was a proper remedy, determining that the issue is not yet ripe, was arbitrary, capricious and contrary to law.

70.     The IBIA's determination not to rule on the issue of whether disgorgement of all monies under the Management Agreement was a proper remedy, determining that the issue is not yet ripe, denied QEL due process of law.

71.     Relief ordered and declarations made by the Regional Director and the affirmances of same by the IBIA were abuses of the Secretary's office.

72.     The Regional Director denied QEL due process of law by, among other things, failing to provide findings of fact in the decision, predicating the decision on unsubstantiated assumptions of fact, prematurely making his decision before taking evidence and developing a record or facts essential to the determinations made in the decision, and failing to give QEL

notice and a meaningful opportunity to be heard or to present evidence before entering the decision.

73.    The IBIA denied QEL due process of law by, after considering preliminary issues in the appeal of the Regional Director's Decision for over three years, declining to address one of the central questions in the case (i.e., whether the Management Agreement was "related to" tribal land) and allowing the Regional Director's Decision to become final, again without providing QEL with a meaningful opportunity to be heard.

74.    The Regional Director's Decision is tainted by bias, and therefore denied QEL due process of law, because, among other things, the Regional Director is obligated to carry out his agency's fiduciary duty to Santo Domingo, and his decision was made based on the Regional Director and/or other BIA representatives having had contact only with representatives of Santo Domingo, to the exclusion of representatives of QEL.

75.    The Management Agreement does not "encumber" tribal land, as that term is used in New Section 81; nor does it otherwise meet the conditions set forth in New Section 81 such that the Management Agreement is subject to approval under New Section 81.

WHEREFORE QEL respectfully requests this Court grant judgment in favor of QEL and grant the following relief:

a.    Reverse the IBIA's and the Regional Director's determination that Old Section 81, as opposed to New Section 81, was the appropriate statute under which to evaluate the Management Agreement, and determine that the Management Agreement is not subject to approval under New Section 81.

b.    If, contrary to QEL's above plea, the Court determines that Old Section 81, as opposed to New Section 81, is the appropriate statute under which to evaluate the

Management Agreement, then reverse the Department's final action by determining that the Management Agreement is not subject to approval under Old Section 81.

c. If, contrary to QEL's above plea, the Court determines that the Management Agreement is subject to approval under either Old Section 81 or New Section 81, as applicable, then (i) reverse the IBIA's holding that QEL does not have standing to appeal the Regional Director's Decision not to retroactively approve the Management Agreement, (ii) order the BIA to conduct an evidentiary hearing to take evidence on and decide the matter, and (iii) order the BIA to enter findings of fact and conclusions of law that underlay its decision.

d. Hold that neither the Regional Director nor the IBIA had the authority to declare the Management Agreement invalid or to declare the proceeds from the Management Agreement unauthorized.

e. Hold that the Regional Director denied QEL due process of law and acted arbitrarily, capriciously and contrary to law by (i) determining that the Management Agreement was subject to the terms of Old Section 81, (ii) declaring that the Management Agreement was invalid, (iii) declaring that the proceeds from the Management Agreement were unauthorized, (vi) ordering remedies against QEL and in favor of Kewa and/or the Pueblo, and (v) making other declarations determinations, and orders; all (a) without providing findings of fact to support his Decision, (b) predicating the Decision on unsubstantiated assumptions of fact, (c) failing to take evidence and develop a record or facts

essential to the Decision, and (d) failing to give QEL notice and a meaningful opportunity to be heard.

f.   Hold (i) that the IBIA's decision that the issue of whether the BIA had the authority to order a remedy against QEL is moot denied QEL due process of law and/or is arbitrary, capricious and/or contrary to law and (ii) that the BIA did not have the authority to order a remedy against QEL or otherwise order QEL to take or to refrain from taking any action.

g.   Hold (i) that the IBIA's decision that the issue of whether disgorgement is an available remedy after adoption of New Section 81 is not ripe  denied QEL due process of law and/or is arbitrary, capricious and/or contrary to law and (ii) that disgorgement is not, and has not been since the adoption of New Section 81, an available remedy for a violation of the statute or its attendant regulations.

h.   Hold that the IBIA denied QEL due process of law and acted arbitrarily, capriciously and contrary to law by (A) refusing to (i) rule on the issue of whether the Management Agreement was subject to the terms of Old Section 81, thereby allowing the Regional Director's Decision to become final agency action, (ii) rule on the issue of whether the BIA had the authority to order a remedy against QEL, (iii) rule on the issue of whether disgorgement is an available remedy after adoption of New Section 81, all resulting in QEL never having been heard on those substantive issues; (B) determining that the Regional Director had the authority to declare that the Management Agreement was invalid and that the proceeds from the Management Agreement were unauthorized; and (C) failing to correct the Regional Director's due process deprivations.

    i.   Hold that the IBIA and the Regional Director lacked the authority to declare that the Management Agreement, and the rights and obligations thereunder, were invalid and that the monies received and actions taken under the Management Agreement were unauthorized.

QEL respectfully requests an award of its costs and attorneys' fees pursuant to 28 U.S.C. § 1920 and 28 U.S.C. § 2412, and such other and further relief as the Court deems just and proper.

Respectfully submitted,

BRACEWELL & GIULIANI, LLP

By: _____

Nancy J. Appleby, Bar No. 470995
Shelby J. Kelley, Bar No. 464248
2000 K Street, N.W., Suite 500
Washington, DC 20006-1872
Telephone: (202) 828-5800
FAX: (202) 223-1225
nancy.appleby@bgllp.com
shelby.kelley@bgllp.com

Counsel for Quantum Entertainment Limited



QEL                    0000007045                 10/24/00  01:07pm  P: 003

Oct-23-2003  01:07pm  From-Bureau of Indian Affairs    +5055451017    T-020  P.001/006  F-010

## United States Department of the Interior
### BUREAU OF INDIAN AFFAIRS
### SOUTHWEST REGION
### P.O. BOX 26567
### Albuquerque, New Mexico 87125-6567

IN REPLY REFER TO:
.100 – Office of the Regional
Director

OCT 2 3 2013

Everett Chavez, Governor
Pueblo of Santo Domingo
P.O. Box 99
Santo Domingo Pueblo, New Mexico 87052

Mr. Ken Newton
Quantum Entertainment Limited, LLC
524 Camino Del Monte Sol
Santa Fe, New Mexico 87505

Re:   Gasoline Distribution Business Management Agreement between Santo Domingo
      Pueblo, Kewa Gas Limited and Quantum Entertainment Limited dated
      August 1, 1996

Dear Governor Chavez and Mr. Newton:

The purpose of this letter is to advise you that at the request of Governor Chavez, officials of the
Department of the Interior (including myself and an attorney from the Regional Solicitor's
Office) have reviewed the wholesale gasoline management agreement between Quantum
Entertainment Limited (QEL), Santo Domingo Pueblo, and Kewa Gas Limited (Kewa Gas) to
determine whether Secretarial approval is required pursuant to 25 U. S. C. § 81.

The Santo Domingo/QEL agreement predates the 2000 amendment of 25 U.S.C. § 81. The prior
version of Section 81 provided, in pertinent part:

   No agreement shall be made by any person with any tribe of Indians...for the
   payment or delivery of any money or other thing of value...in consideration of
   services for said Indians relative to their lands unless the contract or agreement be
   [approved by the Secretary of the Interior and the Commissioner of Indian
   Affairs].

The first question which must be resolved in determining whether Section 81 applies to a
particular agreement is whether it involves either Indian trust land or Indian lands held subject to



EXHIBIT
A

QEL    503307545    10/24/03  01:07pm  P. 004

Oct-23-2003  04:07pm  From-Bureau of Indian Affairs    +5053447517    T-516  P.001/005  F-013

2

a Federal restriction against alienation. The Title Status Report dated September 29, 2003, indicates that title is held by the Pueblo of Santo Domingo in a restricted fee status. Because the land is subject to federal restriction, it qualifies as lands within Section 81.

The next question is whether the management agreement is "with an Indian tribe." The parties to the management agreement for the wholesale fuel business include the Pueblo of Santo Domingo, Kewa Gas which is a tribal corporation chartered under tribal and state law, and Quantum Entertainment Limited (QEL) the proposed manager. Kewa Gas, as Distributor, "engages QEL to manage, supervise, and operate Distributor's Gas Distribution Business during the term of this Agreement." The Distributor also authorizes construction for purposes of building or expansion of the gas distribution business, receives monthly reports from the manager concerning the business, consults with the manager concerning operation of the business, and pays the management fee. The Santo Domingo Pueblo's role in the agreement is that it owns the Distributor/tribal corporation, it agrees to waive sovereign immunity for arbitration and enforcement of disputes, it covenants not to compete against QEL in connection with other gas distribution businesses within the State of New Mexico (other than the retail business) and it owns the business trademarks and logos.

Although many of the provisions of the agreement run between Kewa Gas and QEL, there are still particular provisions of this agreement that run between the Pueblo of Santo Domingo and QEL. Therefore, we conclude that the management agreement qualifies as a "contract with an Indian tribe" for purposes of Section 81.

Furthermore, Kewa Gas is a tribal corporation. Whether or not a contract with an Indian tribal corporation (as opposed to the Tribe itself) should be considered as a contract with an Indian tribe for purposes of the prior version of Section 81 was addressed in Pueblo of Santa Ana v. Hodel, 663 F. Supp 1300 (D.D.C. 1987) which held that a contract with a tribal corporation was a contract with an Indian tribe which required approval under Section 81. Since the QEL management agreement predates the 2000 amendment of Section 81, the Pueblo of Santa Ana v. Hodel case would still be relevant to this decision.

The next issue which must be resolved is whether this contract qualifies as a "contract for services on Indian lands." As we have previously advised you in opinions prior to the 2000 amendment to Section 81, the leading case on determining whether contracts fall within the scope of the prior version of Section 81 was Altheimer & Gray v. Sioux Manufacturing Corp., 983 F.2d 803 (7th Cir. 1993). A helpful discussion of Altheimer & Gray is contained in an unpublished district court decision, United States ex rel Guthrannion v. D & J Enterprises, 1993 WL 757639 (W.D. Wis. 1993), which states:

Plaintiffs...take the position that any contract involving physical contact with tribal land is 'relative to Indian lands.' This is too literal an interpretation. As the Court of Appeals for the Seventh Circuit has explained, 'Indian law cannot be interpreted in isolation but must be read in light of the common assumptions of the day and the assumptions of those who drafted it.' When Congress drafted what

QEL      50457845      10/24/08   01:57pm   P. 005

Oct-17-2008 04:57pm    From-Bureau of Indian Affairs      +2025457517      T-036   P.003/006   F-011

3

is now 25 U.S.C. § 81, it was concerned with the vulnerability of Indian tribes to unscrupulous lawyers and claims agents who were 'plundering' the tribes 'under the plea of services rendered.' Cong. Globe 1485 (1871). The legislation was not intended to require the government merely to oversee every transaction involving services that might cause a non-Indian merely to touch tribal lands when there was no accompanying danger of the tribe's losing legal or de facto control over the land...Under the interpretation urged by plaintiffs, even an arrangement whereby a non-Indian agreed to mow a lawn located on an Indian reservation would require the approval of the Secretary of the Interior. Courts addressing the applicability of Section 81 to agreements for the construction of facilities on Indian property have not suggested that applicability of the statute rest solely on the physical connection to tribal land. Instead, the courts have analyzed the contracts in their entirety...

In the recent case of <u>Altheimer & Gray</u>...the Court of Appeals for the Seventh Circuit enumerated the factors 'important in determining whether a management contract is relative to Indian lands' and applied the factors to decide whether an Indian tribe had cede(d) any right, interest or control of Indian lands...Under the four-factor test delineated by the court in <u>Altheimer</u>, affirmative answers to the following questions indicate that an agreement is relative to Indian lands:

     1) Does the contract relate to the management of a facility to be located on Indian lands?

