IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                                    )
QUANTUM ENTERTAINMENT              )
LIMITED,                          )
                                    )
        Plaintiff,                )
                                    )
v.                                  )        Case No. 1:07-cv-01295-RMU
                                    )
UNITED STATES DEPARTMENT          )
OF THE INTERIOR,                  )
BUREAU OF INDIAN AFFAIRS;         )
                                    )
        Defendant.                )
                                    )
```

## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Defendant hereby moves this Court for an Order granting summary judgment in favor of

Defendant, pursuant to Federal Rule of Civil Procedure Rule 56(b). The grounds for

Defendant's Motion are as follows:

1.      No material issues of fact are in dispute; and

2.      Defendant has properly complied with the Administrative Procedures Act, 5

U.S.C. § 551, *et seq*.

In support of this Motion, Defendant submits the accompanying Memorandum of Points

and Authorities in Support of Defendant's Motion for Summary Judgment, and the entire

Administrative Record on file with the Court (*see* Dkt. Nos. 12, 13).

Respectfully submitted this 27th day of June, 2008,

RONALD J.TENPAS
Assistant Attorney General

By:      */s/ Kristofor R. Swanson*

KRISTOFOR R. SWANSON
(Colo. Bar No. 39378)
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, DC 20044-0663
Tel: 202-305-0248
Fax: 202-305-0506
Email: kristofor.swanson@usdoj.gov

OF COUNSEL:

JANET SPAULDING
Senior Attorney
U.S. Department of the Interior
Office of the Solicitor
Tulsa Field Office
Tulsa, OK 74145

**CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2008, Defendant's Motion for Summary Judgment and the memorandum of points and authorities in support thereof were filed with the United States District Court for the District of Columbia's electronic filing system, to which the following attorneys are registered to be noticed:

Shelby J. Kelley
shelby.kelley@bracewellgiuliani.com

Nancy J. Appleby
nancy.appleby@bgllp.com

Mark A. Smith
msmith@rodey.com

*/s/ Kristofor R. Swanson*
Kristofor R. Swanson

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| QUANTUM ENTERTAINMENT LIMITED, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:07-cv-01295-RMU |
| UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS; | ) ) ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

KRISTOFOR R. SWANSON
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, DC 20044-0663
Tel: 202-305-0248
Fax: 202-305-0506
Email: kristofor.swanson@usdoj.gov


Of Counsel:

JANET SPAULDING
Senior Attorney
U.S. Department of the Interior
Office of the Solicitor
Tulsa Field Office

Date: June 27, 2008

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A.    The QEL Management Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B.    The Acting Regional Director's Decision . . . . . . . . . . . . . . . . . . . . . . . . 4

C.    The IBIA Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.   LEGAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A.    Applicable Statutes and Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

1.    25 U.S.C. § 81 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

2.    Department of the Interior Regulations . . . . . . . . . . . . . . . . . . . . 8

B.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.    THE IBIA ACTED REASONABLY AND IN ACCORDANCE
      WITH LAW IN DETERMINING THE ACTING REGIONAL
      DIRECTOR HAD CORRECTLY FOUND THE AGREEMENT TO
      BE SUBJECT TO, AND INVALID UNDER OLD SECTION 81 . . . . . . . . . 9

A.    The IBIA Acted Reasonably and in Accordance with U.S.
      Supreme Court Precedent in Affirming the Acting Regional
      Director's Decision to Apply Old Section 81 to His Review
      of the Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

B.    The IBIA and Acting Regional Director Acted Reasonably and
      in Accordance with Law in Determining the Agreement was
      Subject to Approval Under Old Section 81, and that the
      Agreement Was Invalid Absent that Approval. . . . . . . . . . . . . . . . . . 14

1.    The IBIA Reasonably Determined the Agreement was

With an Indian Tribe Because the Pueblo was a Party
to the Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

2.    The Acting Regional Director Acted Reasonably in
Determining the Agreement was "Relative to" Indian
Lands by Comparing the Facts Before Him to Judicially-
Recognized Standards, and the IBIA Properly Abstained
From Review Given Then-On-Going Federal Court
Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i.  The Acting Regional Director Acted Reasonably
in Determining the Agreement was "Relative to"
Indian Lands by Applying the Facts to Judicially-
Recognized Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ii.  The IBIA Acted Reasonably in Abstaining
from Addressing Relative to Indian Lands
Determination Given Then-On-Going Federal
Court Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

3.    As a Matter of Law, Any Agreement Subject to Old
Section 81 and Not Approved by the Secretary is
Null and Void, and the Acting Regional Director and
IBIA Therefore Acted Within Their Authority in
Invalidating the Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

C.    The IBIA Adequately Explained its Departure from Prior
Precedent and Therefore Did Not Act Arbitrarily or
Capriciously in Concluding Plaintiff Lacked Standing to
Challenge the Acting Regional Director's Decision
Not to Retroactively Approve the Agreement. . . . . . . . . . . . . . . . . 23

II.    THE DEPARTMENT OF THE INTERIOR COMPLIED WITH
DUE PROCESS REQUIREMENTS BY PROVIDING PLAINTIFF
NOTICE AND THE OPPORTUNITY TO BE HEARD
BEFORE THE IBIA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

A.    The IBIA Proceedings Themselves Provided Plaintiff Ample
Opportunity to be Heard, and the IBIA Determinations
Regarding Potential Due Process Violations in the Acting
Regional Director's Decision Were Reasonable and in
Accordance with Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

1.    The IBIA Proceedings Provided Plaintiff the

Opportunity to be Heard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

2.   The IBIA's Determination that the Acting Regional
Director's Decision Did Not Violate Plaintiff's
Procedural Due Process Rights Was Reasonable
and in Accordance with Law. . . . . . . . . . . . . . . . . . . . . . . . . . . 29

B.   **Given the Opportunity to be Heard Before the IBIA,
Plaintiff's Due Process Claims Relative to the Acting
Regional Director's Decision are Moot**. . . . . . . . . . . . . . . . . . . . . . . 30

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## INTRODUCTION

Plaintiff Quantum Entertainment Limited (QEL) brings claims under the Administrative Procedures Act challenging decisions by the Bureau of Indian Affairs Acting Regional Director for the Southwest Region and Interior Board of Indian Appeals (IBIA) invalidating a Management Agreement between Plaintiff, the Santo Domingo Pueblo, and a wholly-owned Tribal enterprise. Defendant Department of the Interior submits this memorandum in support of its motion for summary judgment. Both the Acting Regional Director and the IBIA acted reasonably, in accordance with law, and within their discretion in invalidating the Agreement. Additionally, by providing Plaintiff the opportunity to be heard before the IBIA, the Department of the Interior ("Department") did not violate Plaintiff's procedural due process rights. Defendant's motion for summary judgment should therefore be granted.

## SUMMARY OF ARGUMENT

The IBIA and Acting Regional Director acted reasonably, within their discretion, and in accordance with law in determining the QEL Management Agreement ("Agreement") was invalid. The IBIA appropriately determined the version of 25 U.S.C. § 81 in effect at the time the Agreement was signed applied, as retroactive application of an amended version of the law would have created contractual obligations otherwise not present. In determining the Agreement required approval under Section 81, the IBIA used the record before it to find the Plaintiff had contracted with the Pueblo, and reasonably abstained from addressing the Acting Regional Director's decision that the Agreement was "relative to" Indian lands in light of on-going litigation. The Acting Regional Director himself applied the facts in the record before him to judicially-recognized standards in making the "relative to" determination. Having found the

Agreement lacked the approval required by Section 81, the IBIA and Acting Regional Director were within their authority to declare the Agreement invalid, as the statute makes clear that contracts lacking the Secretary's approval are "null and void". Finally, the Department of the Interior gave Plaintiff notice of the Acting Regional Director's decision to invalidate the Agreement, and provided the opportunity to be heard before the IBIA, thus giving Plaintiff its procedural due process. Defendant's motion for summary judgment should therefore be granted.