     2) If so, does the non-Indian party have the exclusive right to operate that facility?

     3) Are the Indians forbidden from encumbering the property?

     4) Does the operation of the facility depend on the legal status of an Indian tribe being a separate sovereign?

In summary, these four factors are various ways of ascertaining whether the tribe has proposed to give up legal or de facto control over its lands by entering into the agreement under review.

The first factor of the Altheimer test is satisfied because this is a management agreement for a business to be located on tribal land.

The second factor to be evaluated is whether the contract gives the manager the "exclusive right to operate the facility." Under the terms of this agreement QEL is required to:

     1)      provide day-to-day supervision and direction of the general operation of the business, including purchase, marketing, sale and delivery of branded and unbranded gasoline and special fuels;

QEL                                                            10/24/00    01:57pm  P. 000

Oct-23-2002  01:59pm   From-Bureau of Indian Affairs          01202407817          T-026  P 004/006  F-012

4

2)    hire, select and train personnel to run the daily operations of the business, including an on site manager, all of whom shall be employees of the Distributor, not QEL;

3)    negotiate prices and coordinate deliveries of gasoline and special fuels to customers;

4)    develop policies for the purpose of maximizing net income from the operations;

5)    maintain suitable records and books of account;

6)    bill and collect revenues from sales of gasoline and other products;

7)    pay operating expenses from the Pueblo's funds, including salaries, management fees, costs and expenses for legal, accounting, advertising and other technical and professional services, and other normal expenses of maintaining the business office,

8)    market, promote, and advertise the business,

9)    supervise and use Distributor funds to pay for construction to build or expand the business (with Distributor approval if the amount in question exceeds $10,000), and

10)   prepare annual operating and capital expenditure budgets for approval by the Pueblo,

We have considered the scope of powers granted to QEL under this agreement, and we conclude that these terms give nearly exclusive proprietary control over tribal land to QEL because it is empowered by this agreement to operate the gas distribution business located on the tribal land, including the hiring and supervision of tribal employees, setting of policy, collection of monies earned by the business, payment of operating costs generated by the business, and expenditure of monies earned by the business in payment of capital expenditures up to $10,000. The only powers reserved to the Distributor are to consult with QEL with respect to its conduct of the business, to receive monthly and annual reports submitted by QEL, and to approve construction or capital expenditures exceeding $10,000.

With regard to the third Altheimer factor, there are no provisions limiting the Pueblo or Distributor's rights to encumber the property.

With regard to the fourth Altheimer factor (whether the operation of the facility depends on the legal status of an Indian tribe being a separate sovereign) we note that the reason this Santa

5

Domingo is able to competitively compete in the wholesale gasoline business is that the State of New Mexico has authorized it to receive a tax exemption under state law in order to help provide funding to the Pueblo for tribal governmental needs. We conclude that the fourth Alhelmar factor also applies to this agreement.

Because the QEL agreement meets three of the four criteria discussed above, as the official within the Bureau of Indian Affairs vested with delegated authority from the Secretary to determine whether or not a contract requires approval under Section 81, I hereby advise you that it is my official determination that such approval was required. Therefore the management agreement has never been legally valid and any monies received by QEL pursuant to these agreements were unauthorized. This result is consistent with judicial decisions involving other types of management agreements for tribal business enterprises, including United States ex rel Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enterprise Management Consultants, Inc., 883 F.2d 886 (10th Cir. 1989) and Pueblo of Santa Ana v. Hadel, noted above.

It is my understanding that the Pueblo of Santo Domingo does not wish that I approve the agreement retroactively. Among the concerns raised to me with regard to the fairness of the agreement is that it that QEL is to receive 46% of the net income from which QEL is to pay the salary of its own employees. It is also entitled to be paid ".03 per gallon" of fuel sold to the retail store operated at Santo Domingo Pueblo, and is further entitled to a monthly performance bonus of ".005 per gallon" for every gallon over 1 million gallons per month sold. Based on these factors, I conclude that it is not in the best interest of the Pueblo of Santo Domingo to approve the management agreement retroactively.

You are hereby advised that the Bureau of Indian Affairs demands that QEL take the following actions:

1.    QEL shall vacate the premises of the Pueblo of Santo Domingo wholesale fuel terminal immediately, and any petty cash, keys to the premises, and other items which would give QEL employees access to or control over the premises or facilities should be returned to the Pueblo of Santo Domingo Governor's Office.

2.    QEL should immediately contact the Governor's office to arrange for transfer of the books and records of the business to the Pueblo.

3.    QEL must return all proceeds of the gas distribution business generated under this agreement. To accomplish this, any bank accounts established pursuant to the invalid agreement should be placed solely in the names of Kewa Gas Limited and the Pueblo of Santo Domingo, and no monies should be withdrawn from these accounts except by the appropriate tribal officials. Furthermore, QEL should repay the Pueblo of Santo Domingo any management fees paid during the existence of the management agreement.

Decisions of the Regional Offices may be appealed to the Interior Board of Indian Appeals (IBIA). Accordingly, this decision may be appealed to the IBIA in accordance with the

GSL                          5005007545                    10/24/03  02:01pm  P. 002

Oct-24-2003  04:00pm  From-Bureau of Indian Affairs          +5054407717    T-510  P 002/002  F-902

6

regulations in 43 C.F.R. Part 4, at the following address:

> Interior Board of Indian Appeals
> Office of Hearings and Appeals
> U. S. Department of the Interior
> 801 N. Quincy St., MS-300-QC
> Arlington, Virginia 22203

Your notice of appeal to the IBIA must be signed by you or your attorney and must be mailed within 30 days of the date you receive this decision. (§ 4.332). The notice should clearly identify the decision being appealed. If possible, attach a copy of the decision. You must send copies of your notice of appeal to: (1) the Assistant Secretary - Indian Affairs, 4140 MIB, U. S. Department of the Interior, 18th and C Streets, N.W., Washington, D.C. 20240, (2) each interested party known to you, and (3) this office. Your notice of appeal sent to the IBIA must certify that you have sent copies to these parties (§ 4.333). If you file a notice of appeal, OCA will notify you of further appeal procedures through the notice of docketing (§ 4.311). If no appeal is timely filed, this decision will become final for the Department of the Interior at the expiration of the appeal period. No extension of time may be granted for filing a notice of appeal.

Sincerely,

Ronald G. Toya

Acting   Regional Director

cc:   Kewa Gas Limited
      Regional Solicitor, Southwest Region



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF INDIAN APPEALS
801 NORTH QUINCY STREET
SUITE 300
ARLINGTON, VA 22203

| | | |
|---|---|---|
| QUANTUM ENTERTAINMENT LIMITED,<br>Appellant, | : <br> : <br> : <br> : | Order Affirming in Part, Abstaining in Part, and Dismissing in Part |
| v. | : <br> : | Docket No. IBIA 04-21-A |
| ACTING SOUTHWEST REGIONAL DIRECTOR, BUREAU OF INDIAN AFFAIRS,<br>Appellee. | : <br> : <br> : <br> : | March 27, 2007 |

Quantum Entertainment Limited (Appellant) seeks review of an October 23, 2003 decision (Decision) of the Acting Southwest Regional Director, Bureau of Indian Affairs (Regional Director; BIA). The Regional Director concluded that an August 1, 1996 gasoline distribution business management agreement (Agreement) signed by Appellant, the Santo Domingo Pueblo (Pueblo), and Kewa Gas, Limited (Kewa) was subject to BIA approval under the version of 25 U.S.C. § 81 that was in effect in 1996 ("Old Section 81"), and concluded that the Agreement was invalid because it had not received such approval. The Regional Director declined to approve the Agreement retroactively and demanded that Appellant vacate the Pueblo's property on which the gasoline distribution business was located and disgorge proceeds that Appellant had received under the Agreement.

As a threshold matter, we conclude that Appellant has standing to challenge the Regional Director's determination that Old Section 81 applies to the Agreement and that it is subject to Secretarial approval. On the merits of that issue (1) we affirm the Regional Director's choice of law to review the Agreement under Old Section 81 rather than under the statute as amended in 2000 ("New Section 81"), and (2) with respect to the Regional Director's conclusion that the Agreement is subject to BIA approval under Old Section 81, we affirm in part but also abstain in part based on collateral judicial proceedings involving the Department of the Interior (Department).

Assuming for purposes of this appeal that Old Section 81 requires that the Agreement be approved by BIA in order to be valid, we conclude that Appellant lacks prudential standing to challenge the Regional Director's decision declining to approve the Agreement retroactively. In reaching our conclusion, we overrule Hattum v. Great Plains

44 IBIA 178


EXHIBIT
B

Regional Director, 36 IBIA 79 (2001) because the summary disposition by the Board of
Indian Appeals (Board) of the standing issue in that case does not withstand the weight of
contrary judicial precedent.

With respect to the portions of the Regional Director's decision declaring the
Agreement invalid and the proceeds unauthorized, and demanding remedial action, we
affirm in part and dismiss in part. Appellant has standing to challenge the Regional
Director's authority to include declarations in his decision regarding the invalidity of the
Agreement and the unauthorized status of proceeds received under it. We conclude on the
merits that the Regional Director did have authority to state in a decision what the statute
by its own terms clearly provides.

To the extent that the Regional Director's decision may be read as purporting to
issue a legally-binding judgment or order against Appellant to vacate the premises and to
repay proceeds, we conclude that the Regional Director's disclaimer on appeal of any such
intent, and Appellant's acceptance of that disclaimer, has rendered this portion of
Appellant's appeal moot. In addition, with respect to the Regional Director's demand for
full repayment of proceeds without allowing any setoff for the value of Appellant's services,
the Regional Director on appeal impliedly disclaimed any intent to have made a quantum
meruit determination under Old Section 81. While that disclaimer may not render the
quantum meruit issue moot, we conclude that this issue is not ripe for our review.

Finally, we reject Appellant's claims that the Regional Director denied it due process
by issuing his decision without providing Appellant with advance notice and an opportunity
to submit its views. The Regional Director's decision was neither final nor effective,
pending resolution of this appeal, and Appellant has been afforded a full opportunity to
present its views and have them considered prior to a final Departmental determination.

<u>Background</u>

A. Introduction

This case involves a long-term Agreement signed in 1996 by Appellant, the Pueblo,
and Kewa (a tribally-created entity) under which Appellant was to manage and operate a
gasoline distribution business owned by Kewa on lands leased by Kewa from the Pueblo.
The Agreement was intended, at least in part, to allow the parties to benefit from a tax

44 IBIA 179

exemption available to Indian tribes. 1/ The parties apparently performed under the Agreement for seven years, until the Regional Director issued his decision declaring that the Agreement was subject to Old Section 81 and was invalid for lack of BIA approval.

In order to give context to the facts of this case, we first describe and provide background on the statute at issue in this appeal — 25 U.S.C. § 81. We then describe the facts giving rise to this appeal.

B.  25 U.S.C. § 81

In 1871, Congress first enacted what later was codified as 25 U.S.C. § 81. 2/ From 1872 to 2000, with a minor exception not relevant here, the statute remained unchanged and provided in relevant part as follows:

> No agreement shall be made by any person with any tribe of Indians
> * * * for the payment or delivery of any money or other thing of value * * *
> in consideration of services for said Indians relative to their lands * * * unless
> such contract or agreement be executed and approved [by the Secretary of the
> Interior (Secretary)].  * * * All contracts or agreements made in violation of
> this section shall be null and void, and all money or other thing of value paid
> to any person by any Indian or tribe, or any one else, for or on his or their

---

1/  In 1996, New Mexico's Taxation and Revenue Department, after reviewing both New Mexico state tax law and principles of Federal law, ruled that an Indian entity gasoline distributor (e.g., Kewa), operating on Indian reservation land (e.g., the Pueblo's land), would be exempt from the State's gasoline receipt tax.  See Revenue Ruling 640-96-1; see generally Oklahoma Tax Comm'n v. Chickasaw Nation, 515 U.S. 450 (1995) (State of Oklahoma could not apply its motor fuels tax to fuel sold by the Chickasaw Nation's retail stores on tribal land when the legal incidence of the tax fell on the tribal retailer).