## BACKGROUND

Santo Domingo Pueblo is a federally-recognized Indian Tribe, with a reservation located in New Mexico. Kewa Gas Limited is a wholly-owned tribal enterprise, chartered for the purpose of operating a gasoline business on behalf of the Pueblo. AR0055–56; AR0061. Quantum Entertainment Limited was a New Mexico limited liability corporation, located in Albuquerque, New Mexico. Compl. ¶ 1.

## I.     FACTUAL BACKGROUND[1]

In 1871, Congress first required that all agreements "made by any person with any tribe of Indians . . . in consideration of services for said Indians relative to their lands" must be approved by the Secretary of the Interior.  *See* Act of Mar. 3, 1871, ch. 120, 16 Stat. 544, 570

---

[1] Local Civil Rule 7.1(h) provides that each moving party shall accompany a motion for summary judgment with a statement of undisputed material facts.  The present case, however, is a challenge to agency action under the Administrative Procedures Act (APA).  The APA limits judicial review to the administrative record before the agency at the time of its decision. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985).  District courts, therefore, as the reviewing courts in APA cases, do not act as fact-finders. *Id.* at 744.  Here, the Department of the Interior filed the Administrative Record with the Court on May 14, 2008. *See* Dkt. Nos. 12, 13.  The Administrative Record constitutes the facts in this case.  To facilitate the Court's review and adjudication of the parties' cross-motions for summary judgment, the Defendant submits a statement of relevant, undisputed facts, as drawn from the Administrative Record.

(1871) (made permanent by Act of May 21, 1872, ch. 177, §§ 1, 2, 17 Stat. 136 (1872));

AR0828–29.  The requirement was eventually codified at 25 U.S.C. § 81.

A.      The QEL Management Agreement.

After the U.S. Supreme Court decision in *Oklahoma Tax Commission v. Chickasaw Nation*, 515 U.S. 450 (1995), the combination of federal Indian law principles and state law allowed gasoline to be received onto the Indian reservations within New Mexico, and resold therefrom, free of state gasoline tax.  AR0828 (footnote 1 in IBIA opinion); AR0560–65; AR0595–97.  Seeking to take advantage of the tax benefit, on August 1, 1996, the Pueblo, Kewa Gas, and Plaintiff entered into a Management Agreement.  AR0129; AR0131–40.  The Agreement authorized Plaintiff to manage a wholesale gasoline distribution business for the Pueblo.  AR0131.  Shortly thereafter, the Pueblo leased a portion of Pueblo lands to Kewa Gas for, among other purposes, siting of the distribution facility.  AR0092.  The Pueblo land subject to the lease is held in federal protected status.  AR0147.

The business involved tanker trucks delivering gasoline to storage tanks on Pueblo land.  AR0297–98.  The gasoline was then pumped out of the tanks into additional trucks for delivery to retail service stations.  AR0298.  Plaintiff managed the day-to-day operation; directed all operations; hired and supervised employees; marketed and promoted the business; and had other administrative responsibilities.  AR0131–33.  In exchange, the Agreement provided for Plaintiff to be paid forty-nine percent of the net income from the business.  AR0134.  The forty-nine percent was in addition to a "fee equal to .03 per gallon" sold to the Pueblo's retail gas station, and "a monthly performance bonus in an amount equal to .005 per gallon" for every gallon sold in excess of 1 million gallons per month.  AR0135.  Plaintiff was also responsible for making

-3-

payments on operating costs. AR0132–133. The Pueblo and Kewa Gas covenanted not to compete against Plaintiff in any other gasoline distribution business within the State. AR0137. Kewa Gas provided the financing for operating costs and construction of the facility. AR0132–33  In authorizing the Agreement, the Pueblo's Tribal Council conditioned business operation on the approval of the Agreement by the Secretary of the Interior. AR0130. The Secretary never approved the agreement. AR0040.

In 1999, the New Mexico Legislature amended State tax law, removing the benefit. *See* AR0566; AR0629. In its place, the Legislature enacted a tax deduction for the benefit of certain tribes already operating distribution facilities of a certain size. *See* AR0629–30. Santo Domingo met the requirements for the deduction. *See* AR0568. The tax deduction allowed up to 2.5 million gallons of gasoline per month to be deducted from taxable proceeds. *See* AR0627–30. In 2000, the United States Congress amended 25 U.S.C. § 81, narrowing the scope of the contracts that require Secretarial approval.

### B.    The Acting Regional Director's Decision.

The Santo Domingo Pueblo Governor serves for a term of one year. AR0297. On March 28, 2003, then-Pueblo Governor Everett Chavez wrote the Bureau of Indian Affairs (BIA) Superintendent for the Southern Pueblos Agency requesting BIA review of the QEL Management Agreement. AR0052. Governor Chavez requested the review to ensure the Agreement was fair to the Pueblo, and that the Pueblo's legal rights were adequately protected. AR0052. The Governor also expressed concern that the Agreement was too lucrative for Plaintiff. AR0052. Regional Director Robert Baracker then met with Governor Chavez to discuss the Governor's request. AR0297–98. At the meeting, the Governor articulated health

and safety concerns associated with the facility's location near the Santo Domingo elementary

school.  AR0297–98.  The Governor advised the Regional Director that he had requested Plaintiff

relocate the facility, but Plaintiff refused to do so.  AR0298.

On October 23, 2003, the Acting Regional Director[2] provided written notice to Governor

Chavez and QEL President Ken Newton that the BIA had determined the Agreement required

approval under 25 U.S.C. § 81, that such approval had not been obtained, and, therefore, the

Agreement was not legally valid.[3]  AR0036–41.  In making the determination, the Acting

Regional Director applied the version of Section 81 in place at the time the agreement was

signed.  *See* AR0036.  The Acting Regional Director also decided not to retroactively approve

the Agreement because it was against the Pueblo's best interest.  AR0040.  The Acting Regional

Director provided Plaintiff and the Pueblo with notification concerning the option to appeal his

initial decision to the IBIA.  AR0040–41.  Plaintiff acted upon that option and properly appealed.

AR0002–05.

### C.    The IBIA Decision

After extensive briefing on appeal, the IBIA upheld the Acting Regional Director's

decision that the Agreement required the Secretary's approval, did not receive that approval, and

was therefore invalid.  AR0826–58.  Specifically, the IBIA held the version of Section 81 in

---

[2] Though Governor Chavez met with Regional Director Baracker, Acting Regional Director
Toya actually signed the eventual decision letter.  AR0041.

[3] The Acting Regional Director's letter also demanded that management fees already paid to
Plaintiff be refunded to the Pueblo, all bank accounts established under the Agreement be placed
into the names of Kewa Gas and the Pueblo, and that Plaintiff vacate the premises.  AR0040.
Plaintiff dropped its challenge to those demands before the IBIA in response to BIA's admission
that it lacked authority to order such actions.  AR0853; AR0533–34.

effect at the time the Pueblo, Kewa Gas, and Plaintiff signed the Agreement to be applicable. AR0842. The IBIA determined the Agreement met that version of Section 81's definition of agreements that required approval, though abstaining from determining whether the Agreement was "relative to" Indian lands. AR0842–48. The overall effect was to affirm, though at times on different grounds, the Acting Regional Director's conclusion that the Agreement required Secretarial approval. *See* AR0842–48.