Although Chickasaw struck down Oklahoma's tax as applied to the tribe, the Court and the parties recognized that the State could achieve the same revenue objective by amending its law so that the legal incidence fell on the consumer and the tribe had to collect and remit the tax.  515 U.S. at 460.  Thus, the New Mexico Taxation and Revenue Department's recognition of a federal tax exemption available to an Indian entity gasoline distributor was based on the structure of the State's gasoline receipt tax in 1996.

2/  Initially, the provision was attached to an appropriations bill.  Act of March 3, 1871, ch. 120, § 3, 16 Stat. 570.  In 1872 it was enacted as permanent legislation.  Act of May 21, 1872, ch. 177, §§ 1, 2, 17 Stat. 136.

44 IBIA 180

behalf, on account of such services, in excess of the amount approved by the
* * * Secretary for such services, may be recovered by suit in the name of the
United States * * *.

25 U.S.C. § 81 (1994); cf. R.S. § 2103 (1878). 3/

Congress enacted Old Section 81 to "protect the Indians from improvident and
unconscionable contracts." Altheimer & Gray v. Sioux Mfg. Corp., 983 F.2d 803, 805
(7th Cir. 1993) (quoting In re Sanborn, 148 U.S. 222, 227 (1893)). The statute has been
characterized as "unabashedly paternalistic," TTEA v. Ysleta Del Sur Pueblo, 181 F.3d 676,
682 (5th Cir. 1999), and as reflecting "Congressional concerns that Indians, either
individually or collectively, were incapable of protecting themselves from fraud in the
conduct of their economic affairs," S. Rep. No. 106-150, at 2 (1999).

In 2000, Congress repealed and replaced Old Section 81 with New Section 81, the
Indian Tribal Economic Development and Contract Encouragement Act of 2000, Pub. L.
No. 106-179, 114 Stat. 46 (Mar. 14, 2000), codified at 25 U.S.C. § 81 (2001). New
Section 81 provides that "[n]o agreement or contract with an Indian tribe that encumbers
Indian lands for a period of 7 or more years shall be valid unless that agreement or contract
[is approved by the Secretary or his designee]." Id. § 81(b). New Section 81 required the
Secretary to issue regulations identifying the types of agreements or contracts that are not
covered by the statute.

As described in the legislative history, New Section 81 "eliminate[d] the overly-
broad scope of [Old Section 81]" so that the statute would "no longer apply to a broad
range of commercial transactions." S. Rep. No. 106-150, at 9. Instead, New Section 81 is
intended to "only apply to those transactions where the contract between the tribe and a
third party could allow that party to exercise exclusive or nearly exclusive proprietary

---

3/ In addition to the quoted provisions, Old Section 81 provided that in suits for recovery
brought in the name of the United States, "one-half thereof shall be paid to the person
suing for the same, and the other half shall be paid into the Treasury for the use of the
Indian or tribe by or for whom it was so paid." Suits brought under this provision are
termed "qui tam" actions, shorthand for the Latin phrase describing actions brought by a
private party in the name of the king. See "qui tam action," Black's Law Dictionary 1282
(8th ed. 2004).

control over the Indian lands." Id. 4/ New Section 81 also eliminated the qui tam provision and omitted statutory remedies for contracts or agreements that are rendered invalid for lack of Secretarial approval. 5/ New Section 81 was intended reduce the degree of Federal paternalism in favor of tribal self-determination and autonomy, and in favor of reservation economic development. Id. at 2, 9. See also Notice of Proposed Rulemaking, 65 Fed. Reg. 43,952-53 (July 14, 2000) (discussing Senate Report language concerning reduced scope of New Section 81).

## C. The Gasoline Distribution Business and the Agreement

On August 14, 1996, the Pueblo Tribal Council (Tribal Council) enacted two resolutions for establishing and managing a gasoline distribution business on Pueblo lands — one to create Kewa and another to approve the Agreement.

The first resolution adopted a corporate charter establishing Kewa as a for-profit business of the Pueblo, "to carry on certain economic development activities on behalf of the Pueblo, including * * * operation of a gasoline distribution business." See Res. No. S.D. 08-96-18 (Aug. 14, 1996). Kewa's charter describes it as a "for-profit enterprise," a primary purpose of which is "to act on the Pueblo's behalf as a distinct legal entity with respect to development, construction, operation, and management of one or more businesses relating to the sale and distribution of motor vehicle fuels, * * * and other related businesses directed at serving the motoring public." Charter arts. I, III. Another "principal purpose[]" is "[t]o provide for the separation of the Pueblo's business enterprise management systems from the governmental and political processes of the Pueblo, while maintaining the Enterprise as an integral division of the Pueblo." Id. art. III. The Charter provides that "[a]lthough [Kewa] shall act as an entity which is separate and distinct from the governing body of the Pueblo, [Kewa] is a division and instrumentality of the Pueblo and shall possess all immunities from suit and other proceedings possessed by the Pueblo." Id. art. IV, § 11.

---

4/ New Section 81 does not define "encumber," but through regulation the Department has defined it to mean "to attach a claim, lien, charge, right of entry or liability to real property * * *. Encumbrances * * * may include leasehold mortgages, easements, and other contracts or agreements that by their terms could give to a third party exclusive or nearly exclusive proprietary control over tribal land." 25 C.F.R. § 84.002.

5/ New Section 81 includes several additional reform measures that are not relevant here.

The Charter grants Kewa broad powers to engage in business activities related to the sale and distribution of motor fuel, including entering into contracts in its own name. See id. art. IV, §§ 1, 9. Unless expressly authorized by the Tribal Council, however, Kewa is precluded from entering into any agreements on behalf of the Pueblo and prohibited from encumbering real or personal property of the Pueblo. Id. art. V, §§ 1, 3. Control and operation of Kewa is vested in a Board of Directors. Id. art. VII, § 1. At all times relevant to this appeal, the Pueblo was the sole shareholder of Kewa, although the Pueblo is authorized to transfer up to 40 percent of its shares to another party. Id. art. VI, § 2. As long as the Pueblo remains the sole shareholder, however, members of the Board of Directors must be selected by the Tribal Council. Id. art. VII, § 2. A majority of the members of the Board must be Pueblo members, and the Pueblo's Governor, Lieutenant Governor, and Secretary serve as ex officio members of the Board. Id. art. VII, § 3.

The second Tribal Council resolution enacted on August 14, 1996, was a resolution approving the Agreement at issue in this appeal, under which Appellant was to manage Kewa's gasoline distribution business, in exchange for a percentage of net profits and other performance bonuses. In relevant part, the Tribal Council resolution approving the Agreement reads as follows:

> WHEREAS, the Pueblo has established a wholly-owned tribally-chartered corporation, Kewa Gas Limited, as a means of engaging in various businesses on behalf of the Pueblo, including wholesale distribution of gasoline; and
>
> WHEREAS, Kewa Gas Limited proposes to enter into a Management Agreement with [Appellant], by which [Appellant] would manage all aspects of the gasoline distribution business for a percentage of net profits, plus certain performance bonuses, as set forth in the Management Agreement; and
>
> WHEREAS, the Pueblo understands that the proposed gasoline distribution business involved (sic) certain unusual risk factors due to the uncertainty of state law, and that gasoline distributors are reluctant to do business with Indian entities seeking to take advantage of tax exemptions under current state law, as the result of which a higher than normal management fee is appropriate, in order to obtain the services of experienced managers with established connections in the gasoline distribution business willing to take the risks inherent in the business; and
>
> WHEREAS, [Appellant] has such connections and experience, and in other respects is fully qualified to provide the services called for by the proposed Management Agreement; and
>
> WHEREAS, the proposed Management Agreement has been carefully reviewed by the Pueblo's officers and general counsel, and by the Board of

Directors of Kewa Gas Limited, and they have agreed that its terms are consistent with the Pueblo's interests; and

WHEREAS, the establishment of this business, under the management of [Appellant] as proposed, appears likely to generate substantial benefits to the Pueblo in terms of revenues and some employment for Pueblo members; and

WHEREAS, the approval of the Management Agreement by the Tribal Council is necessary in order to assure that the Pueblo fully backs the venture on behalf of Kewa Gas Limited;

NOW, THEREFORE, BE IT RESOLVED * * * that the Management Agreement by and among [Appellant, Kewa and the Pueblo] * * * is hereby approved, and the Governor of the Pueblo is authorized and directed to execute such agreement on behalf of the Pueblo, and to do any and all other things necessary so as to obtain the approval of the Secretary of the Interior to such Agreement (if such approval is required) * * *; and

Upon the approval of the Management Agreement by [Appellant and Kewa, Kewa] is authorized to commence operation of the gasoline distribution business in accordance with the terms of the Management Agreement, pending its approval by the Secretary of the Interior, on the premises leased to Kewa * * *, by the Pueblo by the lease approved by the Tribal Council by resolution 08-96-17 * * *.

Resolution No. S.D. 08-96-19. 6/

Under the Agreement, Kewa, as the "Distributor," engaged Appellant to "manage, supervise, and operate" Kewa's gasoline distribution business. Agreement § 1.1. In exchange for Appellant's services, Kewa agreed to pay Appellant 49 percent of Kewa's net

---

6/ On August 19, 1996, the Pueblo and Kewa entered into a 33-page lease under which Kewa leased lands from the Pueblo for, among other things, developing and operating the gas distribution business. Lease BIA No. M20 717 50 008 0555. The lease required Kewa to construct and maintain such improvements as were necessary to operate its businesses. Lease art. VIII. As consideration for the lease, Kewa agreed to pay the Pueblo a $1,000 guaranteed minimum monthly rental and 40% of the Estimated Net Income to Kewa from all businesses operated on the leased premises, after payment of Kewa's expenses. Id. art. VI. BIA approved the lease on April 21, 2000, after it had been amended in 1999 to reduce the acreage covered by the lease from approximately 640 acres to approximately 21 acres. The land covered by the amended lease is bounded on the southeast by Interstate 25 and on the northeast by New Mexico Route 22.

income from the business, plus three cents per gallon for gasoline or diesel fuel sold to the Pueblo's retail gasoline station, plus a performance bonus of ½ cents per gallon for every gallon of gasoline or diesel fuel sold by Kewa in excess of one million gallons per month. Id. §§ 1.1, 2.1 - 2.3.

The Agreement itself, dated "as of August 1, 1996," is styled "by and between [Appellant], a New Mexico Limited Liability Company, on the one hand, and the [Pueblo], acting by and through its Tribal Council, and Kewa * * *, on the other hand." Id., Introductory Clause. 7/ The final provision in the Agreement provides that it "may not be modified or amended except in writing signed by both parties." Id. § 9.9. The signature lines list the parties as follows: "QUANTUM ENTERTAINMENT LIMITED, LLC," "SANTO DOMINGO PUEBLO," and "Kewa Gas Limited." Id. at p. 9-10 (capitalization in original). The Agreement has an initial term of 10 years, until July 31, 2006, with an option for Appellant to renew for two additional 10-year periods.

Most of the terms in the Agreement run solely between Appellant and Kewa, but a few also create rights or obligations for the Pueblo. Section 6 provides that any dispute between Appellant and Kewa, or between Appellant and the Pueblo, arising under the Agreement, shall be resolved by binding arbitration. The Pueblo and Kewa "expressly, unequivocally and irrevocably waive sovereign immunity" in connection with arbitration and any disputes arising under or related to the Agreement. Id. § 6. In section 8, the Pueblo and Kewa agree not to compete, directly or indirectly, with Appellant in any other gasoline distribution business within the State of New Mexico. Id. § 8.1. Appellant, in turn, agrees not to compete with Kewa's gasoline distribution business within the State, with a limited exception requiring Kewa's concurrence. Id. § 8.2. And in section 9, the parties agree that the Pueblo and/or Kewa have the sole right to and ownership of all original trademarks, insignia, logos, business names, and other marks or devices under which Kewa does business under the Agreement. Id. § 9.4.