The IBIA also affirmed the Acting Regional Director's authority to declare the Agreement void absent the requisite Secretarial approval (AR0853–54), and determined Plaintiff did not have standing to appeal the Acting Regional Director's decision not to approve the Management Agreement retroactively. AR0849–52. The IBIA dismissed the portion of the appeal dealing with the Acting Regional Director's demands upon Plaintiff as moot or, in the alternative, not ripe. AR0854–55. Finally, the IBIA found no merit in Plaintiff's due process claims against the Acting Regional Director, as the Department's appeal process granted Plaintiff the opportunity to be heard. AR0855–56. Plaintiff now challenges various aspects of both the Acting Regional Director and IBIA decisions under the Administrative Procedures Act.

## II.    LEGAL BACKGROUND

### A.    Applicable Statutes and Regulations

#### 1.    25 U.S.C. § 81

Congress requires certain contracts made between Tribes and non-Tribal parties to be approved by the Secretary of the Interior. *See* 25 U.S.C. § 81(b) (2004). Decisions about the applicability of 25 U.S.C. § 81 are delegated from the Secretary to BIA Regional Directors. AR0036. Prior to its amendment in 2000, 25 U.S.C. § 81 provided, in pertinent part, as follows:

> No agreement shall be made by any person with any tribe of Indians . . . for the payment or delivery of any money or other thing of value . . . in consideration of services for said Indians relative to their lands . . . unless such contract or agreement be executed and approved as follows:
>
> * * *
>
> Second.  It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it.
>
> * * *
>
> All contracts or agreements made in violation of this section shall be null and void, . . . .

Act of Mar. 3, 1871, ch. 120, 16 Stat. at 570; *see* 25 U.S.C. § 81 (1994) ("Old Section 81").

Thus, under Old Section 81, a contract with an Indian tribe for services relative to tribal land must be approved by the Secretary or it is null and void.  *See id.*  Old Section 81 also provides a remedy, allowing suit in the name of the United States to recover payments made under a void contract.  *See* 25 U.S.C. § 81 (1994) ("[A]ll money or other thing of value paid . . . in excess of the amount approved by the Commissioner and Secretary for such services, may be recovered by suit in the name of the United States in any court of the United States").  Congress intended Old Section 81 "to protect the Indians from improvident and unconscionable contracts."  *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 805 (7th Cir. 1993) (citation and internal quotation omitted).

Congress amended Old Section 81 in 2000, removing the requirement that a contract be for services "relative to" Indian lands and replacing it with the requirement that the contract "encumber Indian lands" for a period of at least seven years.  *See* 25 U.S.C. § 81 (2004) ("New Section 81").  Congress also eliminated the provisions allowing recovery of monies paid under an invalid contract.  *See id.*  New Section 81 is intended to limit the range of transactions that

-7-

require Secretarial approval.  *See* S. Rep. No. 106-150, at 9 (1999).

                2.      <u>Department of the Interior Regulations</u>

Department of the Interior regulations applicable to Tribes and Tribal lands are found at

Title 25 in the Code of Federal Regulations.  Procedures and practice for appeals from

administrative decisions are located in Subchapter A, Part 2.  Specifically, § 2.6 provides as

follows:

> (a) No decision, which at the time of its rendition is subject to appeal to a superior
> authority in the Department, shall be considered final so as to constitute
> Departmental action subject to judicial review under 5 U.S.C. 704, unless when
> an appeal is filed, the official to whom the appeal is made determines that public
> safety, protection of trust resources, or other public exigency requires that the
> decision be made effective immediately.
>
> (b) Decisions made by officials of the Bureau of Indian Affairs shall be effective
> when the time for filing a notice of appeal has expired and no notice of appeal has
> been filed.
>
> * * *

25 C.F.R. § 2.6.  The IBIA's authority can be found at 43 C.F.R. § 4.1(b)(2).

**B.**      **Standard of Review**

Plaintiff seeks review of the Acting Regional Director and IBIA decisions under the

Administrative Procedures Act ("APA"), 5 U.S.C. § 551, *et seq*.  Compl. ¶ 3.  The applicable

standard of review, therefore, is whether the IBIA decision was "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law."  *See* 5 U.S.C. § 706(2)(A); *Citizens to*

*Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).  The APA standard of review is narrow,

and courts are not empowered to substitute their judgment for that of the agency.  *Marsh v. Or.*

*Natural Res. Council*, 490 U.S. 360, 378 (1989).  All that is required is that the agency consider

relevant information and articulate a "rational connection between the facts found and the choice

made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986) (citation and internal quotation omitted); *see also Pub. Citizen, Inc. v. Fed. Aviation Admin.*, 988 F.2d 186, 197 (D.C.Cir.1993). Thus, judicial review is limited to a determination on whether "the [IBIA] decision was based on the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416. Additionally, review is limited to the administrative record before the agency at the time the decision was made. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985).

## ARGUMENT

The IBIA and Acting Regional Director acted reasonably, within their discretion, and in accordance with law in applying Old Section 81 to the Management Agreement, determining the Agreement was subject to Secretarial approval, and declaring the Agreement invalid for lack thereof. Further, the Department provided ample opportunity for Plaintiff to be heard before the IBIA, meeting procedural due process requirements. Defendant's motion for summary judgment should therefore be granted.

## I.    THE IBIA ACTED REASONABLY AND IN ACCORDANCE WITH LAW IN DETERMINING THE ACTING REGIONAL DIRECTOR HAD CORRECTLY FOUND THE AGREEMENT TO BE SUBJECT TO, AND INVALID UNDER OLD SECTION 81.

The IBIA appropriately determined New Section 81 should not be applied retroactively to the QEL Management Agreement, as retroactive application would have created contractual obligations not present under Old Section 81. Applying Old Section 81 to the Agreement, the IBIA reasonably determined the Agreement was with a Tribe, as the Pueblo was a party to the Agreement, and reasonably abstained from addressing the Acting Regional Director's determination that the Agreement was "relative to" Indian lands in light of legal uncertainties surrounding then-on-going litigation. The Acting Regional Director himself applied facts in the

-9-

record before him to judicially-recognized factors and therefore acted reasonably and in

accordance with law in making the initial "relative to" Indian lands determination.  Finally,

because Old Section 81 makes "null and void" any agreement that required, and was lacking

Secretarial approval, the IBIA and Acting Regional Director acted within their discretion in

declaring the QEL Management Agreement invalid.  The Department therefore acted reasonably

and in accordance with law in its review of the Agreement, and Defendant's motion for summary

judgment should be granted.

A.    **The IBIA Acted Reasonably and in Accordance with U.S. Supreme Court Precedent in Affirming the Acting Regional Director's Decision to Apply Old Section 81 to His Review of the Agreement.**[4]

The QEL Management Agreement was signed in 1996 when Old Section 81 was in

effect.  Congress passed New Section 81 in 2000.  The Acting Regional Director reviewed the

Agreement in 2003 under Old Section 81.  As an initial matter in its review, the IBIA determined

that the Acting Regional Director was correct in applying Old Section 81 to the Agreement.

AR0842.  In so concluding, the IBIA appropriately applied the legal rules of retroactive statutory

application, and therefore acted reasonably and in accordance with law.

In *Landgraf v. USI Film Products*, the U.S. Supreme Court clarified the test for

retroactive application of statutes, holding that those burdening private rights are not to be given

retroactive effect absent a clear Congressional intent to the contrary.  511 U.S. 244, 270 (1994).