After the Agreement, and the lease between the Pueblo and Kewa, were executed, Appellant apparently began operating Kewa's gas distribution business pursuant to the terms of the Agreement. There is no indication in the record that Appellant, Kewa, or the

---

7/ The only date on the Agreement is the "as of August 1, 1996" date referred to in the introductory paragraph; the signatures are not dated. The date of the Tribal Council resolutions suggests that the Agreement was executed, at least by the Pueblo, on or after August 14, 1996, and purportedly made effective as of August 1, 1996. Kewa, of course, did not exist until August 14, 1996, when it was chartered by the Tribal Council.

Pueblo presented the Agreement to BIA for review and approval at that time, or that any of them discussed with BIA whether Federal approval was required.

## D. The Regional Director's Decision

Seven years later, on March 28, 2003, then-Governor of the Pueblo Everett Chavez sent to the Superintendent of the Southern Pueblos Agency, BIA (Superintendent) various documents relating to the Agreement. The Governor's transmittal letter stated that it was his understanding that none of the documents had ever been sent to BIA for review. Mar. 28, 2003 Letter from Pueblo Governor to Superintendent. The Governor expressed his view that the Agreement was subject to BIA approval, but he did not expressly request BIA's approval. Nor did he state unequivocally that BIA should decline to approve the Agreement, or suggest that the Tribal Council had repudiated the Agreement or repealed the resolution approving it in 1996. Instead, the Governor stated that he believed the Agreement was "far too lucrative" for Appellant. Id. 8/ In a subsequent declaration filed in these proceedings, former Governor Chavez asserted that the Pueblo's "decision to oppose any retroactive BIA approval of the [Agreement] was [also] based in part on * * * health and safety concerns" associated with the gasoline distribution business's proximity to the

---

8/ It is not clear from the record what prompted the Governor's review of the matter and his conclusion that Appellant was receiving a disproportionate fee. However, according to the Pueblo, the tax exemption for Indian distributors was a matter of great controversy in the State between 1996 and 1999 because, among other things, a tax-exempt tribal distributor could legally resell gasoline to off-reservation retailers, and there would never be any sale that was subject to the state gasoline tax. Pueblo's Supplementary Brief at 21. The Pueblo contends that in 1999, with the support of tribes, petroleum marketers, and the State Taxation and Revenue Department, the State enacted a law that eliminated part of the tax "loophole," "but created a new deduction for gasoline sold at retail on tribal land subject to a tribal tax * * * and a new deduction for limited volumes of gasoline sold at wholesale by a tribal entity on tribal land." Id. at 23. The Pueblo describes the law as "a compromise response to the tribes' tax exemption based on Chickasaw." Id. Thus, if we are to accept the Pueblo's version of events, it appears that by 2003, the "unusual risk factors due to the uncertainty of state law," see Resolution No. 08-96-19, which factored into the Pueblo's decision to enter into the Agreement with Appellant in 1996, may no longer have existed.

44 IBIA 186

Santo Domingo Elementary School and retail businesses of the Pueblo. Declaration of Everett F. Chavez ¶ 6. 9/

The Superintendent forwarded the Governor's letter to the Regional Director. On October 23, 2003, without soliciting the views of Appellant, the Regional Director sent a letter to the Governor and to Appellant with the results of his review — the Decision at issue in this appeal.

The Regional Director first concluded that Old Section 81 was the appropriate version of the statute to apply because it was in effect in 1996 when the Agreement was executed and because application of the statute as amended could impermissibly give New Section 81 retroactive effect. The Regional Director then evaluated the Agreement under Old Section 81 and decided that the Agreement fell within the scope of contracts for which the statute required Secretarial approval. The Regional Director announced that

> as the official within the Bureau of Indian Affairs vested with delegated authority from the Secretary to determine whether or not a contract requires approval under Section 81, I hereby advise you that it is my official determination that such approval was required. Therefore the [Agreement] has never been legally valid and any monies received by [Appellant] pursuant to [the Agreement] were unauthorized.

Decision at 5.

Based on his understanding that the Pueblo did not want BIA to approve the Agreement, and identifying the concerns raised by the Pueblo about the fairness of the Agreement, the Regional Director declined to approve it retroactively. 10/ The Regional Director then demanded that Appellant vacate the premises of the gasoline distribution business, return all items of access and control (e.g., keys) to the Pueblo, arrange for transfer of the books and records of the business to the Pueblo, and return all proceeds by

---

9/ Former Governor Chavez's declaration states that in 2003 he asked Appellant to consider moving the facility to a safer location, but Appellant "refused." Declaration of Everett F. Chavez ¶ 5. Appellant denies this version of events. See Affidavit of Kenneth Newton ¶ 10. Neither the Chavez Declaration nor the Regional Director's decision identifies what authority, if any, Appellant had to choose the location of the facility.

10/ The decision does not address the Pueblo's asserted health and safety related concerns regarding the facility.

placing any bank accounts established pursuant to the Agreement solely in the name of the Kewa and the Pueblo and repaying any management fees paid during the existence of the Agreement. Id.

The Decision advised Appellant of its right to appeal to the Board, and Appellant filed this appeal. Appellant, the Regional Director, and the Pueblo submitted briefs. 11/

## Discussion

### A. Summary of Issues on Appeal

In its opening brief, Appellant raises six arguments challenging the Regional Director's decision: (1) the Regional Director should have applied New Section 81 rather than Old Section 81, and the Agreement does not require BIA approval under New Section 81; (2) even under Old Section 81, the Agreement does not require BIA approval because it is not an agreement with a "tribe of Indians" and it is not "relative to" Indian lands; (3) if the Agreement is subject to BIA approval, the Regional Director abused his discretion in declining to approve it; (4) the Regional Director exceeded his authority by including a "declaratory judgment and order of relief" in his decision, by declaring the Agreement invalid and the proceeds unauthorized, and by ordering Appellant to disgorge those proceeds and vacate the premises; (5) the Regional Director abused his discretion by not considering whether to allow Appellant to retain some proceeds as an offset to the value of the services rendered to Kewa, as authorized by Old Section 81; and (6) the Regional Director's decision deprived Appellant of liberty and property interests without due process of law because the Regional Director issued his decision without notice to Appellant.

The Regional Director and the Pueblo contend that the Board should dismiss this appeal for lack of standing because the Decision did not cause injury to Appellant and Appellant is outside the zone of interests protected by Old Section 81. 12/ Their lack-of-

---

11/ In addition to the initial round of briefing on the merits, the Board allowed several additional rounds of briefing, including briefing on Appellant's standing.

12/ Although the Board, as an Executive Branch forum, is not limited by the same constitutional and prudential constraints that apply to the exercise of judicial authority, the Board has a well-established practice of adhering to those jurisdictional constraints as a matter of prudence in the interest of administrative economy. See Pueblo of Tesuque v. Acting Southwest Regional Director, 40 IBIA 273, 274 (2005). These constraints include
(continued...)

injury argument is that the Regional Director's determinations on the applicability of Old Section 81 and the requirement for BIA approval are advisory in nature, and his order for relief is in the nature of a demand letter simply notifying Appellant of a recommendation that BIA might make for action by the U.S. Department of Justice.

As further discussed below in the context of addressing Appellant's claims, we reject the arguments by the Regional Director and the Pueblo that we should dismiss this appeal in its entirety for lack of standing. We conclude that Appellant does have standing to challenge the Regional Director's determination that Old Section 81 applies to the Agreement, and therefore we review those portions of the decision. We also conclude, however, that Appellant does not have standing to challenge the Regional Director's decision declining to retroactively approve the Agreement. In addition, we conclude that the fourth issue raised by Appellant (that the Regional Director exceeded his authority) is now partially moot and that the fifth issue raised by Appellant (that the Regional Director abused his discretion by not making a quantum meruit determination) is not ripe for review. We reject Appellant's due process claims. We now turn to a discussion of each claim made by Appellant.

---

12/(...continued)

the requirement that an appellant demonstrate that it has standing. <u>Arizona State Land Dep't v. Western Regional Director</u>, 43 IBIA 158, 163 (2006). The Board follows the three elements of standing described in <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992): an appellant must show that (1) it has suffered an actual or imminent, concrete and particularized injury to or invasion of a legally-protected interest; (2) the injury is fairly traceable to the challenged action; and (3) the injury will likely be redressed by a favorable decision.

An appellant may have standing to raise certain claims, but not others. <u>See, e.g.,</u> <u>Skagit County v. Northwest Regional Director</u>, 43 IBIA 62, 70 (2006). In addition to the constitutional requirements of standing, prudential principles of standing require that when a plaintiff claims to have been "'adversely affected or aggrieved [by agency action,] within the meaning' of a statute, the plaintiff must establish that the injury he complains of (<u>his</u> aggrievement, or the adverse effect <u>upon him</u>) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." <u>Lujan v. National Wildlife Federation</u>, 497 U.S. 871, 883 (1990).

B. Did the Regional Director Err in Concluding that Old Section 81 Applies and that the Agreement is Invalid Without BIA Approval?

1. Appellant's Standing

We first consider whether Appellant has standing to challenge the Regional Director's decision that Old Section 81 applies to the Agreement and that under Old Section 81, the Agreement must be approved by BIA in order to be valid. Appellant contends that the Agreement is valid without BIA approval and therefore the Regional Director's contrary (and erroneous) decision interfered with Appellant's valid contract rights, causing injury. Appellant further contends that the injury is redressable because a favorable decision by the Board declaring Section 81 inapplicable would grant it the relief that it seeks. The Regional Director contends that Appellant lacks standing to challenge his decision because it is merely a statement of BIA's position, did not require the parties to stop performance of the Agreement, and therefore did not cause injury to Appellant.

It is true that, notwithstanding a Departmental determination and in the absence of an enforcement action, the parties to the Agreement may, if they wish, continue to perform under the Agreement. It is also true that if, as Appellant contends, Kewa has stopped performing under the Agreement, the Department's proceedings do not preclude Appellant from attempting to invoke the Agreement's arbitration provisions for breach of contract, consistent with its position that the Agreement is binding and valid without Secretarial consent.

On the other hand, we find unconvincing the Regional Director's post-hoc characterization of his decision as merely a statement of BIA's position. The Regional Director made a formal administrative determination on whether the Agreement requires Secretarial approval in order to be valid. His decision also demanded remedial action from Appellant.

Even though the Regional Director apparently now seeks to discount the effect or immediacy of his decision, it still — if upheld by the Board and made effective and final for the Department — constitutes an administrative action against Appellant's allegedly lawful contract rights because the Regional Director determined that Appellant is effectively in

trespass on the Pueblo's lands and is holding unauthorized funds. 13/ This result does not change even though the Regional Director subsequently disclaimed any authority to issue self-executing "orders" against Appellant and the fact that an administrative demand is not "binding" in the sense of a judicial order, or otherwise self-enforcing. The Board regularly reviews BIA decisions that, in effect, administratively adjudicate the rights of parties, even though they are not self-executing or self-enforcing. See, e.g., Aloha Lumber Corp. v. Alaska Regional Director, 41 IBIA 147 (2005) (review of BIA decision declaring an appellant in breach of contract and demanding damages); Van Gorden v. Acting Midwest Regional Director, 41 IBIA 195 (2005) (review of BIA decision finding an appellant liable for trespass); Naegele Outdoor Advertising Co. v. Acting Sacramento Area Director, 24 IBIA 169 (1993) (review of BIA decision finding an agreement concerning Indian trust land to be null and void in the absence of Secretarial approval); Bulletproofing, Inc. v. Acting Phoenix Area Director, 20 IBIA 179 (1991) (review of BIA decision declaring lease void and directing appellants to remove their property and vacate the premises).