The key questions in a retroactivity analysis are: (1) whether the new statute would "impair

_____

[4] The Parties have stipulated that, should the Court find the Management Agreement is subject to New Section 81, the Agreement did not require Secretarial approval. *See* Joint Stipulation (Dkt. No. 14) (referencing *GasPlus v. U.S. Dep't of the Interior, Bureau of Indian Affairs*, 510 F. Supp. 2d 18 (D.D.C. 2007) (Case No. 1:03cv1902)).

rights a party possessed when he acted, increase a party's liability for past conduct, or impose

new duties with respect to transactions already completed . . . "; and, if it would, (2) whether

Congress gave a clear intent to apply the statute retroactively. *Id.* at 280.

The IBIA analyzed the Acting Regional Director's decision to apply Old Section

81—rather than the present version—under *Landgraf*. AR0840–41. In proceedings before the

IBIA, Plaintiff conceded that New Section 81 does not contain a clear Congressional expression

of retroactive application. *See* AR0841 (footnote 14 in the IBIA opinion). The only issue before

the IBIA, therefore, was whether application of New Section 81 would change the legal

consequences of the QEL Management Agreement. AR0841. The IBIA made a reasonable

conclusion that it would.

As Plaintiff acknowledges, New Section 81 severely limits the types of agreements that

require Secretarial approval when compared to Old Section 81. *See* AR0192. In both cases, a

contract not approved by the Secretary that requires his approval is invalid. *See* 25 U.S.C. §

81(b) (2004); 25 U.S.C. § 81 (1994). Old Section 81 requires the Secretary's approval for any

agreement, among other things, "relative to" Indian lands. 25 U.S.C. § 81 (1994). New Section

81, however, more narrowly requires it only for agreements "encumbering" Indian lands. 25

U.S.C. § 81 (2004). By amending Section 81 in 2000, Congress therefore changed the legal

regime governing Secretarial approval of contracts with Tribes, expanding the number of

agreements that would be legally enforceable absent Secretarial approval. Thus, an agreement

pre-dating the amendment that is invalid for lack of Secretarial approval could nonetheless be

given legal effect if judged under New Section 81, as it would not have required approval in the

first place. Applying New Section 81 could make binding an agreement that would have

otherwise been invalid.

Here, the Secretary never approved the QEL Management Agreement, and it was therefore null and void from day one.  *See United States ex rel. Crow Creek Sioux Tribe v. Hattum Family Farms*, 102 F. Supp. 2d 1154, 1158 (D.S.D.), *aff'd,* 237 F.3d 919 (8th Cir. 2000). The Agreement, however, would be valid without Secretarial approval under New Section 81. *See GasPlus v. U.S. Dep't of the Interior, Bureau of Indian Affairs*, 510 F. Supp. 2d 18, 27 (D.D.C. 2007).  Thus, as the IBIA concluded, applying New Section 81 to the Agreement now would retroactively create contractual obligations for the Plaintiff and the Pueblo where none previously existed.  As a legal matter under *Landgraf*, New Section 81 should not be applied retroactively to agreements entered prior to the 2000 amendment.  *See Landgraf*, 511 U.S. at 280; *cf. United States ex rel. Bernard v. Casino Magic Corp.*, 384 F.3d 510, 513 n.1 (8th Cir. 2004) (refusing to apply New Section 81 to post-amendment review of pre-amendment qui tam action) (citing *United States ex rel. Steele v. Turn Key Gaming, Inc.*, 260 F.3d 971, 973 (8th Cir. 2001)).

Further, "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Id.* at 265 (quoting *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990) (Scalia, J., concurring)).  Applying New Section 81 to the Agreement now would change the contractual legal regime from that of which Plaintiff, the Pueblo, and Kewa Gas were aware when they entered into the Agreement.   As of 1996, it was well established that management agreements concerning tribal businesses could require BIA approval under Old Section 81.  *See generally Barona Group of the Capitan Grande Band of Mission Indians v. Am. Mgmt. & Amusement, Inc.*,

840 F.2d 1394 (9th Cir. 1987); *A. K. Mgmt. Co. v. San Manuel Band of Mission Indians*, 789

F.2d 785 (9th Cir. 1986); *Wisc. Winnebago Bus. Comm. v. Koberstein*, 762 F.2d 613 (7th Cir.

1985).   In fact, Old Section 81 was enacted to provide a Governmental oversight mechanism to

ensure fair contracting.  *See Altheimer*, 983 F.2d at 805.  And, when the Agreement was signed

in 1996, the Pueblo acknowledged it would require Secretarial approval.  AR0130 (conditioning

authorization to operate under the agreement on Secretarial approval).  Additionally, Old Section

81 includes a remedy which allows suit in the name of the United States to recover payments

made under a void contract.  *See* 25 U.S.C. § 81 (1994); *Bernard*, 384 F.3d at 513–14.  New

Section 81, on the other hand, severely limits the breadth of Governmental oversight and

includes no separate recovery provision.  *See* 25 U.S.C. § 81 (2004).  The Supreme Court has

instructed that a decision on whether a particular statute acts retroactively "should be informed

and guided by familiar considerations of fair notice, reasonable reliance, and settled

expectations."  *INS v. St. Cyr*, 533 U.S. 289, 321 (2001) (quoting *Martin v. Hadex*, 527 U.S. 343,

358 (1999)) (internal quotations omitted).  Applying New Section 81 to the QEL Management

Agreement would change the legal assumptions that were behind the contract when it was

signed.  The IBIA therefore acted reasonably and in accordance with law in applying Old

Section 81 to the Agreement.

**B.    The IBIA and Acting Regional Director Acted Reasonably and in Accordance with Law in Determining the Agreement was Subject to Approval Under Old Section 81, and that the Agreement Was Invalid Absent that Approval.**

The IBIA next addressed whether the Agreement required Secretarial approval under Old Section 81. Determining if approval is required under Old Section 81 entails a three-part inquiry: (1) whether the contract is made with a Tribe; (2) whether the contract is in consideration of services; and (3) whether those services are "relative to" Indian lands. *See* 25 U.S.C. § 81 (1994); *see also, e.g., Hattum Family Farms*, 102 F. Supp. 2d at 1158 (citing Old Section 81 and *Altheimer*, 983 F.2d at 808).

Under the first element, the IBIA determined the Agreement was made with an Indian Tribe. AR0843–46. The second element, whether the Agreement was for services, is not disputed here. *See* AR0842. Regarding the third element, whether the Agreement was "relative to" Indian lands, the IBIA abstained in light of the then-active *GasPlus* litigation. AR0846–48. Thus, the Acting Regional Director's decision that Secretarial approval was required under Old Section 81 became effective as a final agency decision. AR0848. Both the IBIA and the Acting Regional Director acted reasonably and in accordance with law. The IBIA relied upon facts in the Record to determine the Pueblo was a party to the Agreement, as supported by other caselaw. Similarly, the Acting Regional Director applied the facts before him to judicially-recognized factors and reasonably concluded the Agreement was "relative to" Indian lands.

1.    <u>The IBIA Reasonably Determined the Agreement was With an Indian Tribe Because the Pueblo was a Party to the Agreement.</u>

Old Section 81's requirement that an agreement be "with a Tribe of Indians" is fairly straight forward on its face.  In appeal to the IBIA, however, Plaintiff argued that the QEL Management Agreement was between Plaintiff and Kewa Gas, an enterprise rather than a Tribe. AR0205–11.  The IBIA concluded, regardless of Kewa Gas's corporate status, the Agreement was indeed with the Pueblo.  AR0844.  As the IBIA noted (AR0844–46), its decision is well supported by the Record.