We conclude that Appellant has made the necessary showing of injury for purposes of demonstrating standing to challenge the Regional Director's decision on the applicability of Old Section 81 and his statements concerning the consequences flowing from nonapproval of the Agreement.

In addition, the alleged injuries result from the Regional Director's decision, thus satisfying the causation element of standing. Finally, if the Board were to reverse or vacate the Regional Director's demands for relief, it would provide Appellant the relief it seeks against BIA, thus satisfying the redressability element of standing. The Pueblo itself suggests that if the Department were to conclude that Old Section 81 does not apply, "[t]he practical consequence is that the parties will probably act as though they have a valid contract." Pueblo's Response to Board's Order for Briefing on Jurisdiction at 4 n.1.

We therefore conclude that Appellant has standing to challenge the Regional Director's decision based on a claim that the decision interferes with Appellant's valid contract rights.

---

13/ For purposes of evaluating standing, we leave aside the fact that the Regional Director's decision is automatically stayed during the period for filing an appeal and that the stay continues after an appeal is filed. See 25 C.F.R. § 2.6, 43 C.F.R. § 4.314. Therefore, we evaluate the effect of the decision on an appellant as if it were to become a final and effective Departmental decision.

## 2. Which Version of the Statute Applies — Old Section 81 or New Section 81?

Having concluded that Appellant has standing to assert its claim that the Regional Director erred in concluding that the Agreement requires Secretarial approval under Old Section 81 in order to be valid, we now turn to the merits of that claim. We first address the Regional Director's decision to apply Old Section 81, rather than New Section 81, in determining whether Secretarial approval is required. As discussed below, whether or not it is permissible to apply a subsequently-enacted statute (New Section 81) to an earlier event (execution of the 1996 Agreement) depends on the effect such application would have. Therefore, in addressing this issue we assume, for purposes of this discussion, that application of the different versions of the statute would yield different results. Specifically, we assume for this analysis that Appellant is correct that the Agreement is valid without Secretarial approval under New Section 81, and that BIA is correct that the Agreement is invalid without such approval under Old Section 81.

Appellant contends that New Section 81 is the proper choice of law because it was the version of the statute in effect when the Regional Director conducted his review of the Agreement. Appellant argues that "[u]nless application of an amended statute has an impermissibly retroactive effect, the statute in effect when a decision is rendered is the statute that should be applied." Opening Brief at 9. Appellant acknowledges that there is a presumption against giving statutes retroactive effect. Id. at 9-10 (discussing Landgraf v. USI Film Prods., 511 U.S. 244 (1994)). Appellant contends, however, that applying New Section 81 to the Agreement would not give it retroactive (and therefore presumptively impermissible) effect because it would not impair existing rights and would be consistent with congressional intent in amending the statute to remove "the burden of obtaining Secretarial approval of all but a narrow category of contracts." Id. at 10.

In Landgraf, the Supreme Court addressed what the Court described as the apparent tension between "seemingly contradictory" rules of construction concerning the effect of intervening changes in the law: one stating that courts should apply the law in effect at the time their decisions are rendered and the other that statutes will not be construed as having retroactive effect, absent clear congressional intent. 511 U.S. at 264. The Court recognized that applying a statute that is enacted after the events giving rise to a lawsuit does not necessarily make such application "retroactive" in effect, e.g., when it "authorizes or affects the propriety of prospective relief." Id. at 273. However, if giving effect to a statute would "change[] the legal consequences of acts completed before its effective date," such application will be deemed retroactive, and is impermissible without clear congressional

expression to the contrary. Id. at 269-70 & n.23. 14/ In Landgraf, the Court made clear that it had never "displace[d] the traditional presumption against applying statutes affecting substantive rights, liabilities, or duties to conduct arising before their enactment." Id. at 278. In subsequent decisions, the Court reiterated that ordinarily the legal effect of conduct should be assessed under the law that existed when the conduct occurred. See, e.g., INS v. St. Cyr, 533 U.S. 289, 316 (2001).

Appellant argues that because New Section 81 "increases the rights of tribes * * * to enter into contracts without government intervention," and imposes no new duties, applying it in this case would not make it impermissibly retroactive. Opening Brief at 12.

We disagree. Appellant ignores the fact that if the Agreement is exempt from BIA approval under New Section 81, application of New Section 81 would significantly change the legal consequences of the 1996 Agreement by rendering valid an otherwise invalid contract. The issue is not whether New Section 81 generally increased the rights of tribes or imposed new duties, but whether applying it to pre-2000 agreements to which Old Section 81 would otherwise apply would alter the legal consequences of acts completed before New Section 81 was enacted. Undoubtedly it would.

If a tribe entered into an agreement subject to Old Section 81, no legal obligations or liabilities for the tribe arose unless and until the agreement was approved by the Secretary. Such an agreement was deemed "null and void" by the express language of Old Section 81. The application of New Section 81 to such agreements would create contractual obligations and liability on the part of tribes where none previously existed, thus changing the legal consequences of the previous agreement. In 2000, Congress clearly concluded that Old Section 81 was overly paternalistic, but — consistent with the presumption against retroactivity — we find it inconceivable that Congress intended New Section 81 to effect a wholesale ratification of previously invalid agreements without making such an intent utterly clear. It is true, as Appellant contends, that New Section 81 was intended to give tribes greater flexibility and to limit the types of agreements subject to Secretarial approval. But that congressional intent is a far cry from a congressional intent

---

14/ Appellant does not contend that New Section 81 contains clear congressional expression that it should be applied to contracts and agreements entered into before the date of enactment. Therefore, Appellant apparently concedes that if applying New Section 81 to the Agreement would "change the legal consequences" of the Agreement, then the presumption against retroactive application governs.

to ratify previously void agreements, possibly against tribes' wishes, and to create obligations and potential liability for tribes where none previously existed. 15/

We conclude that if the Agreement is subject to BIA approval under Old Section 81, applying New Section 81 would profoundly alter the legal consequences of the parties' actions and therefore is impermissible under Landgraf and St. Cyr in the absence of any clear congressional directive to do so. We therefore affirm the Regional Director's conclusion that the Agreement is properly reviewed under Old Section 81, rather than under New Section 81. 16/

3. Does Old Section 81 Require BIA Approval for the Agreement to be Valid?

We now analyze whether the Agreement falls within the class of contracts for which BIA approval is required. Old Section 81 contains a three-part test for making this determination — (1) is the Agreement with a "tribe of Indians," (2) is the Agreement for the payment or delivery of any money or other thing of value in consideration of services for the tribe, and (3) is the Agreement "relative to" Indian lands? The second element of the test is not disputed in this case, and therefore we address only the first and third elements. We conclude that the first element is satisfied, and we abstain from making a determination regarding the third element because of collateral judicial proceedings involving the Department.

---

15/ If a contract were subject to and void under Old Section 81, but did not require BIA approval under New Section 81, a tribe could simply reexecute the contract if it were so inclined.

16/ Appellant contends that its argument that New Section 81 applies is buttressed by the Board's decision in Madison Gas and Electric Co. v. Acting Midwest Regional Director, 36 IBIA 74 (2001). We disagree. In Madison Gas, the appellant was concerned that it might be subject to a qui tam action unless the Board held that New Section 81 applied to an agreement. The Board stated that the appellant's concern was misplaced because "there is no longer any statutory authority for such suits." Id. at 78; see also Hattum, 36 IBIA at 79 n.1 (same). We are not convinced that repeal of a statutorily-granted cause of action is comparable to retroactively imposing contractual obligations and potential liability based on pre-enactment conduct.

a) Is the Agreement With a "Tribe of Indians"?

The Regional Director determined that the Agreement is with an Indian tribe because the Pueblo is a party to the Agreement. The Regional Director acknowledged that many of the provisions of the Agreement run between Kewa and Appellant, but concluded that there also are provisions that run between the Pueblo and Appellant. The Regional Director also relied on Pueblo of Santa Ana v. Hodel, 663 F. Supp. 1300 (D.D.C. 1987), which he construed as holding that a contract with a tribal corporation is a contract with an Indian tribe within the meaning of Old Section 81.

Appellant argues that the Regional Director erred because (1) the Pueblo's participation as a signatory to the Agreement is not dispositive in determining whether the Agreement is with a tribe, (2) all of the relevant obligations in the Agreement run solely between Appellant and Kewa, and the Pueblo's participation is limited and insignificant for purposes of determining whether the Agreement is enforceable between Appellant and Kewa, and (3) the Regional Director wrongly characterized and relied upon Santa Ana to suggest that Kewa is necessarily a "tribe" within the meaning of Old Section 81. 17/ Appellant contends that Kewa is a corporation that is legally distinct from the Pueblo and is not a "tribe" within the meaning of Old Section 81, and that the Regional Director ignored Inecon Agricorporation v. Tribal Farms, Inc., 656 F.2d 498 (9th Cir. 1981), which allowed the enforcement of an agreement against a tribally-created corporation, even though the tribe was also party to the agreement.

---

17/ In Santa Ana, the Pueblo of Santa Ana — seeking to escape the constraints of Old Section 81 — argued that a non-profit enterprise created by the tribe was a legally separate entity and therefore not a "tribe" within the meaning of Old Section 81. 663 F. Supp. at 1305. The court rejected that argument, finding that the tribal enterprise was "not a separate corporation," but was instead a "non-profit instrumentality of the Pueblo of Santa Ana." Id. at 1306. The court found that the tribal enterprise did not hold itself out as a separate corporation, had no shareholders, and its directors were appointed and could be removed by the tribe's council. Id. The court held that an agreement between a third party and the tribal enterprise was "with a tribe" and was subject to Section 81.

Because we conclude that we need not decide Kewa's precise individual status in this case, see infra at 198, we also need not address the relevance of Santa Ana to the determination of that status. We do agree with Appellant, however, that the Regional Director mischaracterized the holding in Santa Ana. The court undertook a fact-specific analysis and concluded that the tribal entity at issue was an instrumentality of the Santa Ana Pueblo that fell within the meaning of "tribe" under Section 81. The court made no blanket ruling about all tribally-created corporations or instrumentalities.

Appellant relies largely on the Inecon decision as judicial precedent to support its position that the Agreement, at a minimum, is valid and enforceable against Kewa without Secretarial approval. In Inecon, the Fort Mohave Tribe and a tribally-created corporation, Tribal Farms, Inc., raised Old Section 81 as a defense against the enforceability of an agribusiness agreement they had signed with Inecon. The court concluded that Tribal Farms, which had been incorporated by the tribe under state law as an Arizona corporation, was not a "tribe of Indians" within the meaning of Old Section 81. 656 F.2d at 501. The court found that the tribe had only a limited role under the agreement (in a clause prohibiting the tribe from interfering with Inecon's performance of its contract duties or receipt of contract rights) and concluded that the agreement was enforceable between Inecon and Tribal Farms, even assuming that Old Section 81 would bar enforcement against the tribe. Id.

We agree with Appellant that, at least under Inecon, a tribe's participation as a signatory to an agreement is not necessarily dispositive in determining whether the agreement as a whole is subject to Old Section 81. However, because we do not consider the Pueblo's signature as dispositive of the issue in this appeal, this does not end our inquiry.

We also agree with Appellant that the great majority of the specific provisions in the Agreement relate specifically to and describe obligations between Appellant and Kewa. We disagree with Appellant, however, that the nature and extent of the Pueblo's role is such that the Agreement can, in practical effect, be treated as two separate sub-agreements, one between Appellant and Kewa and the other between Appellant and the Pueblo. Viewing the Agreement as a whole, we find that the Agreement does not evidence intent by the parties to bifurcate the Agreement in this way. To the contrary, we find that the Agreement treated the Pueblo and Kewa as a single contracting unit. Therefore, under the facts of this case, we conclude that the Pueblo's participation as a party to the Agreement does make the entire Agreement with a "tribe of Indians" for purposes of Section 81.