First, the parties did not treat Kewa Gas and the Pueblo as separate entities.  AR0844. The Agreement's opening paragraph notes the contract is between "[QEL], on the one hand, and the Santo Domingo Pueblo . . . , and Kewa Gas Limited ("Distributor"), on the other."  AR0130; AR0844.  The Pueblo separately recognized that the Agreement was "by and among Quantum Entertainment Limited, Kewa Gas and the Pueblo of Santo Domingo . . . ."  AR0130 (tribal resolution authorizing the Agreement). The Agreement contains a provision that it cannot be modified except in writing as signed by "<u>both</u> parties."  AR0139 (emphasis added); AR0844–45. The parties noted the Pueblo owned 100 percent of Kewa Gas's stock.  AR0131; AR0845.  In exchange for management, the Pueblo gave up valuable consideration by committing not to participate in any competing gas distribution business within the State.  AR0137; AR0845. Further, the parties included an arbitration clause for disputes between Plaintiff and the Pueblo relating to the Agreement.  AR0136.  All the above supports a conclusion that the Pueblo was a party to the Agreement, and the IBIA therefore reasonably concluded that the Agreement was with an Indian Tribe.

Additionally, the IBIA's determination was by no means contrary to established caselaw

on what constitutes contracting with a Tribe for purposes of Old Section 81.  As the IBIA noted, the Pueblo's role in the Agreement here is far more expansive that of the Tribe in *Inecon Agricorporation v. Tribal Farms, Inc.*, 656 F.2d 498 (9th Cir. 1981).  AR0845.  In *Inecon*, the Tribe's sole obligation was not to interfere in the contract.  *Inecon Agricorp.*, 656 F.2d at 501. The present facts align much more closely with *Altheimer*, where a wholly-owned tribal corporation and governmental subdivision entered into an agreement with a medical supply company to manufacture and market latex medical products.  *Altheimer*, 983 F.2d at 806. Similar to the facts here, the non-tribal party in *Altheimer* acted as if the tribe was party to the agreement (*see id.* at 808); the contract expressly recognized the tribe as a party (*see id.* at 808–09); and the tribe itself did not distinguish between itself and the corporation.  *See id.* at 809 (referencing, *inter alia*, the corporate charter and the fact that the board of directors was comprised of tribal members).  The Seventh Circuit held the contract was with a Tribe for purposes of Old Section 81.  *Id.* at 810.  The *Altheimer* decision and the substantial support in the Record show that the IBIA acted reasonably and in accordance with law in determining the QEL Management Agreement was "with a Tribe" for purposes of Section 81.[5]

---

[5] The IBIA decision discussed *Pueblo of Santa Ana v. Hodel*, 663 F. Supp. 1300, 1305 (D.D.C. 1987).  *See* AR0843.  The decision is not relevant to the IBIA's ultimate determination, however, because it involved the question of whether a tribal enterprise could be considered a Tribe.  *See Pueblo of Santa Ana*, 663 F. Supp. at 1305 ("They contend that Santa Ana Enterprises is a separate entity for purposes of contracting . . . .).  Here, the IBIA's conclusion rests on the Pueblo itself being party to the QEL Management Agreement. AR0846.

2.   <u>The Acting Regional Director Acted Reasonably in Determining the Agreement was "Relative to" Indian Lands by Comparing the Facts Before Him to Judicially-Recognized Standards, and the IBIA Properly Abstained From Review Given Then-On-Going Federal Court Litigation.</u>

To require approval, Old Section 81 merely requires that a contract with a Tribe be "relative to" Indian lands. *See* 25 U.S.C. § 81 (1994). The Acting Regional Director determined the QEL Management Agreement fell within the statute's broad reach. AR0040. At the time of the IBIA's decision, however, a similar agreement was the subject of litigation in this Court. AR0846 (referencing *GasPlus v. U.S. Dep't of the Interior*, No. 1:03-cv-1902 (D.D.C.)). The IBIA therefore abstained from addressing whether the Acting Regional Director had properly determined the QEL Management Agreement was "relative to" Indian lands. AR0848. The abstention had the effect of making final the Acting Regional Director's determination on the issue. AR0848. Neither the Acting Regional Director nor the IBIA acted unreasonably or contrary to law.

i.   *The Acting Regional Director Acted Reasonably in Determining the Agreement was "Relative to" Indian Lands by Applying the Facts to Judicially-Recognized Factors.*

Statutory interpretation begins with a statute's plain meaning. *See, e.g., Mallard v. United States District Court for the Southern District of Iowa*, 490 U.S. 296, 301 (1989). The relevant portion of Old Section 81 reads as follows:

> No agreement shall be made by any person with any tribe of Indians . . . for the payment or delivery of any money or other thing of value . . . in consideration of services for said Indians relative to their lands.

25 U.S.C. § 81 (1994). The statute on its face covers a wide-array of contracts. The Seventh Circuit has noted, "[i]t is obvious from the broad language 'relative to their lands' that Congress

-17-

intended to cover almost all land transactions with Indian property."[g]  *Wis. Winnebago*, 762 F.2d at 618.  Further, interpreting Old Section 81 broadly conforms with "the weighty rule that statutes and regulations intended to benefit Indians be liberally construed in their favor."  *Star Lake R. Co. v. Lujan*, 737 F. Supp. 103, 109 (D.D.C. 1990) (citations omitted), *aff'd*, 925 F.2d 490 (D.C. Cir. 1991) (per curiam) (before R. Ginsburg, J., D. Ginsburg, J., and Henderson, J.).

Courts have consistently given broad meaning to the "relative to" provision.  In *A.K. Management*, the Ninth Circuit held a contract was "relative to" Indian lands because the non-Indian party had an exclusive right to build and control a bingo facility, which was located on tribal lands, and the contract prohibited the tribe from encumbering the land.  *See* 789 F.2d at 787.  A year later, holding that exclusive control and an encumbrance clause were not required, the Ninth Circuit found a management contract for an on-reservation bingo facility was "relative to" Indian lands solely because the non-Indian party had the exclusive right to build and operate the facility.  *Barona Group*, 840 F.2d at 1404.  The Eighth Circuit went even further in reviewing an agreement for sitework and employment services.  *See Steele*, 260 F.3d at 975–80.  The Circuit held the "relative to" language in the statute incorporates all agreements that involve actual "incidents and rights of property ownership."  *Id.* at 979–80.  The agreements at issue in *Steele* were not "relative to" Indian lands because they did not involve such rights, including the

_____

[g] At best from Plaintiff's perspective, Old Section 81's "relative to" provision is ambiguous.  *See Steele*, 260 F.3d at 975.  Ambiguous statutory provisions enacted for the benefit of Indians are to be interpreted for the benefit of Tribes.  *See Cobell v. Norton,* 240 F.3d 1081, 1101 (D.C. Cir. 2001) (quoting *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766 (1985))*; Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444–45 (D.C. Cir. 1988) (quoting *Blackfeet Tribe*, 471 U.S. at 766); *Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt*, 116 F. Supp. 2d 155, 158–59 (D.D.C. 2000); *cf. Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1266 n.7 (D.C. Cir. 2008) (noting that agency deference is particularly appropriate where the interpretation advances the trust relationship between the Government and Indians).

right to construct, maintain, and operate the facility. *Id.* The QEL Management Agreement, on

the other hand, explicitly granted Plaintiff those privileges. *See* AR0131–32. Thus, under the

broad reading required for statutes benefitting Indians, the QEL Management Agreement is

"relative to" Indian lands.