As Appellant acknowledges, "[i]t is the Management Agreement that sets forth the relationship between Kewa, [the Pueblo], and [Appellant]." Opening Brief at 4. Nowhere does the language of the Agreement, however, state it that was intended to be treated as, in effect, two separate contracts, the terms of which were intended to be separately and independently enforceable between any two of the three signators. In fact, although the Agreement divides certain roles and responsibilities between the Pueblo and Kewa, with Kewa undoubtedly assuming the active role between the two, it is significant that the Agreement is drafted as an agreement "between" two parties — not three — Appellant "on the one hand," and the Pueblo and Kewa "on the other hand." Agreement, Introductory Clause. In addition, the Agreement provides that it cannot be modified "except in writing

signed by both parties." Id., § 9.9. The signature lines capitalize Appellant and the Pueblo, but not Kewa, which appears below the Pueblo's signature line in lower case letters. These are not mere semantic or stylistic quirks, particularly when viewed collectively.

Our reading of the Agreement as treating the Pueblo and Kewa as a single contracting unit is bolstered by the fact that the Agreement recites that the Pueblo owns 100% of Kewa's stock, thus denoting its complete and exclusive control over and interest in Kewa at the time the Agreement was signed. Thus, despite distinct roles and obligations of the Pueblo and Kewa, the evidence on the face of the Agreement indicates that the Pueblo and Kewa are treated collectively as a single "party." Even assuming that outside the context of the Agreement, Kewa may in certain respects be considered a distinct legal entity from the Pueblo, that does not mean that the parties treated Kewa that way in the Agreement.

Apart from the form of the Agreement, the substance of the Agreement requires the Pueblo to surrender valuable consideration, and the practical value of the Agreement is inextricably tied to the Pueblo's commitments. The Pueblo's commitment not to compete with Appellant in the gasoline distribution business is hardly insignificant consideration for the Agreement as a whole. Without that commitment, the Pueblo, as sole shareholder of Kewa, could simply dissolve Kewa and its business and start a new gasoline distribution business without Appellant. Because Appellant's role under the Agreement is to manage and operate Kewa's business, the dissolution of Kewa would effectively defeat the entire Agreement. Therefore, the non-compete provision is a significant concession by the Pueblo and an integral component of the Agreement as a whole. We need not decide whether a tribal non-compete provision, without more, would be enough to find that an entire contract is "with a tribe" for purposes of Old Section 81 because here we have the additional language in the Agreement, discussed above, to support our finding. 18/

---

18/ The court in Inecon summarily concluded that the agreement in that case was enforceable against Tribal Farms because of the tribe's "limited role" and because Tribal Farms was a corporate creature of Arizona state law. 656 F.2d at 501. Inecon apparently stands alone in effectively compartmentalizing an agreement to which a tribe is a party in order allow a portion of the agreement to be enforced against a tribally-created and controlled, but not "tribal," entity. Whether the court reached the correct result in that case, as a matter of law or as a matter of fairness, or both, we find it to be of limited usefulness here, given the court's sparse factual recitation and equally sparse analysis, and given the factual distinctions that can be discerned from the present case.

In summary, we conclude that the form of the Agreement establishes an intent to treat the Pueblo and Kewa collectively as a single contracting unit, and the substance establishes that the Pueblo's commitments are integral to the Agreement as a whole. Therefore, we conclude that the Agreement must be treated as one with a "tribe of Indians." In light of this conclusion, we need not decide whether Kewa, by itself, is a "tribe" within the meaning of Old Section 81.

b) Is the Agreement "Relative to" Indian lands?

The next issue relevant to the applicability of Old Section 81 is whether the Agreement is "relative to" the Pueblo's lands.

Here, we face an initial question regarding the propriety of the Board reaching the merits of this issue because in a separate case, the Assistant Secretary - Indian Affairs determined that a virtually identical agreement "encumbers" Indian lands within the meaning of New Section 81 and 25 C.F.R. Part 84, and the Department presently is defending that decision in judicial litigation, GasPlus v. United States Department of the Interior, No. 1:03-CV-1902 (RMC) (D.D.C.). 19/

Appellant contends that the Agreement in this case neither "encumbers" the Pueblo's lands within the meaning of the more limited scope of New Section 81, nor is it "relative to" Pueblo lands, under the admittedly broader, but not unlimited, language of Old Section 81. The Regional Director and the Pueblo both contend that the Agreement both "encumbers" and is "relative to" Pueblo lands. Among the disagreements between the parties on appeal is the degree to which the Agreement does, or does not, give Appellant control over Kewa's gasoline distribution business or Pueblo lands or both, and whether that control constitutes an "encumbrance" or is "relative to" Pueblo lands. Compare Opening Brief at 14

---

19/ The Gasplus litigation involves a decision by the Department finding that a January 4, 2001 management agreement signed by Gasplus and the Pueblo of Nambe falls within the scope of New Section 81. Appellant asserts that the Agreement in this case and the agreement at issue in GasPlus are "not identical," although it does not articulate any relevant differences. Appellant's Reply to Regional Director's Response Brief at 7. Based on the extensive excerpts from the GasPlus agreement quoted in the decision of the Acting Assistant Secretary - Indian Affairs in GasPlus's appeal from the Regional Director's decision in that case, and in the absence of any evidence or articulation of relevant differences, the Board finds that the two agreements are identical in all relevant respects for purposes of our analysis of the relative-to-Indian-lands issue.

("Agreement does not encumber Indian lands") with Regional Director's Response Brief at
15 ("there was actually an encumbrance of tribal land").

The Regional Director does not contend that the Assistant Secretary's GasPlus
decision is binding on the Board, but does argue that the management agreements in both
cases are virtually identical, that the rationale of the Assistant Secretary's GasPlus decision in
is equally applicable in this case, and that the Assistant Secretary's decision "should be
applied consistently throughout the Department." Regional Director's Response Brief at
10.

Appellant contends that the Assistant Secretary's decision is not controlling
authority, and that the Board should make an independent decision in this case. Appellant
also argues that it is "inappropriate" for the Regional Director to suggest that the Board
make its decision in this case based on the Department's interest in another case.
Appellant's Reply to Regional Director's Brief at 7.

We first address the relationship between the Assistant Secretary's determination in
GasPlus and the issue in this case. The agreement at issue in GasPlus post-dates the 2000
amendments to Section 81, and therefore the Assistant Secretary applied New Section 81 in
determining whether Secretarial approval was required. As we concluded above, Old
Section 81, not New Section 81, governs whether the Agreement in this case requires
Secretarial approval in order to be valid.

None of the parties in this appeal has argued, or even implied, that an agreement
that "encumbers" Indian land under New Section 81 would not also fall within the "relative
to" Indian lands language in Old Section 81, nor do we think such an argument would be
consistent with either the statutory language or legislative history of New Section 81. 20/

20/ As we have already noted, New Section 81 was clearly intended to reduce the range of
commercial transactions subject to Secretarial approval, and to allow tribes and their
business partners greater flexibility and authority to enter into agreements without
Departmental involvement. Nothing in either the statutory language nor legislative history
of New Section 81 suggests any congressional intent to create a new category of agreements
that will be subject to approval under New Section 81 that were not subject to approval
under Old Section 81. Instead, the intent was simply to shrink the universe of covered
agreements. See S. Rep. No. 106-150, at 9 ("eliminates the overly-broad scope of [Old
Section 81]" so that the statute "will no longer apply to a broad range of commercial
transactions"); see also Opening Brief at 13 ("There is little doubt that by changing Section
81 as it did, Congress intended to narrow the application that Old Section 81 had been
given by some courts.").

Thus, regardless of how broadly, or narrowly, the term "relative to" Indian lands is properly construed under Old Section 81, we conclude that if the Agreement in this case would "encumber" Indian lands under New Section 81, it necessarily would be "relative to" those lands under Old Section 81. Therefore, if the court in GasPlus upholds the Assistant Secretary's determination on that issue, it would, in practical effect, be controlling in this case.

Conversely, if the Board were to address the merits of the issue in this case and find that the Agreement here is not "relative to" the Pueblo's lands within the meaning of Old Section 81, it would be inconsistent with the Department's position in GasPlus that a virtually identical agreement "encumbers" Indian lands within the meaning of New Section 81.

It is well-established that the Board does not have authority to review a decision of the Assistant Secretary unless the decision or a regulation specifically grants a right of appeal to the Board. Felter v. Acting Western Regional Director, 37 IBIA 247, 250 (2002). It is also well-established that the conduct of litigation in Federal court is a matter within the control of the Department of Justice and the Solicitor's Office of this Department. Id.

In Felter, the appellant apparently asked the Board to change or directly review the litigating position of the Department in pending litigation. In the present case, Appellant does not ask us to review the Assistant Secretary's decision in GasPlus directly, but a Board decision could undermine the litigating position of the Department in that case if the Board were to conclude that the Agreement is not "relative to" the Pueblo's lands. As such, Appellant's arguments in this case that the Agreement is not "relative to" Indian lands amounts to a collateral attack on the Assistant Secretary's conclusion that a substantively identical agreement was an encumbrance on Indian lands.

Under these circumstances, the Board concludes that it is appropriate to abstain from addressing the merits of this issue. Abstention will accommodate the Board's strong interest in protecting its independence when reviewing matters brought before it, while recognizing the realities of the broader context in which the Board operates within the Department and the Executive Branch. Therefore, we do not address or express any view on the merits of this issue, and instead dismiss this portion of the appeal, allowing the Regional Director's determination on this particular issue to become effective. We assume, for purposes of resolving the remaining issues in this appeal, that the Agreement is subject to the requirement of Secretarial approval under Old Section 81.

44 IBIA 200

## C. Did the Regional Director Abuse His Discretion in Declining to Approve the Agreement?

We do not reach the merits of this issue because we conclude that Appellant lacks prudential standing to challenge the Regional Director's exercise of discretion declining to approve the Agreement. Appellant's interest in contracting with the Pueblo is outside the zone of interests sought to be protected by the provision in Old Section 81 requiring Secretarial approval of certain contracts. 21/

Two Board decisions involving Old Section 81 — Madison Gas, 36 IBIA 74, and Hattum, 36 IBIA 79 — have held that a party contracting with a tribe did have standing to challenge BIA's decision declining to approve a contract. We conclude, however, that Madison Gas is distinguishable and, after reviewing judicial decisions interpreting Old Section 81, we conclude that Hattum should be overruled.

Under the doctrine of prudential standing, when a party claims to have been adversely affected or aggrieved by agency action, within the meaning of a statute, the party

---

21/ Appellant argues that it has constitutional standing, primarily on the ground that the Regional Director's decision caused it injury by interfering with its contract rights. We found that argument sufficient to establish jurisdiction to review whether the Agreement is subject to Secretarial approval under Old Section 81. Once that issue is decided against Appellant however, by operation of law the Agreement is "null and void" because the Agreement has received no such approval.

Appellant's constitutional standing to challenge the Regional Director's decision declining to approve the Agreement requires a separate inquiry. In effect, the Regional Director declined to affirmatively grant relief to Appellant from a void contract and from the liability arising as a matter of law in the absence of such relief. Thus, Appellant's claimed contract rights may no longer serve as a basis for injury resulting from this portion of the Regional Director's decision. Because we conclude that Appellant lacks prudential standing, we need not decide whether Appellant has alleged injury to a legally-protected interest resulting from the Regional Director's decision not to approve the Agreement. We also do not address the Pueblo's argument that its opposition to Secretarial approval of the Agreement precludes such approval, and therefore the redressability element of standing cannot be satisfied. We do note, however, that the record before the Board does not show that the Tribal Council has repealed the Resolution approving the Agreement, has formally revoked its consent, or has otherwise withdrawn from the Agreement. The record only reflects the Pueblo's opposition based on issues of fairness and on health and safety concerns.

must establish that the interest to be protected arguably falls within the "zone of interests" sought to be protected or regulated by the statutory provision in question. Ass'n of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153 (1970); see also Lujan, 497 U.S. at 883 (plaintiff must show that the injury complained of "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint").