The Acting Regional Director, however, based his determination on the Seventh Circuit's

narrower *Altheimer* approach to the "relative to" provision. AR0038–40; *Altheimer*, 983 F.2d at

810–12. Despite the narrower approach, he still found the Agreement to be "relative to" the

Pueblo's lands. AR0040. In *Altheimer*, the Seventh Circuit identified four factors to consider in

determining whether a contract is "relative to" Indian lands. *Id.* at 811. The factors are: (1)

whether the contract relates to management of a facility located on Indian lands; (2) whether the

non-Indian party has the exclusive right to operate the facility; (3) whether the Tribe is forbidden

from encumbering the property; and (4) whether the operation of the facility depends on the

Tribe's legal status. *Id.* Though important, "none of the above factors are the '*sine qua non*' of

a contract which relates to Indian lands." *Id.* (italics in original). The Seventh Circuit held the

*Altheimer* contract was not "relative to" Indian lands because it met only the first—and then only

arguably—of the four factors. *See id.* at 811–12. Following *Altheimer*'s guidance, the Acting

Regional Director found the QEL Management Agreement was "relative to" Indian lands

because of the business's location on tribal land; the Plaintiff's exclusive control of the business;

and the fact that the business relied upon its location on Tribal land to take advantage of a State

tax benefit. *See* AR0038–40. By applying conservative, judicially-recognized factors to the

facts before him,[7] the Acting Regional Director acted reasonably and in accordance with law.

Under the first *Altheimer* factor, there is no question that the gasoline distribution business was located on Tribal lands. A title search revealed that the land leased to Kewa Gas is Pueblo land held in restricted fee status. AR00147–52. The gasoline distribution business was located on the leased land. AR0130. Similarly, there is no question the Agreement was for the management of that gasoline distribution business. AR0131 ("[Kewa Gas] hereby engages QEL to manage, supervise, and operate . . . ."). Thus, the Acting Regional Director made a more than reasonable conclusion under the first *Altheimer* factor.

For the second *Altheimer* factor, the Acting Regional Director reasonably concluded the Agreement gave Plaintiff the exclusive right to operate the facility. The Agreement granted Plaintiff the responsibility to supervise and direct general operation; negotiate fuel prices; set income maximization policies; hire personnel; and pay legal, accounting, advertising, insurance, tax, permit, license, and other administrative costs. AR0131–33. Plaintiff's duties were thus in stark contrast to the agreement in *Altheimer*. There, the court found significant the fact that the non-tribal manager "did not have unilateral power to set wages and salaries or operation and administration costs." *Altheimer*, 983 F.2d at 811–12.

For the third *Altheimer* factor, the Acting Regional Director concluded the QEL Management Agreement did not encumber Tribal lands. AR0039. But the Pueblo argued before the IBIA that the Agreement's covenant not to compete was an encumbrance. *See* AR0558–59. With the non-compete clause, the Agreement comports with a bingo contract the Eight Circuit

---

[7] The record before the Acting Regional Director when making his decision is a sub-part of the IBIA Administrative Record, located at AR0052–157. *See* AR0146 (certification from Acting Regional Director Toya).

found to be "relative to" Indian lands because the Tribe "gave up the right to independently

establish any other bingo operations on its land." *Steele*, 260 F.3d at 979. Similarly, the

covenant here prevented the Pueblo from participating in the operation of another distribution

facility. AR0137.

   Finally, under the fourth *Altheimer* factor, the Acting Regional Director determined the

very existence of the gasoline distribution facility depended upon its location on the Pueblo's

land and the associated tax benefits. AR0040–41. The Acting Regional Director had

information before him that the operation had "a competitive price advantage" resulting from a

combination of Federal Indian law principles and State tax law, and that the Agreement was

aimed at taking advantage of the tax benefit. AR0129; AR0157. The State tax benefit again

distinguishes the present facts from *Altheimer*, where the medical supply production facility

derived no special benefit from being located on reservation lands. *Altheimer*, 983 F.2d at 812.

The Seventh Circuit noted that "manufacturers of latex medical products need not seek refuge

from state civil laws by locating on a reservation." *Id.* By contrast, operating beyond the reach

of State tax law was exactly the purpose of the QEL Management Agreement. *See* AR0129.

The Acting Regional Director therefore reasonably concluded that the business operation

depended on the legal status of the Tribe. The Acting Regional Director's conclusion under that

fourth *Altheimer* factor, combined with his conclusions under two of the other three, led him to

determine the QEL Management Agreement was "relative to" Indians lands. In so doing, the

Acting Regional Director acted reasonably by using judicially-recognized analytical factors and

making conclusions supported in the Record.

   Thus, in light of caselaw broadly interpreting Old Section 81 and the Acting Regional

Director's use of more conservative, judicially-recognized standards to evaluate facts supported by the Record, the Acting Regional Director did not act arbitrarily, capriciously, or contrary to law in determining the QEL Management Agreement was "relative to" Indian lands.

> ii.    *The IBIA Acted Reasonably in Abstaining from Addressing Relative to Indian Lands Determination Given Then-On-Going Federal Court Litigation.*

The IBIA also acted reasonably in deciding to abstain from reviewing the determination that the Agreement was "relative to" Indian lands. The IBIA decided to abstain because of unanswered questions being litigated in *GasPlus*. AR0847–48. If this Court had determined the agreement in *GasPlus* "encumbered" Indian lands,[9] the QEL Management Agreement necessarily would also "encumber" Indian lands and therefore—given the broader scope of Old Section 81—be "relative to" Indian lands. AR0848. Any premature IBIA determination to the contrary would have simply led to reversal. Similarly, an IBIA determination that the QEL Management Agreement was not "relative to" Indian lands would amount to a contradiction of the Department's litigating position. AR0848. Stuck between a rock and a hard place, the IBIA chose to abstain and allowed the Acting Regional Director's decision to become effective. Given that unanswered questions of statutory interpretation were already being litigated at the time of its decision, the IBIA acted reasonably in abstaining.

Thus, neither the IBIA nor Acting Regional Director acted arbitrarily, capriciously, in an abuse of discretion, or otherwise contrary to law in determining the QEL Management Agreement was made with an Indian Tribe and "relative to" Indian lands.

---

[9] This Court ultimately determined the *GasPlus* agreement did not "encumber" Indian lands. *See GasPlus*, 510 F. Supp. 2d at 27.

-22-

3.      As a Matter of Law, Any Agreement Subject to Old Section 81 and Not
        Approved by the Secretary is Null and Void, and the Acting Regional
        Director and IBIA Therefore Acted Within Their Authority in Invalidating
        the Agreement.

After determining the QEL Management Agreement was subject to Old Section 81, the

Acting Regional Director declared it invalid for lacking the requisite Secretarial approval.

AR0040.  The IBIA effectively upheld that conclusion.  AR0853–54.  Old Section 81 explicitly

states: "All agreements made in violation of this Section shall be null and void."  25 U.S.C. § 81

(1994).  A straight reading of the statute leads to the conclusion that an agreement requiring

Secretarial approval is invalid without it.  *See Hattum Family Farms*, 102 F. Supp. 2d at 1164

("As a matter of law, such a contract is null and void for lack of [approval by the Secretary].").

Thus, neither the Acting Regional Director nor the IBIA acted outside their authority by simply

reciting the statute's requisite legal conclusion.

The IBIA and Acting Regional Director acted reasonably, within their discretion, and in

accordance with law in determining Old Section 81 applied, that the Agreement was subject to

Secretarial approval, and that it was invalid without that approval.  Defendant's motion for

summary judgment should therefore be granted.