Several courts have held that a non-Indian contracting party lacks standing to challenge BIA's decision declining to approve a contract under Old Section 81 because the non-Indian party is outside the zone of interests sought to be protected or regulated by the statute. In Western Shoshone Business Council v. Babbitt, 1 F.3d 1052, 1056 (10th Cir. 1993), the Tenth Circuit Court of Appeals stated that "the undisputed purpose of [Old Section 81] is to protect tribal lands, not to regulate [non-Indian contractors] or to create either an administrative right of review or a contract cause of action for non-Indian contractors." (Emphasis added.) The court continued: "Given the overtly paternalistic cast of [Old Section] 81, we conclude that 'it cannot reasonably be assumed that Congress intended to permit the suit," * * * by non-Indian contractors." Id.

Similarly, while ultimately not deciding the standing issue, the court in United States ex rel. Shakopee v. Pan American Mgmt. Co., 616 F. Supp. 1200, 1208 (D. Minn. 1985), rejected an argument that Old Section 81 was intended at least to "regulate" non-Indian contractors, stating that the statute "is concerned with the Indian tribes and their ability to contract * * *." (Emphasis added.) The potential economic interest of non-Indians in a contractual relationship with a tribe is not within the intended purview of the statute." See also Enterprise Mgmt. Consultants, Inc. v. United States ex rel. Hodel, 685 F. Supp. 221, 223 (W.D. Okla. 1988) (non-Indian contracting party "is not even arguably within the 'zone of interest' to be protected by [Old Section 81]"), aff'd on other grounds, 883 F.2d 890 (10th Cir. 1989), cited approvingly in Western Shoshone, 1 F.3d at 1056. Similar reasoning was applied in Rosebud Sioux Tribe v. McDivitt, 286 F.3d 1031, 1037 (8th Cir. 2002), in which the court concluded that a non-Indian lessee lacked standing to challenge BIA's decision to declare void a previously-approved contract.

At least one court has entertained a suit by a non-Indian contracting party challenging a BIA decision not to approve a contract with an Indian tribe, but the jurisdictional issue apparently was not raised and was not addressed by the court. See Ho-Chunk Mgmt. Corp. v. Fritz, 618 F. Supp. 616 (D. Wisc. 1985). As we noted earlier, however, two Board cases — Madison Gas and Hattum — have expressly recognized the standing of a non-Indian contracting party to challenge a BIA decision declining to approve a contract that was submitted for approval under Old Section 81.

In Madison Gas, BIA declined a request from the Ho-Chunk Nation to approve an agreement under Old Section 81 on the grounds that it had already been approved under BIA's right-of-way regulations, and did not require section 81 approval to be valid. The tribe did not appeal, but Madison Gas (the non-Indian contracting party) did. In the appeal to the Board, the Regional Director challenged Madison Gas's standing. The Board held that Madison Gas had standing to appeal, and proceeded to affirm the Regional Director's decision on the merits — i.e., the determination that the agreement did not require approval under Old Section 81. 36 IBIA at 77-78.

The Board in Madison Gas thus held that when a tribe has requested approval of a contract under Old Section 81 and BIA determines that the contract does not require such approval, the non-Indian contracting party has standing to appeal that determination. Under those facts, the primary, if not sole incentive to obtain higher-level review within the Department to reduce or eliminate the risk of a future contrary Departmental position (i.e., that the contract did require approval and without such approval is void) is on the non-Indian contracting party. As such, there is some logic to affording the non-Indian contracting party standing under these circumstances. This is true even though the Department owes no duty to the non-Indian party to review the contract or take any action whatsoever. 22/ Thus, in Madison Gas, when the tribe submitted a contract for review under Section 81, the Board afforded standing to the non-Indian contracting party to obtain administrative review with respect to the determination whether or not the contract fell within the class of contracts subject to Old Section 81. Madison Gas did not, however, decide whether a non-Indian contracting party has standing to appeal from a BIA discretionary decision declining to approve a contract that BIA has determined does fall within the class of contracts subject to Old Section 81.

In Hattum, however, the Regional Director specifically considered and declined a request by appellant Hattum — the non-Indian contracting party — to grant approval under Old Section 81 to an agreement between Hattum and the Crow Creek Sioux Tribe, after a court in a qui tam action had held that the agreement was void without such approval. In declining Hattum's request for approval, the Regional Director found that

---

22/ On the other hand, a non-Indian contracting party can easily protect itself: It need only make its obligations under the contract and initiation of performance contingent on approval of the contract by BIA, thus providing the tribe with an incentive to appeal a BIA decision declining to approve it. If the tribe is committed to the deal, the tribe could be expected to appeal BIA's decision. Conversely, if the tribe chooses not to appeal, the non-Indian contracting party is protected because the contract by its own terms never becomes effective.

there was no indication that the tribe had requested BIA's approval. To the contrary, the tribe had filed the qui tam action to invalidate the contract. The Regional Director concluded that absent a request for approval from the tribe, BIA's approval would not be appropriate. Hattum appealed BIA's decision to the Board, and on appeal the Regional Director challenged Hattum's standing. Relying on Madison Gas, the Board held that Hattum had standing. 36 IBIA at 80. The Board then decided, on the merits, that it was appropriate for the Regional Director to consider the tribe's opposition to the agreement and that he reasonably declined to approve it. Id. at 82.

Hattum is not distinguishable from the present case in any relevant respect. The Board in Hattum, however, relied solely on Madison Gas to find that the non-Indian contracting party had standing. As we have already concluded, Madison Gas was limited to deciding the threshold issue of the applicability of Old Section 81 and is therefore distinguishable from the present case and from Hattum. Moreover, Hattum did not discuss any judicial precedent construing the zone of interests under Old Section 81.

Given the "unabashedly paternalistic" nature of Old Section 81, see TTEA, 181 F.3d at 682, it is unlikely that Congress intended to give a non-Indian party a cause of action to force the Secretary to consider whether to approve a contract that is subject to Old Section 81. Even if Old Section 81 were construed to authorize such a cause of action, the substantive standard to apply is solely within the province of the Secretary or the tribe to raise — whether the contract is in the tribe's interest. Old Section 81 makes no provision for the Secretary to consider the economic interests of the non-Indian contracting party, and the non-Indian party cannot assert the tribe's interest to gain approval of the contract. See Cheyenne River Sioux Tribe v. Acting Great Plains Regional Director, 41 IBIA 308, 311 (2005) (a party generally must assert its own legal rights and interests). The absence of consideration of the non-Indian's interest in deciding whether or not to approve a contract reinforces the judicial decisions that find a non-Indian contracting party to be outside the zone of interests for purposes of challenging a decision declining to approve a contract with a tribe under Old Section 81.

We conclude that Hattum erred in summarily relying on Madison Gas, and in failing to discuss or analyze the prudential requirements of standing as applied to the specific facts of that case. In light of judicial precedent, we now conclude that Hattum should be overruled. We therefore overrule the standing portion of Hattum and hold that Appellant lacks prudential standing to challenge the Regional Director's decision declining to approve the Agreement.

## D. Did the Regional Director Exceed His Authority in Issuing His Decision?

In its opening brief, Appellant argued that the Regional Director exceeded his authority by including a "declaratory judgment and order of relief" in his decision, i.e., by declaring the Agreement invalid and ordering Appellant to disgorge proceeds and vacate the premises. Opening Brief at 35. According to Appellant, "the most that the Regional Director was authorized to do by Section 81 was determine whether the Management Agreement required Section 81 approval and, if so, approve or disapprove it." Id. The Regional Director responded that Appellant had "misapprehended the purpose of BIA's determination letter." Regional Director's Response Brief at 18. The Regional Director concedes that BIA "has no authority to enter a legally binding order against [Appellant]." Id. In subsequent briefing, Appellant acknowledged that "the authority issue (whether BIA has the authority to order a non-Indian to [take] any action) * * * was effectively removed as an issue in controversy * * * by BIA's admission that it lacked authority to order [Appellant] to action." Appellant's Supplemental Brief on Effect of GasPlus at 2-3. 23/ Appellant continues to assert, however, that the Regional Director's "authority is limited to determining whether a contract requires Secretarial approval," and does not extend to issuing "legal conclusions regarding the validity of the [Agreement] and the monies paid under it." Appellant's Reply to Regional Director's Response Brief at 25. Appellant also argues that the Regional Director did not have authority to apply or even "to look to" Old Section 81 to "invalidate" the "valid, enforceable, and lucrative contractual agreement with Kewa." Appellant's Reply Brief to Pueblo's and Regional Director's Response to the Board's Order for Briefing on Jurisdiction at 3, 10, 13.

We conclude that the issue of the Regional Director's authority to enter a legally binding order of relief is moot. The Regional Director's authority to include in a decision legal conclusions about the validity of a contract and monies paid under it is not moot, but on the merits of this issue we reject Appellant's argument.

We find no basis for Appellant's assertions that the Regional Director had no authority to look to Old Section 81 or to include statements in his decision that the Agreement was "invalid" and that the proceeds received under it by Appellant were "unauthorized." These statements, whether or not styled as "declarations," did not reflect

___

23/ Appellant's supplemental brief was submitted in response to the Board's November 23, 2005 order for briefing on the effect, if any, of a then-recent decision issued on remand by the Associate Deputy Secretary of the Interior in Gasplus. The Associate Deputy Secretary's decision on remand in Gasplus addressed certain remedial and due process issues arising in that case.

actions taken by the Regional Director, but were merely statements that mirror the statutory language regarding the status of an unapproved contract that is subject to Old Section 81 and the attendant legal consequences for the non-Indian contracting party.

Contrary to Appellant's argument, the Regional Director did not purport to take any action to invalidate or void an otherwise valid contract. Rather, he simply evaluated the Agreement under Old Section 81 and stated the consequences of nonapproval as provided by the statute itself. See United States ex rel. Crow Creek Sioux Tribe v. Hattum Family Farms, 102 F. Supp. 2d 1154, 1164 (D.S.D. 2000) ("As a matter of law, such contract is null and void for lack of such approval."). Assuming, as Appellant contends, that it has a valid contract that is not subject to Secretarial approval, then the Regional Director's decision that Old Section 81 applies would be in error, and his action declining to approve the Agreement would simply be irrelevant to the parties' rights and obligations. The Regional Director's statements that the unapproved contract was invalid and that therefore the proceeds received by Appellant were unauthorized were not outside the scope of the Regional Director's authority.

B. Did the Regional Director Err in Demanding that Appellant Return All Proceeds Received Under the Agreement, Without Making Allowance for the Value of Appellant's Services?

In its opening brief, Appellant argued that even if the Agreement does fall within the scope of Old Section 81, the Regional Director nevertheless erred in demanding full disgorgement of monies received under the Agreement, without considering quantum meruit principles that might warrant allowing Appellant to retain at least a portion of the proceeds. In response, the Regional Director disclaimed any intent to issue a legally binding order against Appellant. The Regional Director also apparently disclaimed any intent to have made a quantum meruit determination, by arguing that the quantum meruit issue is outside the scope of the present appeal. See Regional Director's Response Brief at 22-23. Appellant did not respond to the Regional Director's assertion that the quantum meruit issue is outside the scope of these proceedings. In the absence of a response from Appellant on this issue, it is possible that this issue is moot. It is also possible that the Regional Director simply did not intend to exercise the Secretary's quantum meruit authority in his decision, but rather to state Appellant's legal liability under the statute, but not its actual liability if quantum meruit principles are applied. Given this possible reading of the Regional Director's intent, we decline to find that this issue is moot. Cf. Friends of the Earth v. Laidlaw Envtl. Services, 528 U.S. 167, 189 (2000) (strict standard for finding mootness based on a defendant's voluntary cessation of challenged conduct). We do conclude, however, based on the Regional Director's assertion that the quantum meruit

issue is outside the scope of this appeal, that this issue is not ripe for our review and that this portion of the appeal should therefore be dismissed.