**C.    The IBIA Adequately Explained its Departure from Prior Precedent and
       Therefore Did Not Act Arbitrarily or Capriciously in Concluding Plaintiff
       Lacked Standing to Challenge the Acting Regional Director's Decision Not to
       Retroactively Approve the Agreement.**

Having effectively upheld the Acting Regional Director's decision that the QEL

Management Agreement required Secretarial approval and was therefore invalid, the IBIA

turned to whether the Acting Regional Director had appropriately decided against after-the-fact

approval.  AR0849–52.  The IBIA, however, did not reach the merits, and instead determined

Plaintiff did not have standing to challenge the decision, overruling *Hattum v. Great Plains Regional Director*, 36 IBIA 79, 2001 WL 328233 (Mar. 20, 2001). Under the APA, an agency ruling in an informal or formal adjudication does not act arbitrarily simply because it has departed from prior precedent. Only an unexplained departure rises to the level of an arbitrary and capricious decision. *See N. Cal. Power v. FERC*, 37 F.3d 1517, 1522 (D.C. Cir. 1994); *Pontchartrain Broadcasting Co. v. FCC*, 15 F.3d 183, 185 (D.C. Cir. 1994). Here, the IBIA identified potential precedent, analyzed the precedent in light of the present facts, and explained the reason for its decision. The IBIA therefore did not act arbitrarily or capriciously in finding Plaintiff had no standing to challenge the Acting Regional Director's decision not to retroactively approve the Agreement.

In reaching the conclusion on standing, the IBIA analyzed two other Board opinions on a non-Indian party's standing to challenge decisions made under Old Section 81. *See* AR0849. In, *Madison Gas & Electric Co. v. Acting Midwest Regional Director*, the non-Indian party to a utility service agreement sought to have the Department approve the agreement after a decision that the agreement was not subject to Old Section 81. 36 IBIA 74, 74–75, 2001 WL 328232 (Mar. 20, 2001). The Regional Director argued non-Indian parties lack standing to challenge approval decisions under Old Section 81 because they are not within the statute's zone of protected interests. *Id.* at 77. The IBIA rejected the Regional Director's argument. *Id.*

The IBIA also considered *Hattum*. There, the non-Indian party to four farming contracts appealed a Regional Director decision not to retroactively approve the contracts after they were found null and void for lack of Secretarial approval. *Hattum*, 36 IBIA at 79–80 (referencing *Hattum Family Farms*, 102 F. Supp. 2d at 1154). The IBIA found the non-Indian party had

standing to challenge the denial of retroactive approval "for the reasons discussed in *Madison Gas*." *Hattum*, 36 IBIA at 80. Thus, on their face, *Madison Gas* and *Hattum* would appear to have supported Plaintiff's standing before the IBIA. After careful analysis of the facts, however, the IBIA determined otherwise.

Regarding *Madison Gas*, the IBIA found the facts surrounding the QEL Management Agreement to be distinguishable. The IBIA concluded *Madison Gas* afforded standing to non-Indian contracting parties seeking review of a determination that an agreement <u>does not require approval</u> under Old Section 81. AR0851. But that situation is distinct from a non-Indian party challenging a decision <u>not to approve</u> an agreement that requires approval. AR0851. Plaintiff here made the latter challenge. *Hattum*, on the other hand, which involved a Regional Director decision not to grant retroactive approval, is more closely aligned with Plaintiff's appeal below. *See* AR0852. The IBIA, however, concluded the *Hattum* decision was made in error because it did not include a zone of interest analysis. AR0852. Turning to that analysis, the IBIA determined the "unabashedly paternalistic" nature of Old Section 81 meant that "it is unlikely Congress intended to give a non-Indian party a cause of action to force the Secretary to consider whether to approve a contract that is subject to Old Section 81." AR0852. Further, Old Section 81 does not allow the Secretary to consider the non-Indian party's interests. AR0852 (citing a post-*Hattum* IBIA decision). *Hattum* was therefore in error and Plaintiff had no standing. AR0852.

The IBIA's determination that Plaintiff did not have standing is well supported. The Tenth Circuit has noted that "it is well settled that [Old] § 81 was 'intended to protect the Indians from improvident and unconscionable contracts.'" *W. Shoshone Bus. Council v. Babbitt*, 1 F.3d

1052, 1056 (10th Cir. 1993) (quoting *In re Sanborn*, 148 U.S. 222, 227 (1893)).   Several other

courts have denied standing to a non-Indian contracting party challenging BIA decisions under

Old Section 81.   *See, e.g., Schmit v. Int'l Fin. Mgmt. Co.*, 980 F.2d 498, 498 (8th Cir. 1992) (per

curium); *Enter. Mgmt. Consultants, Inc. v. United States ex rel. Hodel*, 685 F. Supp 221, 223

(W.D. Okla. 1988) ("[P]laintiff is not even arguably within the "zone of interest" to be protected

by [Old Section 81]."), *aff'd on other grounds*, 883. F.2d 890 (10th Cir. 1989); *United States ex*

*rel. Shakopee Mdewakanton Sioux Cmty. v. Pan Am. Mgmt Co.*, 616 F. Supp. 1200, 1208 (D.

Minn. 1985) ("The potential economic interest of non-Indians in a contractual relationship with a

tribe is not within the intended purview of the statute."), *appeal dismissed*, 789 F.2d 632 (8th

Cir. 1986).   The purpose of Old Section 81 is to protect the Indian tribe, not a non-Indian

contractor.   *Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031, 1036–37 (8th Cir. 2002).   Non-

Indian contracting parties therefore fall outside Old Section 81's zone of interest and lack

standing to challenge approval decisions.

    In sum, the IBIA concluded the rule in *Madison Gas* did not apply to Plaintiff's

challenge.   AR0852.   Additionally, *Hattum* was incorrectly decided and non-Indian contracting

parties, including Plaintiff here, do <u>not</u> have standing before the IBIA to challenge a decision not

to retroactively approve a contract found to be null and void under Old Section 81.   Because the

IBIA explained its departure from *Madison Gas* and *Hattum*, it did not act arbitrarily or

capriciously.   Further, the IBIA's ultimate conclusion is supported by other caselaw.

Defendant's motion for summary judgment should therefore be granted.

II.    **THE DEPARTMENT OF THE INTERIOR COMPLIED WITH DUE PROCESS REQUIREMENTS BY PROVIDING PLAINTIFF NOTICE AND THE OPPORTUNITY TO BE HEARD BEFORE THE IBIA.**

In addition to its Section 81 arguments, Plaintiff alleges that several aspects of the agency actions below violated its due process rights.  Procedural due process imposes certain requirements on government decisions depriving an individual of an interest in life, liberty, or property.  *See Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).   Defendant presumes Plaintiff is arguing a deprivation of a property interest in the QEL Management Agreement and its potential profits.  Under Old Section 81, however, the Agreement was never valid, and Plaintiff therefore lacks a property interest altogether.  *See Orange v. Dist. of Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995); *Kirkland v. St. Vrain Valley School Dist. No. Re-1J*, 464 F.3d 1182, 1190 (10th Cir. 2006).  Lacking an interest, there is nothing for the Government to deprive, and Plaintiff lacks standing to bring a procedural due process claim.

Even assuming Plaintiff had a valid interest, its Complaint still does not state a Constitutional cause of action.  Plaintiff alleges its "right of review arises under the federal Administrative Procedures Act."  Compl. ¶ 3.  Although some review of "colorable constitutional claims" is available under the APA, *see Lincoln v. Vigil*, 508 U.S. 182, 195 (1993) (citing *Webster v. Doe*, 486 U.S. 592, 603–04 (1998)), this Court's review should only consider whether the IBIA's determination that Plaintiff received due process was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Here, assuming Plaintiff had a valid property interest in the Agreement, the Department of the Interior provided notice and the opportunity to be heard, as required.  Further, the IBIA reasonably, and in accordance with law, determined Plaintiff received due process because it was

-27-

given the full opportunity to be heard before the IBIA.  The opportunity to be heard before the

IBIA also renders Plaintiff's due process claims relative to the Acting Regional Director's

decision moot.  Defendant's motion for summary judgment should therefore be granted.