Because the effectiveness of the Regional Director's decision has been automatically stayed pending resolution of this appeal, our determinations of mootness and lack of ripeness serve as the only final and effective Departmental determination with respect to these issues. If Appellant requests that the Regional Director exercise the Secretary's quantum meruit authority under Old Section 81, the Regional Director will at that time have an opportunity to consider the exercise of such authority and to consider Appellant's views concerning the appropriateness of quantum meruit relief. **24/**

F. Did the Regional Director's Failure to Provide Appellant with Notice and an Opportunity to Present its Views Before Issuing His Decision Deprive Appellant of Due Process?

We next address Appellant's argument that it was deprived of due process. Appellant contends that it was denied due process because the Regional Director issued his decision without providing prior notice to Appellant, or giving it an opportunity to respond. Whether or not the better course of action would have been for the Regional Director to allow all of the parties, including Appellant, to fully present their arguments and any evidence they considered relevant before issuing his decision, we find no merit in Appellant's due process claims.

Appellant first argues that due process was offended by the Regional Director's failure to afford it an opportunity to present documents and testimony to support its position through a hearing. Appellant relies on Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950), in which the Supreme Court stated that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated * * * to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."

Appellant's reliance on Mullane is misplaced. The Regional Director's decision, standing alone, did not deprive Appellant of any property or liberty interests without due

---

**24/** In this appeal, none of the parties has even addressed whether the Secretary's quantum meruit authority survived the amendments to Old Section 81 in 2000, which bolsters our conclusion that Appellant's initial challenge to the Regional Director's demand for full disgorgement, based on entitlement to some quantum meruit relief, is not ripe for our review.

process because it was not an effective or a final decision for the Department. The decision was automatically stayed during the period for filing an appeal, see 25 C.F.R. § 2.6(a) & (b), and the automatic stay continued once this appeal was filed, see 43 C.F.R. 4.314(a). See Chuchua v. Pacific Regional Director, 42 IBIA 1, 7 (2005) (a BIA decision is not final until the Board affirms it, citing 25 C.F.R. § 2.6(a)). Appellant contends that "[t]he only way the [Regional] Director could make the case that [Appellant] was not deprived of due process would be to make the claim that his Decision was of no force or effect." Reply Brief at 28. But that is precisely what occurred by operation of 25 C.F.R. § 2.6(a), which automatically stayed the effectiveness of the Regional Director's decision. 25/

In addition, because the Regional Director's decision did not purport to affect any existing rights, due process did not require prior notice to Appellant. Cf. Tallgrass Petroleum Corp. v. Acting Eastern Oklahoma Regional Director, 39 IBIA 9, 11 (2003) (due process did not require advance notification before BIA notified lessee that the lease had terminated by its own provisions); Magnum Energy, Inc. v. Eastern Oklahoma Regional Director, 38 IBIA 141, 142 (2002) (same). The Regional Director purported only to determine the status of the Agreement under Federal law, and not, by his action or a decision, to "void" or otherwise alter any existing legally-enforceable rights held by Appellant.

Finally, the Board has repeatedly held that an appellant's due process rights are protected by the right to appeal a BIA decision to this Board. See Chuchua, 42 IBIA at 7; All Materials of Montana, Inc. v. Billings Area Director, 21 IBIA 202, 211 (1992). Appellant contends that the fact that the Regional Director's decision was appealable to the Board "does not shield it from the requirements of due process [because were] it otherwise, orders of district courts would not be subject to due process requirements." Appellant's Reply to Regional Director's Response Brief at 26. Orders of district courts, however, are effective unless stayed pending appeal. As we have already discussed, a Regional Director's decision is automatically stayed pending appeal, unless made effective by the Board. 25 C.F.R. § 2.6(a). Appellant had ample opportunity to, and did, present arguments to the Board and the Board has fully considered Appellant's arguments.

_____

25/ Whether the Regional Director's decision "emboldened" Kewa to "refuse to allow [Appellant] to perform under [the Agreement]," Appellant's Reply to Regional Director's Response Brief at 26, Kewa's conduct cannot be attributable to that decision being effective. Kewa apparently chose to assume that the Regional Director's decision eventually would be sustained in an appropriate forum, and chose to accept any risk that the Agreement might ultimately be deemed enforceable.

The Board concludes that Appellant has failed to show that it was denied due process.

Conclusion

For the reasons discussed above and pursuant to the authority delegated to the Board of Indian Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, the Board affirms the Regional Director's decision to review the Agreement under Old Section 81 rather than under New Section 81, and affirms in part and abstains in part from the Regional Director's conclusion that the Agreement is subject to BIA approval under Old Section 81. We dismiss for lack of standing Appellant's challenge the Regional Director's decision declining to approve the Agreement. We affirm the Regional Director's authority to include in his decision a determination that in the absence of Secretarial approval, the Agreement is void. We dismiss the portion of the appeal concerning the Regional Director's decision demanding relief, based in part on mootness and in part on lack of ripeness.

I concur:

Steven K. Linscheid
Chief Administrative Judge

Debora G. Luther
Administrative Judge

44 IBIA 209

Quantum Entertainment Limited v. Acting
Southwest Regional Director, BIA
Docket No. IBIA 04-21-A
Order Affirming in Part, Abstaining in Part,
and Dismissing in Part
Issued March 27, 2007
44 IBIA 178

Distribution:

Mark A. Smith, Esq.
Rodey, Dickason, Sloan, Akin &
  Robb, P.A.
for Quantum Entertainment
  Limited, LLC
201 Third Street NW, Suite 2200
Albuquerque, NM  87102
    BY CERTIFIED MAIL

Wayne H. Bladh, Esq.
Noelle Graney, Esq.
Nordhaus, Haltom, Taylor,
  Taradash & Bladh, LLP
for Pueblo of Santo Domingo
1239 Paseo de Peralta
Santa Fe, NM  87501

Pueblo of Santo Domingo
ATTN: Governor
P.O. Box 99
Santa Domingo, NM  87052

Kewa Gas Limited
ATTN: Chairman of the Board of Directors
P.O. Box 159
Santa Domingo, NM  87052

Regional Director
Southwest Regional Office
Bureau of Indian Affairs
P.O. Box 26567
Albuquerque, NM  87125-6567

Janet Spaulding, Esq.
Tulsa Field Solicitor's Office
U.S. Department of the Interior
7906 E. 33rd Street, Suite 100
Tulsa, OK  74145

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| **(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF<br>**(EXCEPT IN U.S. PLAINTIFF CASES)** | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>**(IN U.S. PLAINTIFF CASES ONLY)**<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

1 U.S. Government
Plaintiff

2 U.S. Government
Defendant

3 Federal Question
(U.S. Government Not a Party)

4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

### A. *Antitrust*

410 Antitrust

### B. *Personal Injury/ Malpractice*

310 Airplane
315 Airplane Product Liability
320 Assault, Libel & Slander
330 Federal Employers Liability
340 Marine
345 Marine Product Liability
350 Motor Vehicle
355 Motor Vehicle Product Liability
360 Other Personal Injury
362 Medical Malpractice
365 Product Liability
368 Asbestos Product Liability

### C. *Administrative Agency Review*

151 Medicare Act

**Social Security:**
861 HIA ((1395ff)
862 Black Lung (923)
863 DIWC/DIWW (405(g)
864 SSID Title XVI
865 RSI (405(g)
**Other Statutes**
891 Agricultural Acts
892 Economic Stabilization Act
893 Environmental Matters
894 Energy Allocation Act
890 Other Statutory Actions (If
   Administrative Agency is Involved)

### D. *Temporary Restraining Order/Preliminary Injunction*

**Any nature of suit from any category may be selected for this category of case assignment.**

**\*(If Antitrust, then A governs)\***

### E. *General Civil (Other)*   OR   F. *Pro Se General Civil*

**Real Property**
210 Land Condemnation
220 Foreclosure
230 Rent, Lease & Ejectment
240 Torts to Land
245 Tort Product Liability
290 All Other Real Property

**Personal Property**
370 Other Fraud
371 Truth in Lending
380 Other Personal Property Damage
385 Property Damage Product Liability

**Bankruptcy**
422 Appeal 28 USC 158
423 Withdrawal 28 USC 157

**Prisoner Petitions**
535 Death Penalty
540 Mandamus & Other
550 Civil Rights
555 Prison Condition

**Property Rights**
820 Copyrights
830 Patent
840 Trademark

**Federal Tax Suits**
870 Taxes (US plaintiff or
   defendant
871 IRS-Third Party 26
   USC 7609

**Forfeiture/Penalty**
610 Agriculture
620 Other Food &Drug
625 Drug Related Seizure
   of Property 21 USC 881
630 Liquor Laws
640 RR & Truck
650 Airline Regs
660 Occupational
   Safety/Health
690 Other

**Other Statutes**
400 State Reapportionment
430 Banks & Banking
450 Commerce/ICC
   Rates/etc.
460 Deportation

470 Racketeer Influenced &
   Corrupt Organizations
480 Consumer Credit
490 Cable/Satellite TV
810 Selective Service
850 Securities/Commodities/
   Exchange
875 Customer Challenge 12 USC
   3410
900 Appeal of fee determination
   under equal access to Justice
950 Constitutionality of State
   Statutes
890 Other Statutory Actions (if
   not administrative agency
   review or Privacy Act

| **G**. *Habeas Corpus/ 2255* | **H.** *Employment Discrimination* | **I.** *FOIA/PRIVACY ACT* | **J.** *Student Loan* |
|---|---|---|---|
| **530 Habeas Corpus-General**<br>**510 Motion/Vacate Sentence** | **442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)**<br><br>***(If pro se, select this deck)**** | **895 Freedom of Information Act**<br>**890 Other Statutory Actions (if Privacy Act)**<br><br>***(If pro se, select this deck)**** | **152 Recovery of Defaulted Student Loans (excluding veterans)** |

| **K.** *Labor/ERISA (non-employment)* | **L.** *Other Civil Rights (non-employment)* | **M.** *Contract* | **N.** *Three-Judge Court* |
|---|---|---|---|
| **710 Fair Labor Standards Act**<br>**720 Labor/Mgmt. Relations**<br>**730 Labor/Mgmt. Reporting & Disclosure Act**<br>**740 Labor Railway Act**<br>**790 Other Labor Litigation**<br>**791 Empl. Ret. Inc. Security Act** | **441 Voting (if not Voting Rights Act)**<br>**443 Housing/Accommodations**<br>**444 Welfare**<br>**440 Other Civil Rights**<br>**445 American w/Disabilities-Employment**<br>**446 Americans w/Disabilities-Other** | **110 Insurance**<br>**120 Marine**<br>**130 Miller Act**<br>**140 Negotiable Instrument**<br>**150 Recovery of Overpayment & Enforcement of Judgment**<br>**153 Recovery of Overpayment of Veteran's Benefits**<br>**160 Stockholder's Suits**<br>**190 Other Contracts**<br>**195 Contract Product Liability**<br>**196 Franchise** | **441 Civil Rights-Voting (if Voting Rights Act)** |

**V. ORIGIN**

| 1 Original Proceeding | 2 Removed from State Court | 3 Remanded from Appellate Court | 4 Reinstated or Reopened | 5 Transferred from another district (specify) | 6 Multi district Litigation | 7 Appeal to District Judge from Mag. Judge |
|---|---|---|---|---|---|---|

**VI.  CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23 | **DEMAND $**<br>**JURY DEMAND:** | Check YES only if demanded in complaint<br>**YES**           **NO** |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction)     **YES**     **NO** | If yes, please complete related case form. |
|---|---|---|

| **DATE** | **SIGNATURE OF ATTORNEY OF RECORD** |
|---|---|

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
#### Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  Listed below are tips for completing the civil cover sheet.  These tips coincide with the Roman Numerals on the Cover Sheet.

I.        COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C.,  and 99999 if plaintiff is outside the United States.

III.      CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section **II**.

IV.      CASE ASSIGNMENT AND NATURE OF SUIT:   The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint.  You may select only <u>one</u> category.  You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.      CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.