> **A.    The IBIA Proceedings Themselves Provided Plaintiff Ample Opportunity to be Heard, and the IBIA Determinations Regarding Potential Due Process Violations in the Acting Regional Director's Decision Were Reasonable and in Accordance with Law.**

After receiving notice of the Acting Regional Director's decision, the Department

granted Plaintiff the opportunity to be heard before the IBIA.  Additionally, because Department

regulations withhold finality from any internally appealable BIA decision, the IBIA acted

reasonably and in accordance with law in determining the Acting Regional Director had not

violated Plaintiff's due process rights.

> 1.    The IBIA Proceedings Provided Plaintiff the Opportunity to be Heard.

The fundamental principle of due process is "the opportunity to be heard 'at a meaningful

time and in a meaningful manner.'" *Eldridge*, 424 U.S. at 333.  Due process requires the

Government to precede any deprivation of a protected interest with "notice and opportunity for

hearing appropriate to the nature of the case."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339

U.S. 306, 313 (1950).  Here, notice and the opportunity to be heard were given to Plaintiff via

the Acting Regional Director's letter and the IBIA proceedings.

On October 23, 2003, the Acting Regional Director informed Plaintiff that the QEL

Management Agreement was invalid because it had not been approved by the Secretary.

AR0040.  The Acting Regional Director notified Plaintiff of the opportunity for appeal to the

IBIA (AR0040), where to direct any appeal, what form the appeal should take, and that, absent

appeal, the Acting Regional Director's decision would become final.  AR0041.  In response,

Plaintiff appropriately filed an appeal.  AR0031–35.  Once before the IBIA, Plaintiff received its

opportunity to be heard through extensive briefing.  *See* AR0172; AR0302; AR0382; AR0424;

AR0532; AR0738; AR0786; AR0825; *see also Chuchua v. Pacific Regional Director, Bureau of

Indian Affairs*, 42 IBIA 1, 4, 2005 WL 3506563 (2005) ("An appellant's due process rights are

protected by the right to appeal a BIA decision to [the IBIA].").  By providing notice and the

opportunity to be heard, the Department complied with the requirements of procedural due

process.

> 2.     The IBIA's Determination that the Acting Regional Director's Decision
>        Did Not Violate Plaintiff's Procedural Due Process Rights Was
>        Reasonable and in Accordance with Law.

The IBIA found no merit in Plaintiff's arguments below that the Acting Regional

Director had deprived Plaintiff of its procedural due process rights.  AR0855.  The IBIA

concluded: "The Regional Director's decision, standing alone, did not deprive Appellant of any

property or liberty interests without due process because it was not an effective or a final

decision for the Department."  AR0855–56.  The IBIA decision was reasonable and in

accordance with Department regulations and IBIA precedent.

Procedural due process requires that a party be given notice of "any proceeding which is

to be accorded finality to apprise the interested parties of the pendency of the action and afford

them an opportunity to present their objections."  *Mullane*, 339 U.S. at 314 (emphasis added).

The Acting Regional Director's decision lacked the requisite finality.  Department of the Interior

regulations withhold finality from an agency decision until the opportunity for appeal within the

Department is no longer available.  *See* 25 C.F.R. § 2.6(b).  Thus, as the IBIA noted, the Acting

Regional Director's decision had no legal effect until after the IBIA appeal.  *See* AR0855–56.

As the Acting Regional Director's decision was not yet effective, it did not deprive Plaintiff of any protected interest, and Plaintiff's procedural due process rights could therefore not have been injured.  In fact, Plaintiff acknowledged below that, if the Acting Regional Director's decision had no force, its procedural due process rights could not have been violated.  *See* AR0335.  Such is precisely the effect of 25 C.F.R. § 2.6.  *See* AR0856.

Further, the IBIA has consistently interpreted § 2.6 as withholding finality until appeal.  *See Chuchua*, 42 IBIA at 4 ("Except in unusual circumstances . . . a decision on appeal before the Board is not final for the Department until the Board affirms it.") (citing 25 C.F.R. § 2.6(a)); *Mobil Oil Corp. v. Albuquerque Area Director, Bureau of Indian Affairs*, 18 IBIA 315, 332–33, 1990 WL 321061 (1990) (holding that the appellant's due process rights were adequately protected given the administrative review process of 25 C.F.R. Part 2 and the fact that appellant had fully participated in the IBIA proceedings).  As noted by the Supreme Court in *Mullane*, procedural due process must be given to any proceeding that is accorded finality.  339 U.S. at 314.  As the Acting Regional Director's determination lacked that finality, the IBIA appropriately concluded Plaintiff's due process rights had not been violated.  Defendant's motion for summary judgment should therefore be granted.

**B.    Given the Opportunity to be Heard Before the IBIA, Plaintiff's Due Process Claims Relative to the Acting Regional Director's Decision are Moot.**

Plaintiff's direct due process challenge to the Acting Regional Director's decision is moot.  A plaintiff's "[s]tanding is determined at the time the complaint is filed."  *Natural Law Party of the United States of Am. v. Fed. Elec. Comm'n*, 111 F. Supp. 2d 33, 40 (D.D.C. 2000).  Thus, even assuming the Acting Regional Director's decision entailed the finality required for a due process analysis, the Department of the Interior's internal review procedures have remedied

any lost opportunity to be heard.  This Court therefore cannot grant Plaintiff any meaningful relief.  *See McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of the Judicial Conf. Of the U.S.*, 264 F.3d 52, 55 (D.C. Cir. 2001) (noting that when "events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot"); *see also Abigail Alliance for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006) (noting redressability as an "irreducible constitutional minimum" showing to establish jurisdiction) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); *GasPlus*, 510 F. Supp. 2d at 34 ("[T]here is essentially no remedy available to GasPlus that could redress its alleged constitutional injury . . . .  Therefore, GasPlus lacks Article III standing to pursue its due-process claim.").

Plaintiff received notice of the Acting Regional Director's decision and an opportunity to be heard before the IBIA.  The latter renders moot any due process challenge to the Acting Regional Director's decision itself.  Defendant's motion for summary judgment should therefore be granted.

## **CONCLUSION**

For the reasons stated above, the Department of the Interior acted reasonably, within discretion, and in accordance with law.  Defendant's motion for summary judgment should therefore be granted.


Respectfully submitted this 27th day of June, 2008,

                    RONALD J.TENPAS
                    Assistant Attorney General

        By:       */s/ Kristofor R. Swanson*

-31-

KRISTOFOR R. SWANSON
(Colo. Bar No. 39378)
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, DC 20044-0663
Tel: 202-305-0248
Fax: 202-305-0506
Email: kristofor.swanson@usdoj.gov

OF COUNSEL:

JANET SPAULDING
Senior Attorney
U.S. Department of the Interior
Office of the Solicitor
Tulsa Field Office
Tulsa, OK 74145

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| QUANTUM ENTERTAINMENT LIMITED,<br><br>　　　Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS;<br><br>　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 1:07-cv-01295-RMU

## [PROPOSED] ORDER

Before the Court are the parties' cross-motions for summary judgment.  Having

considered both motions, the memoranda in support thereof, and the Administrative Record,

IT IS HEREBY ORDERED THAT:

(1)　　Plaintiff's Motion for Summary Judgment is DENIED; and

(2)　　Defendant's Motion for Summary Judgment is GRANTED.

Signed this _____ day of _____, 2008.

By the Court:

_____
RICARDO M. URBINA
United States District Judge