IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
QUANTUM ENTERTAINMENT                )
limited,                             )
                                     )
            Plaintiff,               )
                                     )
v.                                   )          Case No. 1:07-cv-01295-RMU
                                     )
UNITED STATES DEPARTMENT             )
OF THE INTERIOR,                     )
BUREAU OF INDIAN AFFAIRS,            )
                                     )
            Defendant.               )
_____)

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff hereby moves the Court for an Order granting summary judgment in favor of

Plaintiff, pursuant to Federal Rule of Civil Procedure Rule 56(b).  As grounds for its motion,

Plaintiff states as follows:

1.      Plaintiff's Statement of Undisputed Material Facts is being filed

contemporaneously with this motion; and

2.      Plaintiff has properly complied with the Administrative Procedures Act, 5 U.S.C.

§  551, *et seq.*

3.      The October 23, 2003, Decision by the Acting Regional Director of the Southwest

Region of the United States Department of the Interior Bureau of Indian Affairs and the March

27, 2007, Decision by the Interior Board of Indian Appeals, both, are arbitrary, capricious and

contrary to law and otherwise should be reversed, all as set forth more fully in Plaintiff's

Statement of Undisputed Material Facts and in Plaintiff's Brief in Support of Motion For

Summary Judgment.  Additionally, in reaching such decisions both the Acting Regional Director

and the Interior Board of Indian Appeals denied Plaintiff due process of law.

In support of this motion, Plaintiff submits the accompanying Statement of Undisputed Material Facts and Brief in Support of Motion for Summary Judgment.

WHEREFORE, Plaintiff asks this Court for an order granting Plaintiff summary judgment on all claims and that the Court

1.     Reverse the IBIA's and the Regional Director's determination that Old Section 81, as opposed to New Section 81 (both as defined in Plaintiff's Brief), was the appropriate statute under which to evaluate the Management Agreement and determine that the Management Agreement is not subject to approval under New Section 81.

2.     If, contrary to QEL's above plea, the Court determines that Old Section 81, as opposed to New Section 81, is the appropriate statute under which to evaluate the Management Agreement, then QEL requests that the Court reverse the Department's final action by determining that the Management Agreement is not subject to approval under Old Section 81.

3.     Hold that neither the Regional Director nor the IBIA had the authority to declare the Management Agreement invalid or to declare the proceeds from the Management Agreement unauthorized.

4.     Hold that the Regional Director denied QEL due process of law and acted arbitrarily, capriciously and contrary to law.

5.     Hold that the IBIA and the Regional Director lacked the authority to declare that the Management Agreement, and the rights and obligations thereunder, were invalid and that the monies received and actions taken under the Management Agreement were unauthorized.

6.     Award QEL its costs and attorneys' fees pursuant to 28 U.S.C. § 1920 and 28 U.S.C. § 2412, and such other and further relief as the Court deems proper.

Respectfully submitted,

BRACEWELL & GIULIANI, LLP
Shelby J. Kelley
D.C. Bar Number 464248
Nancy J. Appleby
D.C. Bar Number 470995
2000 K Street, N.W., Suite 500
Washington, DC 20006-1872
Telephone:  (202).828-5800
FAX:  (202).223-1225

-and-

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By:  ___/s/ Mark A. Smith_____
       Mark A. Smith (Appearing under Minute Order
       dated 3/11/08, Granting Pro Hac Vice Motion)
       Post Office Box 1888
       Albuquerque, New Mexico 87103
       Telephone: (505).768-7500
       FAX: (505).768-7395

## CERTIFICATE OF SERVICE

Pursuant to Fed R. Civ. P. 5(b)(2)(D) and the Local Rules, I hereby certify that on June 27, 2008, a true copy of the foregoing pleading was filed electronically.  Service of this filing to all parties, including those listed below, will be accomplished by operation of the Court's ECF system, and the parties may access this filing through the Court's system:

Devon Lehman McCune                    Kristofor R. Swanson
U.S. DEPARTMENT OF JUSTICE             U.S. DEPARTMENT OF JUSTICE
Natural Resources Section              P.O. Box 663
1961 Stout Street                      Washington, DC 20044
8th Floor                              Email: kristofor.swanson@usdoj.gov
Denver, CO 80294
Email: devon.mccune@usdoj.gov

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By:  ___/s/ Mark A. Smith_____
       Mark A. Smith

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

QUANTUM ENTERTAINMENT
LIMITED, a New Mexico )
limited liability company, )
)
     Plaintiff, )
)
v. )    Civil Case No: 1:07-CV-01295-RMU
)
UNITED STATES DEPARTMENT )    Judge: Ricardo M. Urbina
OF THE INTERIOR )
BUREAU OF INDIAN AFFAIRS; )    Deck Type:   Administrative
)                       Agency Review
     Defendant. )

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

    The merit of an administrative decision should be determined exclusively on the administrative record and summary judgment is appropriate after a review of the administrative record. As such, the facts are contained in the administrative record and the Court does not "find" underlying facts in the review of an administrative decision.    LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham, 215 F. Supp. 2d 73, 84 n.5 (D.D.C. 2002).("As all material facts are within the administrative record, no material issues of fact are in dispute … The only issues presented are issues of law."). Because, as a general rule, all relevant facts are contained in the administrative record a Statement of Undisputed Material Facts serves a limited purpose in cases brought pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. See, e.g., Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985).

    Even so, it may be helpful to highlight certain facts in the record in order to place the decision being reviewed in context, and to highlight certain facts that may be helpful to the Court.    Moreover, Local Civil Rule 7(h).requires the submission of a statement of undisputed

material facts.    In compliance therewith, Plaintiff Quantum Entertainment Limited ("QEL").submits the following:

1.      QEL is a New Mexico limited liability company located in Santa Fe, New Mexico, that provides consulting and management services to gas distribution businesses. (Record ("AR" 131)).[1]

2.      Kewa Gas Limited ("Kewa") is a corporation incorporated under the laws of the Pueblo of Santo Domingo, New Mexico ("Santo Domingo") and registered with the State of New Mexico to business in New Mexico as a foreign, for-profit corporation.  (AR55-56; AR 84.)

3.      Santo Domingo is a federally recognized Indian tribe.  (AR 55.)

4.      Santo Domingo is the sole shareholder of Kewa.  (AR 131.)

5.      The majority of Kewa's board members, when Kewa was formed, were not members of Santo Domingo's Tribal Council.  (Compare AR 55, AR 56.)

6.      The Bureau of Indian Affairs ("BIA") is an agency of the Defendant United States Department of the Interior ("Department").  For the purpose of approving or disapproving certain types of agreements, the BIA determines whether agreements between an Indian tribe, a pueblo or a federally chartered Indian corporation and a non-Indian entity or party are subject to 25 U.S.C. § 81 ("Section 81").

7.      25 U.S.C. § 81 was amended in 2000.  In this Statement of Undisputed Material Facts, 25 U.S.C. § 81, as amended in 2000, is referred to as "New Section 81."  25 U.S.C. § 81 prior to the 2000 amendment is referred to as "Old Section 81."

8.      This appeal arises out of an agreement ("Management Agreement") in which QEL agreed to manage a gasoline distribution business ("Business" or "Distribution Business").owned by Kewa. (AR 131-140.)

---

[1] Citations to the Administrative Record filed by the United States on May 14, 2008 (sometimes referred to herein as the "Record"), will be indicated by an "AR," followed by the Bates number.

9.    The Management Agreement sets forth the relationship between Kewa, Santo Domingo and QEL.  (AR 131-140.)

10.   Kewa and QEL operated under the terms of the Management Agreement for approximately seven years (Compare AR 131, AR 36-41)

11.   Almost seven years after execution of the Management Agreement, on March 28, 2003, the Governor of Santo Domingo, Everett Chavez, requested that the Superintendent of the Bureau of Indian Affairs ("BIA") review the Management Agreement, complaining that "the management contract [is] far too lucrative for [QEL], which impacts the tribe adversely, but moreover, financially."  (AR 52.)

12.   On or about October 23, 2003, Ronald G. Toya, Acting Regional Director of the Southwest Region of the United States Department of the Interior Bureau of Indian Affairs ("Regional Director") determined that the Management Agreement was subject to approval under Old Section 81, that the Management Agreement had not been approved, that the Management Agreement "has never been legally valid and any monies received by QEL pursuant to these agreements were unauthorized." The Regional Director further concluded that it was not in the best interest of the Pueblo for the BIA to approve the Management Agreement retroactively.  The Regional Director ordered QEL (i) to vacate the premises on which the Distribution Business is operated and to return all petty cash, keys and other items to Governor of Santo Domingo, (ii) arrange for the transfer of "the books and records of the business to the Pueblo" and (iii) return all proceeds of the Distribution Business "generated under" the Management Agreement (all, the "Regional Director's Decision").  (AR 40.)

13.   The Regional Director' Decision was based on the premises that: (1)  Old Section 81, as opposed to New Section 81, should be used to evaluate whether the Management Agreement was subject to the statute; (2) the Management Agreement was "'with an Indian

tribe' for the purposes of Section 81;" and (3) the Management Agreement was "relative to Indian lands" under the analysis set forth in Altheimer & Gray v. Sioux Mfg. Corp., 983 F.2d 803, 810 (7th Cir. 1993).  (AR 36-41.)

14.     QEL received no notice that the Regional Director was reviewing the Management Agreement, or why.  It simply received the Director's Decision "out of the blue." (AR, generally.)

15.     The Management Agreement recites that Kewa owns the distribution business and that Kewa desires to engage QEL to manage the Distribution Business.  (AR 131.)

16.     The Management Agreement delineates QEL's duties, all of which relate to "manag[ing] the day-to-day- operation of the Gas Distribution Business" owned by Kewa. (AR 131-33.)  Those duties include directing and supervising Kewa's operations related to purchasing, marketing, sales and delivery of fuel; selecting and training personnel to operate Kewa's Distribution Business; maintaining and operating equipment used in Kewa's Distribution Business; paying operating expenses of the Distribution Business out of Kewa's funds; marketing the Distribution Business on Kewa's behalf; maintaining books and records for the Distribution Business; filing with appropriate authorities on Kewa's behalf various papers related to the Distribution Business, and preparing budgets for the Distribution Business subject to Kewa's approval or disapproval.  (AR 131-33.)

17.     The Management Agreement requires QEL to report and consult with Kewa regarding management decisions and operations. Specifically, QEL must: (i)."regularly" consult with Kewa's Board of Directors about QEL's management operations; (ii).provide Kewa's Board of Directors with copies of any written financial statements or other reports dealing with the Business, and forward to Kewa's Board "at least monthly" a written report summarizing the

activity of the Business during the preceding month; and (iii).designate a representative to attend meetings of Kewa's Board of Directors in order to report on and discuss the Business.  (AR 133.)

18.    Real property is not mentioned in the Management Agreement.  (AR 131-140.)

19.    There is no legal description of real property referenced in or attached to the Management Agreement.  (AR 131-140.)

20.    The Management Agreement does not divest Kewa of its ownership of the Business, or of its leasehold interest under the Lease.  (AR 131-140.)

21.    The Management Agreement does not provide QEL with any right to acquire, control or encumber any Indian land under any circumstances.  (AR 131-140.)

22.    The Management Agreement does not vest Kewa with any authority to dispose of, pledge or otherwise encumber real property of Santo Domingo.  (AR 131-140.)

23.    The Management Agreement addresses only QEL's relationship to Kewa by virtue of QEL operating Kewa's Distribution Business. QEL acquires no property rights under the Management Agreement, and no right to dispose of or encumber any real property rights of Kewa or of Santo Domingo.  (AR 131-140.)

24.    At all times relevant to this lawsuit, the Business was located within the exterior boundaries of the reservation of Santo Domingo, on land that Kewa leased from Santo Domingo. (AR 90-122 ("Lease"); AR 123-28.)

25.    QEL is not a party to the lease ("Lease") between Santo Domingo and Kewa. (AR 90-128.)

26.    There is no lease or other conveyance of real property or of a real property interest to QEL in the Record.  (AR, generally.)

27.    The Lease evidences an arms length transaction between Kewa and Santo Domingo.  It contemplates that Kewa not only will own the Business, but also will operate a gift shop, retail gas station and other businesses on the leased premises.  (AR 91-92.)

28.    The Lease requires a Guaranteed Minimum Monthly Rental to be paid to Santo Domingo by Kewa, as well as a percentage of the estimated net income to Kewa from "all businesses operated on the lease premises."  (AR 93-94.)

29.    The Lease requires Kewa to perform an annual accounting of its lease-related income, for the benefit of Santo Domingo, to maintain the leased premises in good order, at Kewa's expense, and to post a corporate surety bond to guarantee its obligations under the L:ease.  (AR 94-99.)

30.    The Lease prohibits Kewa from encumbering the leased premises without Santo Domingo's approval.  (AR 102.)

31.    The Lease requires that Kewa carry a variety of insurance in connection with the leased premises, and provides Santo Domingo with a host of remedies against Kewa in the case of a default by Kewa, including the collection of attorneys' fees incurred by Santo Domingo in enforcing its rights.  (AR 110-17.)

32.    On or about November 21, 2003, QEL appealed the Regional Director's Decision to the Interior Board of Indian Appeals ("IBIA").  (AR 31-35.)

33.    Following briefing by the parties and numerous procedural delays, on or about March 27, 2007, the IBIA issued a decision ("IBIA Decision") affirming a portion of the Regional Director's Decision, abstaining from making a decision regarding a portion of the Regional Director's Decision, and dismissing a portion of QEL's appeal.  (AR 826-58.)

34.    In the IBIA Decision, the IBIA:

    (a)    Determined that QEL had standing to challenge the Regional Director's determination that (i).the Management Agreement should be evaluated

6

under Old Section 81, as opposed to New Section 81, (ii).Old Section 81 required that the Management Agreement be approved, and (iii).the Management Agreement was invalid and the proceeds from it unauthorized;

(b)     Determined that QEL did not have standing to appeal the Regional Director's decision not to retroactively approve the Management Agreement;

(c)     Determined that the Management Agreement should be evaluated under Old Section 81, as opposed to New Section 81;

(d)     Allowed the Regional Director's Decision to become final by (i).affirming the Regional Director's decision that the Management Agreement was with an Indian tribe for the purposes of Section 81 and (ii).refusing to make a decision on the issue of whether the Management Agreement was related to tribal land;

(e)     Determined that the Regional Director had the authority to declare that the Management Agreement was invalid and to declare that the proceeds from the Management Agreement were unauthorized;

(f)     Declined to rule on the issue of whether the BIA had the authority to order a remedy against QEL, declaring the issue to be moot;

(g)     Determined that QEL had not been denied due process; and

(h)     Declined to rule on the issue of whether disgorgement of all monies under the Management Agreement was a proper remedy, determining that the issue is not yet ripe.

(AR 826-58).

Respectfully submitted,

BRACEWELL & GIULIANI, LLP
Shelby J. Kelley
D.C. Bar Number 464248
Nancy J. Appleby
D.C. Bar Number 470995
2000 K Street, N.W., Suite 500
Washington, DC 20006-1872
Telephone:  (202).828-5800
FAX:  (202).223-1225

-and-

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By: ___/s/ Mark A. Smith_____
      Mark A. Smith (Appearing under Minute Order
      dated 3/11/08, Granting Pro Hac Vice Motion)
      Post Office Box 1888
      Albuquerque, New Mexico 87103
      Telephone: (505).768-7500
      FAX: (505).768-7395

## CERTIFICATE OF SERVICE

Pursuant to Fed R. Civ. P. 5(b)(2)(D) and the Local Rules, I hereby certify that on June 27, 2008, a true copy of the foregoing pleading was filed electronically. Service of this filing to all parties, including those listed below, will be accomplished by operation of the Court's ECF system, and the parties may access this filing through the Court's system:

Devon Lehman McCune
U.S. DEPARTMENT OF JUSTICE
Natural Resources Section
1961 Stout Street
8th Floor
Denver, CO 80294
Email: devon.mccune@usdoj.gov

Kristofor R. Swanson
U.S. DEPARTMENT OF JUSTICE
P.O. Box 663
Washington, DC 20044
Email: kristofor.swanson@usdoj.gov

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By: ___/s/ Mark A. Smith_____
      Mark A. Smith

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| QUANTUM ENTERTAINMENT LIMITED, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 1:07-cv-01295-RMU ) |
| UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS, | ) ) ) ) |
| Defendant. | ) ) ) |

**PLAINTIFF'S BRIEF IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

**I. BACKGROUND**

This background is based on Plaintiff's Undisputed Material Facts, filed contemporaneously with this brief.

This is an appeal by Quantum Entertainment Limited, a New Mexico limited liability company ("QEL") of an October 23, 2003, decision ("Director's Decision") by Ronald G. Toya, Acting Regional Director of the Southwest Region of the United States Department of the Interior Bureau of Indian Affairs ("Regional Director") and a March 27, 2007, decision ("IBIA Decision") issued by the Interior Board of Indian Appeals ("IBIA"). Together the Director's Decision and the IBIA Decision may be referred to in this brief as the "Decisions".

On or about August 1, 1996, QEL and Kewa Gas Limited, a tribal corporation registered with the State of New Mexico to do business in New Mexico as a foreign, for-profit corporation, ("Kewa"), entered into a Management Agreement ("Management Agreement"), whereby QEL agreed to manage a gas distribution business ("Business") owned by Kewa and located on

property that Kewa had leased from its sole shareholder, the Pueblo of Santo Domingo ("Santo Domingo"). Under the lease, Kewa had the right to operate a gas distribution business, as well as other businesses on the property. QEL had no interest in the lease and no interest in, rights against or control over the property. Of the documents relevant to this appeal, QEL was a party only to the Management Agreement. The property is not described or mentioned in the Management Agreement. The Management Agreement sets forth certain duties of QEL with respect to managing the Business.

Kewa and QEL performed the Management Agreement for approximately seven years. In March of 2003, the Governor of Santo Domingo asked the Superintendent of the Bureau of Indian Affairs ("BIA") to review the Management Agreement, complaining that "the management contract [is] far too lucrative for [QEL], which impacts the tribe adversely, but moreover, financially."

QEL received no notice that the BIA was reviewing the Management Agreement, or why. On or about October 23, 2003, the Regional Director issued his Decision. In it, he determined, among other things, that the Management Agreement was subject to 25 U.S.C. § 81 ("Section 81") and that under Section 81, in order for the Management Agreement to be "valid," it had to be approved by the Secretary of the Interior or her designee ("Secretary").

The Regional Director also determined that because such approval was not obtained the Management Agreement "has never been legally valid." As a result, the Regional Director ordered QEL (i) to vacate the premises on which the Business is operated and to return all petty cash, keys and other items to Governor of Santo Domingo, (ii) arrange for the transfer of "the books and records of the business to the Pueblo" and (iii) return all proceeds of the Business "generated under" the Management Agreement.

The Regional Director elected to base all of his determinations on his interpretation of Section 81 as it existed prior to a substantial amendment in 2000. Section 81 as amended in 2000 will be referred to in this brief as "Current Section 81". Section 81as it was immediately prior to the 2000 amendment will be referred to as "Old Section 81." Thus, the Management Agreement was executed in 1996, when Old Section 81 was in effect, but the Regional Director made his decision in 2003, when Current Section 81 was in effect. While QEL believes that neither Old Section 81 nor Current Section 81 applies to the Management Agreement, it also believes that the correct statute under which to conduct the inquiry is New Section 81, not Old Section 81.

QEL appealed the Regional Director's Decision to the IBIA. The IBIA Decision affirmed a portion of the Regional Director's determinations, abstained from making a decision regarding a portion of the Regional Director's determinations, and dismissed a portion of QEL's appeal.

More specifically, the IBIA (i) affirmed that the Management Agreement should be evaluated under Old Section 81, as opposed to New Section 81; (ii) affirmed that the Management Agreement was with an Indian tribe for the purposes of Section 81; and (iii) affirmed that the Regional Director had the authority to declare that the Management Agreement was invalid and to declare that the proceeds from the Management Agreement were unauthorized.

The IBIA refused to address the issue of whether the Regional Director was correct in determining that the Management Agreement related to tribal land, and dismissed that portion of QEL's appeal. By doing so, the IBIA allowed the Regional Director's Decision to become Interior's final decision in this respect. (AR 848.) ("Therefore, we do not address . . . the merits

of this issue, . . . allowing the Regional Director's determination on this particular issue to become effective.")

The IBIA also declined to rule on the issue of whether the BIA had the authority to order a remedy against QEL, declaring the issue to be moot because BIA conceded in its brief that it had no authority to enter a legally binding order against QEL.  (AR 853.)  IBIA declined to rule on the issue of whether disgorgement of all monies under the Management Agreement was a proper remedy, as well, determining that the issue was not yet ripe.

Finally, the IBIA determined that QEL had not been denied due process.

## II.  STANDARD OF REVIEW

While decisions by administrative agencies are afforded deference by courts under certain circumstances, the law does not give an agency free rein. "Certainly, the Secretary's decision is entitled to a presumption of regularity.  But that presumption is not to shield [her] action from a thorough, probing, in-depth review."  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971) (citations omitted), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977).

The standard for the court's review of an agency decision is whether the decision is not in accordance with the law, arbitrary, capricious, or an abuse of discretion.  See, e.g., Lee v. U.S. Air Force, 354 F.3d 1229 (10th Cir. 2004).

In determining whether agency action is arbitrary, capricious, or an abuse of discretion a reviewing court "must determine whether the agency's decision-making was reasoned, i.e., whether it considered the relevant factors and explained the facts and policy concerns on which it relied, and whether those facts have some basis in the record."  Nat'l Treasury Employees Union v. Helfer, 53 F.3d 1289, 1292 (D.C. Cir. 1995) (internal quotation marks and citation omitted).

Evidence is "substantial" under the Administrative Procedures Act ("APA") if it would be "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn . . . is one of fact. Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors, 745 F.2d 677, 684 (D.C. Cir. 1984); see also Dickinson v. Zurko, 527 U.S. 150, 162 (1999) (describing the "APA court/agency substantial evidence standard as requiring a court to ask whether a reasonable mind might accept a particular evidentiary record as adequate to support a conclusion." (internal quotation marks and citation omitted)). "With respect to the factual support for the agency's action . . . [t]he district court may not rely on counsel's statements as to what was in the record; the district court itself must examine the administrative records and itself must find and identify facts that support the agency's action." Olenhouse, 42 F.3d at 1576 (citation omitted) (refusing to uphold agency action where, in part, the agency rejected contentions, made no findings with respect to contentions, but instead merely stated its conclusion without discussion). Moreover, Section 706(2)(F) of the APA, 5 U.S.C. § 706(2)(F), authorizes de novo review of an agency determination when the agency action is "unwarranted by the facts." "[S]uch de novo review is authorized when the action is adjudicatory in nature and the agency factfinding procedures are inadequate." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971). In the instant case, Department of the Interior ("Department") did not even consider facts that were relevant to determining whether the Management Agreement was with a tribe or whether to retroactively approve the Management Agreement, let alone enter relevant findings.

## ARGUMENT

I.    **The Regional Director and the IBIA Erred By Applying Old Section 81, Instead Of Current Section 81**

The ultimate issue in this lawsuit is whether the Management Agreement is subject to approval under Section 81. QEL contends that, while the analysis is different under each statute,

neither Old nor Current Section 81 applies to the Management Agreement. The Government

agrees with QEL with respect to Current Section 81. It acknowledges that under GasPlus v. U.S.

Department of the Interior, Bureau of Indian Affairs, 510 F. Supp. 2d 18 (D.D.C. 2007), the

Management Agreement does not need approval. On June 4, 2008, the parties filed a Joint

Stipulation to that effect.

      The Government believes and has held, however, that under Old Section 81 the

Management Agreement needs approval and is invalid and, further, that Old Section 81 applies.

      **A.**    **Current Section 81 Was Enacted on March 14, 2000. The Regional Director and the IBIA Nonetheless Applied Old Section 81.**

      Old Section 81 was originally adopted in 1871, particularly because of "claims agents

and attorneys working on contingency fees who routinely swindled Indians out of their land,

accepting it as payment for prosecuting dubious claims against the federal government." United

States ex rel. Steele v. Turn Key Gaming, Inc., 260 F.3d 971, 976 (8th Cir. 2001). Old Section 81

required, among other things, that the Secretary approve contracts for "services for . . . Indians

relative to their lands." If such approval was not obtained, Old Section 81 provided that the

contract was "null and void" and that the money paid by the tribe to the contracting party could

be recovered in a *qui tam* action. The statute provided that half of the money so recovered would

be paid to the plaintiff in the *qui tam* action and the other half would be paid to the United States

for the use of the tribe with whom the contract was made.

      Recognizing that the paternalistic rationales underlying Old Section 81 had become

antiquated and that the language of Old Section 81 had caused considerable uncertainty about the

types of contracts within its scope, in 2000 Congress passed the Indian Tribal Economic

Development and Contract Encouragement Act of 2000, Pub. L. No. 106-179, 114 Stat. 46

(2000) ("Contract Encouragement Act"), which effectively repealed Old Section 81 and

substituted Current Section 81. See generally S. Rep. No. 106-150 (1999) (labeling the proposed

amendment an "amendment in the nature of a substitute" and explaining that the policies underlying the Old Section 81 had become outdated in an era of self-determination, and that Current Section is aimed at promoting contracting with Indian tribes by clarifying and limiting which agreements require Secretarial approval and eliminating harsh penalties). Among other things, Current Section 81 clarified that the statute applies only to contracts that "encumber[] Indian lands for a period of 7 or more years," eliminated the qui tam action provision, and eliminated the disgorgement provision. 25 U.S.C. § 81(b); see also 25 C.F.R. pt. 84.

In his Decision, the Regional Director assumed that Old Section 81, instead of Current Section 81, applies to the Management Agreement, without addressing the issue of which version of the statute should control. The Regional Director began his Decision by stating that "The Santo Domingo/QEL agreement predates the 2000 amendment of 25 U.S.C. § 81. The prior version of Section 81 provided . . .." (AR 36.)   Moreover, the Regional Director consciously restricted to Old Section 81 case law his analysis of the extent to which contracting with a tribal corporation is tantamount to contracting with a tribe. (Id. at 2 ("Since the QEL Management Agreement predates the 2000 Amendment of Section 81. . . .") Additionally, the Regional Director ordered the remedy of disgorgement, a remedy that is referenced in Old Section 81, but absent from Current Section 81. (Id.)

For its part, the IBIA affirmed the Regional Director's use of Old Section 81 by assuming that the Management Agreement would be valid under Current Section 81 and that it would be invalid under Old Section 81.  Based on this assumption, the IBIA reasoned that the application of Current Section 81 would burden Kewa with the obligations of the Management Agreement, a burden that Kewa would not have had under Old Section 81.  IBIA Characterized this as an impermissible retroactive effect and, so, held that Current Section 81 could not be applied to the Management Agreement. (AR 840-42.)

7

### B. Under the Law Governing Retroactive Application of a Statute, the Regional Director and IBIA Should Have Applied Current Section 81

QEL respectfully submits that the Regional Director and IBIA should have applied Current Section 81 in his analysis. Unless application of an amended statute has an impermissibly retroactive effect, the statute in effect when a decision is rendered is the statute that should be applied. This is so even when the amendment is applied to facts that are antecedent to the amendment.

As a general rule "a court is to apply the law in effect at the time it renders its decision." Bradley v. Sch. Bd., 416 U.S. 696, 711 (1974). Current Section 81 is the law that was in effect at the time the Regional Director made his Decision. Current Section 81 was enacted March 14, 2000. Santo Domingo asked the Secretary to review the contract March 28, 2003, and the Regional Director's Decision is dated October 23, 2003. Thus, we start with the proposition that, generally, the Regional Director should have made his Decision under Current Section 81. If that generality holds, the parties are not in disagreement with respect to the application of the statute or the validity of the Management Agreement.

Despite this general rule, which recommends applying Current Section 81 in the instant case, there is a competing principle of construction that a law will not be construed to have "retroactive effect" unless required by its language. Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988). "Retroactive effect,"[1] however, is a legal term of art and does not refer merely to the application of a statute to conduct that antedates the statute's enactment. Landgraf v. USI Film Prods., 511 U.S. 244, 269 (1994). Indeed, the Supreme Court has opined that "in many situations, a court should apply the law in effect at the time it renders its decision, even though that law was enacted after the events that gave rise to the suit." Id. at 273 (internal quotation

---

[1] Courts also refer to the issue of retroactive effect as whether a statute operates "retrospectively." Landgraf v. USI Film Products, 511 U.S. 244, 269 (1994).

marks and citation omitted). Nor does having a "retroactive effect" refer to upsetting expectations that were based on prior law. Id.; see also id. n.24 ("If every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever." (quoting L. Fuller, The Morality of Law 60 (1964)).

Instead, whether the application of a current statute results in an impermissible retroactive effect is a matter of whether it "impose[s] new burdens on persons after the fact." Id. at 270. In fact, the Court has commented favorably on the common law presumption in favor of applying a current statute to antedated behavior if the statute "merely remove[s] a burden on private rights by repealing a penal provision (whether criminal or civil)." Id. Thus, the Court has observed that, in deciding whether application of a statute has an impermissible retroactive effect, a court should analyze "whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Id. at 280.

Application of Current Section 81 to the Management Agreement meets the Supreme Court's criteria and that application of Section 81 to the Management Agreement does not have an impermissible retroactive effect. The change from Old to Current Section 81 alleviated burdens and eliminated an onerous penal provision. Indeed, the primary purpose of Current Section 81 is to remove, especially from tribes but also from persons with whom they contract and from the BIA, the burden of obtaining Secretarial approval of all but a narrow category of contracts.

> Excessive federal regulation, especially if it impedes business and economic development in Indian Country, needs to be eliminated. . . . There is no group of people who have experienced more federal regulation of every aspect of their lives than Indians. This bill [Current Section 81] represents a commitment to reduce unnecessary and anachronistic federal bureaucratic requirements.

145 Cong. Rec. S2667 (daily ed. Mar. 15, 1999) (statement of Sen. Campbell); see also S. Rep. No. 106-150 (1999) ("Indian tribes, their corporate partners, courts, and the Bureau of Indian Affairs (BIA) have struggled for decades with how to apply [Old Section 81] in an era that emphasizes tribal self-determination, autonomy, and reservation economic development."); 145 Cong. Rec. H520-21 (daily ed. Feb. 29, 2000) (statement of Cong. Faleomavaega) (Under Old Section 81, "the Secretary of the Interior is asked to approve contracts for everything from construction of a new building to the purchase of tribal office supplies. The Bureau of Indian Affairs is overwhelmed by these unnecessary requests and the process severely hinders economic development on Indian lands."

Moreover, Current Section 81 eliminates the penalty of disgorgement. Disgorgement is viewed as "penal" when its purpose, even partly, is to punish an offender, as opposed to solely restore an aggrieved party to the status quo ante. "'[A] civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.'" Austin v. United States, 509 U.S. 602, 610 (1993) (quoting United States v. Halper, 490 U.S. 435, 448 (1989), abrogated on other grounds by Hudson v. U.S., 522 U.S. 93 (1997)).[2] Thus, Current Section 81's repeal of the penal provision in Old Section 81 invokes the common law presumption in favor of applying a current statute to antedated behavior where the statute "merely remove[s] a burden on private rights by repealing a penal provision (whether criminal or civil)." Landgraf, 511 U.S. at 270.

---

[2] In the instant case, the disgorgement feature of Old Section 81 "cannot fairly be said solely to serve a remedial purpose." The statute does not provide for actual damages to be calculated and awarded to the tribe. Moreover, the plaintiff is to receive one half of the disgorgement without regard to whether the amount going to the tribe's benefit is sufficient to return the tribe to status quo ante. There can be little doubt that the purpose of the statute, at least in part, is to discourage persons from entering into certain contracts with tribes absent governmental approval.

Current Section 81, then, increases the rights of tribes and others to enter into contracts without government intervention, instead of impairing rights or imposing new duties. It also removes civil penal provisions, instead of increasing liability. In short, according to the <u>Landgraf</u> analysis, Current Section 81 is the sort of statute that should be applied to antecedent behavior.

This conclusion is buttressed by <u>Madison Gas & Elec. Co.</u>, 36 I.B.I.A. 74 (2001), wherein the IBIA observed that a person could not bring a *qui tam* action after the adoption of Current Section 81, even though the contract upon which the action would have been based was executed before the adoption of Current Section 81. <u>Madison Gas</u> involved an appeal from a Regional Director's decision that under Old Section 81 Secretarial approval was not required for a particular contract. Because Madison Gas feared a *qui tam* action and that the Regional Director's decision would not be binding in such an action, the company elected to continue appealing the Regional Director's decision until it received a federal court ruling confirming that Secretarial approval was not required. Before the IBIA considered the appeal, Congress adopted Current Section 81. Madison Gas sought a ruling from the IBIA that Current Section 81 applied retroactively. The IBIA ruled that it was "unnecessary to engage in any protracted analysis of retroactivity. Appellant states that its principal concern is that it may be subject to a *qui tam* action under Old Section 81. The qui tam provision was not carried forward into the revised section 81. Thus there is no longer any statutory authority for such suits." <u>Id</u>. at 78.

Despite the general rule that a court is to apply the law in effect at the time it renders its decision and the relatively straightforward evaluation of whether Current Section 81 has an impermissible retroactive effect, the IBIA chose to assume that Current Section 81 has a retroactive effect.  First, the IBIA (i) assumed that under Old Section 81 the Management Agreement would be void and (ii) assumed that under Current Section 81 the Management Agreement would not be void.  Based on those assumptions, the IBIA reasoned that application

of Current Section 81 would burden Kewa with the obligations of the Management Agreement and, so, would have an impermissible retroactive effect. The IBIA dismisses its holding in Madison Gas by saying that "[w]e are not convinced that repeal of a statutorily-granted cause of action is comparable to retroactively imposing contractual obligations and potential liability based on pre-enactment conduct." (AR 842.)

The entirety of IBIA's position, then, boils down to its assumption that Current Section 81 "imposes" new obligations on Kewa because under Old Section 81 the Management Agreement is void, and under Current Section 81 it is not.

There are at least two problems with IBIA's analysis. The first is that IBIA truly does assume the primary premise to its argument, which premise is that the application of Old Section 81voids the Management Agreement. IBIA can only assume the truth of this premise because it does not analyze, but merely assumes, that the Management Agreement "relates" to tribal land. And IBIA acknowledges that it does not analyze or address that key issue.

> [W]e do not address or express any view on the merits of [the issue of whether the Management Agreement "relates" to tribal land], and instead dismiss this portion of the appeal, allowing the Regional Director's determination on this particular issue to become effective. We assume, for the purposes of resolving the remaining issues in this appeal, that the Agreement is subject to the requirement of Secretarial approval under Old Section 81.

(AR 848.)[3]

---

[3] At the time that the IBIA had this case before it, the Department was in the D.C. District Court litigating GasPlus v. U.S. Department of the Interior, Bureau of Indian Affairs, 510 F. Supp. 2d 18 (D.D.C. 2007). The IBIA abstained from making a determination regarding whether the Management Agreement was "relative to" Indian land in the instant case, because it feared that if it determined that the Management Agreement was not relative to Indian land, the determination would undermine Interior's position that a similar agreement "encumbered" tribal land under Current Section 81, which was being litigated in GasPlus. (AR846-48).

This reasoning is peculiar, if for no other reason than that the IBIA did not employ it with respect to any other issues that were similar between the cases. GasPlus, for instance, also involved the issue of whether the contract was with a tribe. IBIA did not refrain from making a ruling on that issue, however. For some reason, it sought refuge only on the issue of whether the Management Agreement "related to" tribal land.

Thus, the IBIA assumes that the Management Agreement relates to tribal land and, so, assumes that the Management Agreement is subject to the Old Section 81 approval requirement. Having assumed that the Management Agreement is, then, void for want of approval under Old Section 81, the IBIA goes on to reason that under Old Section 81 Kewa has no contractual obligations. Thus, application of Current Section 81` imposes the burden of a contract on Kewa and, so, has an impermissible retroactive effect.

Ultimately, the entirety of IBIA's retroactivity analysis is based on its unanalyzed assumption that the Management Agreement "relates" to tribal real property. [4]

The second problem with IBIA's analysis is the notion that Current Section 81 burdens Kewa with contractual obligations. As noted above, Current Section 81 allows a tribe to enter into more types of contracts without federal approval than Old Section 81 did. The fact that a tribe exercises that freedom by entering into a contract does not mean that the statute places a burden on the tribe. The statute allows the tribe to burden itself with a contract, but the statute, itself, does not place the burden. Quite the opposite, Current Section 81 increases the rights of tribes and others to enter into contracts without government intervention, instead of impairing rights or imposing new duties.

In sum, a retroactivity analysis using factors established by the Supreme Court results in the conclusion that Current Section 81 should have been applied by the Regional Director in determining whether the Management Agreement needs Secretarial approval. The IBIA's analysis, however, is built on assumption and misconstruction of the effect of Current Section 81.

---

[4] Not only is this proposition a key premise to IBIA's retroactivity analysis, it is really the central issue in this whole lawsuit.

## II.    Old Section 81 Does Not Require Secretarial Approval Of The Management Agreement

QEL believes that the question of whether the Management Agreement needs approval by the Secretary should be answered under Current Section 81, which disposes of the primary issue in this lawsuit because the parties are in agreement that under Current Section 81 the Management Agreement was not subject to Secretarial approval. If, however, the Court decides not to apply Current Section 81, QEL respectfully submits that Secretarial approval of the Management Agreement was not required by Old Section 81, either.

### A.    The Management Agreement is not "Relative" to Indian Land

A central issue in whether a contract for services is subject to Old Section 81 is whether the contract is "relative" to Indian land. See, e.g., Altheimer & Gray v. Sioux Mfg. Corp., 983 F.2d 803, 810 (7th Cir. 1993) (Reversing lower court's ruling that contract was subject to Old Section 81: "The District court, however, was too liberal in its interpretation of when a contract actually does relate to Indian lands.") In making the determination as to whether a contract is "relative" to Indian lands, there is no sine qua non, and courts have taken into account a variety of factors. See Id. at 811.

Because the IBIA did not address the merits of the issue of whether the Management Agreement "relates" to tribal land and allowed the Regional Director's determination on that issue to become effective (AR 848), we must look to the Regional Director's Decision to determine BIA's position.  The Regional Director relied on the factors as discussed in Altheimer: (i) whether the contract is for management of a facility on tribal land, (ii) whether the non-Indian party has the exclusive right to operate the facility, (iii) whether the tribe is forbidden from encumbering the property, and (iv) whether the operation of the facility depends on the tribe's sovereignty.  (AR 9.) Of these four factors, the Regional Director misapplied the second factor, ignored the absence of the third factor and misapplied and assumed the applicability of the fourth

factor, leaving a clear affirmation of only the first factor: that the Distribution Business QEL managed was located on tribal land. As common sense, case law and even the Gulbronson decision quoted by the Regional Director dictate, the mere physical location of a business on tribal land is not enough to subject an agreement to manage that business to Section 81 requirements.

> Plaintiffs . . . take the position that any contract involving physical contact with tribal land is "relative to Indian lands." This is too literal an interpretation. . . . The legislation [Old Section 81] was not intended to require the government to oversee every transaction involving services that might cause a non-Indian merely to touch tribal lands when there was no accompanying danger of the tribe's losing legal or de facto control over the land. . . .
>
> Under the interpretation urged by plaintiffs, even an arrangement whereby a non-Indian agreed to mow a lawn located on an Indian reservation would require the approval of the Secretary of the Interior. Courts addressing the applicability of § 81 to agreements for the construction of facilities on Indian property have not suggested that applicability of the statute rests solely on the physical connection to tribal land. Instead, the courts have analyzed the contracts in their entirety.

United States ex rel. Gulbronson v. D & J Enters., No. 93-C-233-C, 1993 WL 767689, at *6 (W.D. Wis. Dec. 23, 1993) (emphasis added); (R. Decision at 2-3).

> **1.    The Altheimer test, upon which the Regional Director relies, requires that QEL have "exclusive" control over the Distribution Business, which QEL does not.**

After listing QEL's obligations in the Management Agreement, the Regional Director concludes that "these terms give nearly exclusive proprietary control over tribal land to QEL because it is empowered by this agreement to operate the gas distribution business located on the tribal land. . . .  The only powers reserved to the Distributor are to consult with QEL with respect to its conduct of the business, to receive monthly and annual reports submitted by QEL, and to approve construction or capital expenditures exceeding $10,000." (AR 9-10.)

There are several things wrong with the Director's reasoning and conclusions, here. First, there is no authority in any case law for the proposition that operating a business on tribal land, without more, gives the operator nearly exclusive proprietary control over that land.

Second, it is not clear why the Regional Director referenced the "nearly exclusive proprietary control over tribal land" standard, a criterion under Current Section 81. This phrase is used in 25 C.F.R. § 84.002, which is the definition for "encumbrance," a pivotal word in analyzing Current Section 81, but a stranger to Old Section 81.  That definition says that "encumbrance"  "include[s] leasehold mortgages, easements, and other contracts or agreements that by their terms could give to a third party exclusive or nearly exclusive proprietary control over tribal land."

The Regional Director, however, made it clear that he was predicating his Decision on Old Section 81 law and that he was performing the Old Section 81 Altheimer analysis, one criterion of which is the non-Indian having control over the facility to the exclusion of the tribe. The Regional Director appears to be mixing the old **exclusive**-control-over-the-**business** criterion with the current **nearly-exclusive**-proprietary-control-over-tribal-**land** criterion and manufacturing a hybrid criterion:  nearly-exclusive-control-over-the-business.  This hybrid criterion is not the Altheimer criterion, as discussed below.

The Regional Director acknowledged that QEL's control over the business was not exclusive, but that it had enough control for Old Section 81 to apply. This is contrary to Altheimer, where the court held that a contract was not subject to Old Section 81 approval because the non-Indian's control under the contract, while substantial, was not exclusive.

In Altheimer the non-Indian party, MST, was "heavily involved" in the venture on tribal property. Altheimer, 983 F.2d at 811. But, the Court pointed out, MST "did not have unilateral power to set wages and salaries or operation and administration costs." Id. Based on the tribe's

ability to participate in setting salaries and costs, the court concluded: "While it may be an understatement to characterize MST solely as a consultant, it would be an overstatement to say MST had exclusive control over the . . . facility." Id. at 811-12. This was one of the determinative factors in the court's decision that the contract at issue was not subject to Old Section 81 approval. The Regional Director acknowledged that QEL did not have exclusive control of the Distribution Business. Based on this acknowledgment and Altheimer, the Regional Director should have decided that the Management Agreement does not meet the exclusive control criterion of the Altheimer test.

In fact, Kewa had a good deal of control over the business under the Management Agreement, but the Regional Director overlooked portions of the Management Agreement in his description of Kewa's role in the business, and minimized the importance of the portions of the Management Agreement that he did mention. Actually, Kewa's power under the Management Agreement is at least as great as, and appreciably exceeds, that of the tribe's in Altheimer. The only control that the tribe in Altheimer had, cited by the court, was that the non-Indian party could not unilaterally set salaries or administration costs or "other operational costs." 983 F.2d at 807.

In the case now before the Kewa, Kewa held approval rights to the entire operating and capital budgets.[5] (AR 133) (QEL required to submit operating and capital budgets "for approval by Distributor).) Clearly, as with the non-Indian party in Altheimer, QEL could not unilaterally set operating costs, because Kewa had the right to approve or disapprove the operating and capital budgets. This similarity with Altheimer, alone, is sufficient to require a ruling that the Management Agreement is not subject to Old Section 81 approval.

---

[5] The Regional Director ignored or overlooked this considerable power of Kewa's when describing Kewa's power in his analysis. ("The only powers reserved to [Kewa] are to consult with QEL with respect to its conduct of the business, to receive monthly and annual reports submitted by QEL, and to approve construction of capital expenditures exceeding $10,000.") (AR10.)

Kewa's control over the Business, however, goes even beyond the budgeting similarity with the tribe in <u>Altheimer</u>. Kewa does not just "consult" under the Management Agreement, as the Regional Director characterizes. QEL is required to "regularly" consult with Kewa. (AR 133.)  QEL is required to provide to the Kewa board copies of "financial and other statement or reports . . . dealing with the Gas Distribution Business." (<u>Id</u>.) QEL is required to provide a monthly "written report summarizing activity of the Gas Distribution Business during the preceding month, and noting any special problems or notable gains, or other matters of interest worthy of the board's attention." (<u>Id</u>.) QEL also is required to designate a representative to attend Kewa's board meetings "to report on and discuss the Gas Distribution Business." (<u>Id</u>.)

Further, all books and records of the Distribution Business were Kewa's property and were to be retained by Kewa upon termination of the Management Agreement. (AR 132.) All employees hired to operate the Distribution Business were required by the Management Agreement to be employees of Kewa, not QEL. (<u>Id</u>.) All operating expenses, costs, expenses and obligations of the Distribution Business were to be paid from Kewa's funds. (<u>Id</u>.; AR135.) Kewa (or the Pueblo) retained ownership of all intellectual property associated with the Distribution Business. (AR 137.) All plans and specifications of any construction under the agreement required Kewa's approval. (<u>Id</u>.)

The picture painted by the Management Agreement is of a corporation, Kewa, that is regularly informed through written and personal appearances by QEL about the details of the way in which Kewa's business is being run, that retains ultimate control of the business' employees, is regularly consulted about decisions regarding the running of its business <u>and</u>, as in <u>Altheimer</u>, that retains control of the business' operating and capital budgets. If the contract in <u>Altheimer</u> gave the non-Indian party insufficient control for it to be subject to Old Section 81, even more is the case with the Management Agreement now before the Court.

18

2.    **The Management Agreement does not restrict Kewa's or Santo Domingo's right to encumber tribal property**

The Regional Director acknowledges that the Management Agreement does not restrict either Kewa's or Santo Domingo's ability to encumber tribal property. (AR 10.)

3.    **The operation of the Distribution Business did not depend on the Santo Domingo's status as a sovereign**

The Regional Director concludes that the fourth factor in the Altheimer test is met because "Santo Domingo is able to competitively compete in the wholesale gasoline business [because] the State of New Mexico has authorized it to receive a tax exemption under state law in order to help provide funding to the Pueblo for tribal governmental needs." (R. Decision at 4-5.) As with the analysis of the "exclusive" control issue, the Regional Director stretched Altheimer's fourth factor beyond its limits.

The fourth factor in Altheimer is whether operation of the facility depends on the tribe's sovereignty. It is based on a case that holds that a gaming management agreement is subject to Old Section 81 because the tribe's ability to conduct gaming on the reservation was a function of tribal sovereignty. United States ex rel. Shakopee Mdewakanton Sioux Cnty. v. Pan Am. Mgmt. Co., 616 F. Supp. 1200 (D. Minn. 1985). "'The very existence of the bingo operations arises from the Indian tribe's sovereignty over tribal trust lands which makes state gaming laws inapplicable to games on reservations.'" Altheimer, 983 F.2d at 811 (quoting Shakopee, 616 F. Supp. at 1218); see also Wisc. Winnebago Bus. Comm. v. Koberstein, 762 F. 2d 613, 616 n.3 (7th Cir. 1985) ("The Wisconsin Winnebago Tribe rather than the State of Wisconsin regulates bingo games conducted by the tribe on the Winnebago reservation because Wisconsin's bingo law, a civil regulation, is inapplicable to games conducted on Indian reservations."); White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142 (1980) (tribes are "a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws

of . . . the State within whose limits they reside." (quoting <u>McClanahan v. Arizona State Tax</u> <u>Comm'n.</u>, 411 U.S. 164, 173 (1973)); <u>see generally</u> <u>Koberstein</u>, 762 F. 2d at 616 n.3.

Unlike <u>Shakopee</u> and <u>Koberstein</u>, the ability of Kewa to conduct the Distribution Business was not a product Santo Domingo's sovereignty. If anything, it is a product of New Mexico statute. The Regional Director acknowledges this when he writes that "the reason that the [tribe] is able to . . . compete in the wholesale gasoline business is that <u>the State of New</u> <u>Mexico has authorized [the tribe] to receive a tax exemption under state law</u>." (AR 10-11) (emphasis added).) If the Distribution Business' ability to compete is based on an authorization granted by the State of New Mexico, then it is not the tribe's, but New Mexico's, sovereignty upon which the business depends.

The tax "exemption" to which the Director refers is a state statute that allows an average of 2,500,000 gallons per month to be excluded from the calculation of the tax on gasoline sold by certain registered tribal gasoline distributors.

> In computing the gasoline tax due, the following amounts of gasoline may be deducted from the total amount of gasoline received in New Mexico during the tax period, provided satisfactory proof thereof is furnished to the department:
>
> . . .
>
> (F) gasoline received in New Mexico and sold by a registered Indian tribal distributor from a nonmobile storage container located within that distributor's Indian reservation, pueblo grant or trust land for resale outside that distributor's Indian reservation, pueblo grant or trust land; provided the department certifies that the distributor claiming the deduction sold no less than one million gallons of gasoline from a nonmobile storage container located within that distributor's Indian reservation, pueblo grant or trust land for resale outside that distributor's Indian reservation, pueblo grant or trust land during the period of May through August 1998; and provided further that the amount of gasoline deducted by a registered Indian tribal distributor pursuant to this subsection shall not exceed two million five hundred thousand gallons per month, calculated as a monthly average during the calendar year.

NMSA 1978, § 7-13-4 (1999). The "exemption" referenced by the Regional Director, then, <u>depends</u> on <u>state</u> law. This is very different from <u>Shakopee</u> and <u>Koberstein</u>, where operation of

the gambling business depended on tribal sovereignty to preclude operation of state laws on tribal land.

In the case now before the Court, the true state of affairs is that if the Distribution Business depends on any sovereignty, it is that of the State of New Mexico, not Santo Domingo's. Indeed, if the State Legislature wished to repeal the deduction, it could. If the deduction upon which the Regional Director believes the business rests is a function of the whim of the New Mexico legislature, it cannot be that the Distribution Business depends on tribal sovereignty.

Also unlike the gambling operations in <u>Shakopee</u> and <u>Koberstein</u>, gasoline distribution businesses may be operated in New Mexico on non-Indian and Indian land, alike. There is nothing that prohibits an entity, Kewa or anyone else, from operating a gasoline distribution business on non-Indian property. Indeed, there are "tank farms" in other, non-reservation areas of New Mexico. The operation of the business, while perhaps more profitable because of the deduction allowed by New Mexico's law, simply does not depend on tribal sovereignty.

In sum, the only <u>Altheimer</u> factor met by the Management Agreement is that the business is located on tribal land. QEL does not have exclusive control over the business. The Management Agreement does not prohibit the tribe from encumbering tribal land. Operating the business does not depend on tribal sovereignty. Indeed, the case for making the Management Agreement subject to Old Section 81 is even weaker than the case for making the contract in <u>Altheimer</u> subject to Old Section 81, and in <u>Altheimer</u> the court had no difficulty in holding that "neither the Letter of Intent nor the contemplated contract relate[d] to Indian lands, and therefore the agreement is not subject to Section 81." <u>Altheimer</u>, 983 F.2d at 812.

**B.      Even apart from the Altheimer factors, case law and common sense do not support application of Old Section 81 to the Management Agreement.**

Not only does the Management Agreement not fit the Altheimer factors, there is no reason to stretch the Altheimer factors so that the Section 81 net may be cast broadly enough to catch the Management Agreement. In even the most generous applications of Old Section 81 the contracts met more of the Altheimer factors and had at least arguable ties to real property, which are not present in the case now before the Court. "The common element to these holdings has been whether by an agreement a tribe transferred a property interest in tribal lands. . . .  These contracts all, then, implicated one or more of the bundle of ownership rights inherent in the notion of real property." United States ex rel. Steele v. Turn Key Gaming, Inc., 260 F.3d 971, 978 (8th Cir. 2001).

In Koberstein, for instance, the court held that a management agreement for a bingo hall was "relative" to Indian land. In that agreement, however, not only did the non-Indian party have control over the business, it was granted the exclusive right to "operate and maintain the Property." Koberstein, 762 F.2d at 614 (emphasis added). The agreement contained a legal description of the Property, prohibited the tribe from encumbering the Property, and allowed the non-Indian party to record the agreement in the public records. Id. at 615. In Barona Group of Capitan Grande Band of Mission Indians v. American Management & Amusement, 840 F.2d 1394 (9th Cir. 1987), the court held a management agreement for a bingo hall to be relative to Indian land when the agreement gave the non-Indian party the exclusive right to "finance, construct, improve, develop, manage, operate and maintain the property." Id. at 1404 (emphasis added). In Shakopee, not only did the gambling business depend on the tribe not being subject to state gambling prohibitions, but the non-Indian party was granted the "absolute right to control the construction, development, maintenance and operation of the property" and the court noted that there was a legal description of the property "specifically included in an appendix to the

22

agreement." <u>Shakopee</u>, 616 F. Supp. at 1218. Additionally, the <u>Shakopee</u> agreement contemplated that it would be recorded and the tribe was prohibited from encumbering "the property <u>subject</u> to this Agreement." <u>Id</u>. (emphasis added). And the Eighth Circuit has noted that "[f]or an agreement to be "relative" to the land, the agreement must put in play actual incidents and rights of property ownership." <u>U.S. ex rel. Bernard v. Casino Magic Corp.</u>, 384 F.3d 510, 513, n.2 (8th Cir. 2004) (quotation marks & citation omitted).

In the case before the Court, not only does the Management Agreement not meet the <u>Altheimer</u> factors, it does not otherwise create a risk to tribal property. The Management Agreement does not mention real property, does not contain a real property description, does not reference tribal land, and does not give QEL control over real property. The Management Agreement does not prohibit Kewa or the tribe from encumbering tribal property. The agreement does not contemplate being recorded.

According to case law cited by the Regional Director, Old Section 81 should not apply "when there [is] no accompanying danger of the tribe's losing legal or de facto control over the land." <u>United States ex rel. Gulbronson v. D & J Enters.</u>, No. 93-C-233-C, 1993 WL 767689, at *6 (W.D. Wis. Dec. 23, 1993). In addition to not meeting the <u>Altheimer</u> factors, it would be difficult for a contract to be more removed from tribal land than is the Management Agreement.

The Management Agreement is not subject to Secretarial approval even under Old Section 81, and the Regional Director's Decision should be reversed.

**III.    Regardless of Which Version of the Statute Applies, the Management Agreement Was Not With an Indian Tribe For the Purposes of Section 81.**

Case law indicates that where a tribe's role under a contract is sufficiently limited, the contract will not be considered to be "with an Indian tribe" for purposes of Section 81. Case law also indicates, contrary to the Regional Director's Decision, that contracting with a corporation owned by a tribe, is not the same as contracting with the tribe.

The role of Santo Domingo in the Management Agreement is very limited. In the Management Agreement, Santo Domingo agrees with QEL and Kewa that Santo Domingo will not compete with the Distribution Business and that it waives sovereign immunity for the purposes of arbitrating and enforcing the contract. That is the extent of Santo Domingo's obligations under the Management Agreement. QEL also acknowledges that it has no interest in intellectual property associated with the Distribution Business, and that same is owned by either Kewa or Santo Domingo. That is the extent of Santo Domingo's participation in the Management Agreement.

It is Kewa, not Santo Domingo, that is defined as "Distributor" under the Management Agreement and that carries the burdens and benefits of contracting with QEL. It is the Distributor who, under the Management Agreement, "owns" the Distribution Business (AR 131); engages QEL to manage the business (id.); retains as its own employees those who are hired to run the business (AR 132); provides funds for all operating expenses of the business (id.); pays for and authorizes all construction (AR 133); requests that QEL file various forms on its behalf (id.); approves or disapproves operating and capital budgets for the Business (id.); approves construction and certain capital expenditures that are not contemplated by the budget (id.); consults with QEL, receives the oral and written reports on the Business from QEL and discusses the Business with QEL (id.); pays the management fee to QEL (AR 134); provides its U.S. income tax form from which to calculate the management fee (id.); pays an additional fee to QEL (AR 135); pays a performance bonus to QEL (id.); provides the funds for payment of all costs, expenses and obligations of operating the Distribution Business (id.); holds the right of termination (AR 136); holds the rights of indemnification from QEL (id.); indemnifies QEL (id.); and approves plans and specifications for all construction. (AR 137.)

It is not simply that "many" of the provisions of the agreement run between QEL and Kewa, as the Regional Director asserted. In fact, the provisions between QEL and Kewa comprise the contract's terms by an overwhelming margin. The only real obligation of the tribe under the Management Agreement is to refrain from competing with Kewa's business. All other obligations are between QEL and Kewa. Based on this remarkably limited role of Santo Domingo in the Management Agreement, the Regional Director concluded that "the management agreement qualifies as a "contract with an Indian tribe" for purposes of Section 81.

The Regional Director ignored Inecon Agricorporation v. Tribal Farms, Inc., 656 F. 2d 498 (9th Cir. 1981). In that case, Inecon contracted with Tribal Farms, an Arizona corporation, wholly owned by the Fort Mojave Indian Tribe. The tribe also was a party to the contract. Tribal Farm's board of directors was made up of the tribe's council members. The contract was a reinstatement agreement, which reinstated agricultural land development and management contracts. The contract was not approved by the Secretary under Old Section 81. Inecon sued to enforce an arbitration award given Inecon pursuant to an arbitration clause in the contract. The district court entered judgment enforcing the award. Tribal Farms appealed, arguing, in part, that the contract was not enforceable because it was "with an Indian tribe" and, so, required Old Section 81 approval. The court noted that the tribe's "sole interest" in the contract was its pledge "not to interfere . . . in [Inecon's] performance of its contract duties or receipt of its contract rights." Inecon, 656 F. 2d at 501; see also Altheimer, 983 F. 2d at 809-10 ("In Inecon, the Ninth Circuit described the Indian tribe as having a "limited role" in the contract. . . . The Sioux cannot be said to have played such a limited role in the present contract.") Based on the "limited role" of the tribe in the contract, the Ninth Circuit held that the contract "is enforceable as between Tribal Farms and Inecon." Inecon, 656 F.2d at 501. Additionally, the court noted that even if the contract were not enforceable against the tribe, it still would be enforceable against the tribe's

corporation. "Assuming, *arguendo*, that the reinstatement agreement cannot be enforced against the Tribe because the contract was not approved as required by 25 U.S.C. § 81, the contractual incapacity of the Tribe does not render the agreement unenforceable as between Inecon and Tribal Farms." Id.

Santo Domingo's role in the Management Agreement is as limited as that of the tribe in Inecon. In Inecon, the tribe's sole interest in the contract was not to interfere with the non-Indian's performance of its duties and enforcement of its rights. Under the Management Agreement, Santo Domingo's sole interest is not to compete against Kewa's distribution business. The Management Agreement is overwhelmingly between QEL and Kewa, and, as in Inecon, the tribe's "limited role" should not be construed to make the Management Agreement" with an Indian tribe" for purposes of Section 81.

Perhaps in recognition of this, the Regional Director justified his conclusion that the Management Agreement was with an Indian tribe by relying on Pueblo of Santa Ana v. Hodel, 663 F. Supp. 1300 (D.D.C. 1987). The Regional Director seemed to imply that the Santa Ana court held, as a matter of law, that "a contract with a tribal corporation was a contract with an Indian tribe." (R. Decision at 2.) This simply is not the holding in Santa Ana. In Santa Ana a contract with a tribal enterprise was held to be a contract with the tribe because, in contradistinction to Inecon and the case before the Court, the Santa Ana tribal enterprise was not a separate corporation, but a "non-profit instrumentality" of the tribe. Moreover, the court found it significant that the enterprise had no shareholders, unlike Kewa, and did not hold itself out as a separate entity, unlike Kewa. Finally, the court noted that the tribe took inconsistent positions with respect to the separateness of the enterprise, depending on the statute from which the tribe was seeking advantage. The tribe did not want the gambling contract at issue in Santa Ana subjected to Section 81 approval and, so, claimed that the enterprise was separate from the tribe.

But the tribe also did not want a lease with the enterprise subjected to Secretarial approval under

25 U.S.C. § 415 and, so, claimed that the enterprise was not separate from the tribe. This, too, is

unlike the case now before the Court.

The instant case is not similar to <u>Santa Ana</u> in any respect[6]:

- Kewa is incorporated, as a for-profit corporation.

- Kewa has shareholders.

- Kewa has a board of directors that is distinct from the Santo Domingo tribal council.

- The Lease between Kewa and Santo Domingo evidenced an arms-length transaction between two distinct entities, with detailed rental and other obligations of Kewa, as well as a host of remedies that Santo Domingo may exercise against Kewa upon a default.

- The lease between Santo Domingo and Kewa, unlike the lease in <u>Santa Ana</u>, <u>was</u> submitted to the Secretary by Santo Domingo for approval, which approval was received.

- Kewa holds itself out as an entity separate from the tribe.

- Kewa registered with the State of New Mexico as a foreign corporation doing business in New Mexico.

- Kewa's name "Kewa Gas Limited" contains the word of incorporation, "Limited," as required under NMSA 1978, § 53-11-7(A) (1983) ("The corporate name shall . . . contain the separate word "corporation," "company," "incorporated" or "limited" or shall contain a separate abbreviation of one of these words. . . .").

- The person signing the Management Agreement on behalf of the tribe was different from the person signing on behalf of Kewa.  (AR 140.)

- The Management Agreement recites that Santo Domingo "owns 100% of the issued and outstanding shares of capital stock of Distributor [Kewa]."  (AR 131.)

For its part, the IBIA acknowledged that the Regional Director "mischaracterized" <u>Santa</u>

<u>Ana</u>.  (AR 843, n.17.)  Moreover, the <u>IBIA</u> found no fault with the reasoning of the Court in

<u>Inecon</u>.  Even so, IBIA determined that the Management Agreement was "with a tribe" for

purposes of Section 81 because: (i) it read the Management Agreement as treating Santo

---

[6] This list is of indicia of separateness that are available in the record. Had the Regional Director taken evidence, other indicia could have been offered, as well.

Domingo and Kewa as a "single party" (AR 845) and (ii) Santo Domingo's agreement not to compete was not "insignificant" consideration. (Id.)

Perhaps IBIA asserts the "single party" theory because in Altheimer, the court found that a contract with a tribally formed corporation was with the tribe, in part, because "both plaintiff and defendant seemingly considered the Tribe and [its corporation] to be interchangeable." 983 F.2d at 808. The reasons that IBIA finds to treat Santo Domingo and Kewa as single parties, however, are extraordinarily weak. IBIA notes that the Management Agreement recites that it is "between" two parties, QEL, on one hand, and Santo Domingo and Kewa, on the other. (AR 844.) Additionally, on the signature page the names of QEL and Santo Domingo are capitalized, whereas Kewa's is not. Finally, IBIA says that its conclusion is bolstered by the fact that the Management Agreement recites that Santo Domingo is the sole shareholder of Kewa.

These reasons, even isolated from the rest of the facts, do not lead a reasonable person to believe that the contracting parties thought of Santo Domingo and Kewa as a single party. And certainly, in the face of all surrounding circumstances, they do not. Whomever's name may have been capitalized on the signature page, the fact remains that Santo Domingo and Kewa signed as separate parties and different persons signed on behalf of each. And while Santo Domingo may have been the sole shareholder of Kewa, the two were managed by different bodies, and most of the Directors on Kewa's Board did not sit on Santo Domingo's tribal council. (Material Fact No. 5.)[7] Ultimately, the IBIA's conclusion that Santo Domingo and Kewa should be treated as a single party is reduced to the fact that the recital used the word "between" instead of "among."

That is a thin, thin reed to support the notion that Kewa and Santo Domingo were treated as a single party—especially in light of the business realities that formed the context for the Management Agreement. While Kewa was not a corporation incorporated under the authority of

---

[7] References to "Material Facts" in this brief are to Plaintiff's Statement of Undisputed Material Facts, filed contemporaneously herewith.

a sovereign state of the Union, it was nonetheless a for-profit corporation, incorporated under the authority of another sovereign, Santo Domingo. Given the terms of the Management Agreement, the Lease between Kewa and Santo Domingo (which plainly evidences the two as separate and distinct entities (see Material Fact Nos. 24-31)), Kewa's registration with the State of New Mexico, and all the other evidence in the Record, it is clear that no one treated Kewa and the tribe as a single party with respect to the Management Agreement or otherwise.

Moreover, the New Mexico statute pursuant to which Kewa registered as a foreign corporation recognizes that Kewa is an independent corporate entity by providing that "A [registered] foreign corporation shall . . . enjoy the same, but no greater, rights and privileges as a domestic corporation . . . and . . . is subject to the same duties, restrictions, penalties and liabilities now or hereafter imposed upon a domestic corporation of like character." NMSA 1978, § 53-17-2 (1967). The hallmark of corporate status is that the corporation is an entity separate and distinct from its shareholders. Scott v. AZL Resources, Inc., 107 N.M. 118, 121, 753 P.2d 897, 900 (1988). Absent a piercing of the corporate veil, a domestic corporation cannot purport to be a separate entity one day and not, the next. Neither, then, can a foreign corporation.

In short, the factors considered in Santa Ana, Altheimer, and Inecon indicate that the Management Agreement should not be treated as being with an Indian tribe under Section 81. Santa Ana does not stand for the proposition that a contract with a tribal corporation is the same as contracting with the tribe. Kewa was incorporated and operated as a separate entity, and held itself out as such, even to the point of registering as a foreign corporation doing business in New Mexico. All of these factors are very much unlike Santa Ana.

With respect to IBIA's claim that the consideration given by Santo Domingo, a non-compete, was significant, that was not the issue in Inecon. The point of Inecon was not that the tribe's participation was not valuable, it was that it was very limited. In Inecon, the tribe's sole

29

interest in the contract was not to interfere with the non-Indian's performance of its duties and enforcement of its rights. That was an important role, but it was limited.  In the instant case, the tribe's sole interest is not to compete.  That is an important role, but it is limited.  All financial and performance obligations run between Kewa and QEL.

IBIA admits that "the great majority of the specific provisions in the Agreement relate specifically to and describe obligations between [QEL] and Kewa."  (AR 844.)  It also admits that Santo Domingo and Kewa have "distinct roles and obligations."  (AR 845.)  Regardless, and in the face of all of the foregoing, IBIA still says "[e]ven assuming that outside the context of the Agreement, Kewa may in certain respects be considered a distinct legal entity from the Pueblo, that does not mean that the parties treated Kewa that way in the Agreement." (Id.)

Virtually everything before the IBIA and before this Court indicate that Kewa and Santo Domingo were distinct entities and were treated that way, and that Santo Domingo's role under the Management Agreement was very limited.  The IBIA strains to make it otherwise, and it should be reversed.

## IV.    The Secretary Did Not Have Authority Under Old or Current Section 81 To Declare That the Management Agreement Has Never Been Legally Valid

It is well settled that "[a]gency actions that do not fall within the scope of a statutory delegation of authority are ultra vires and must be invalidated by reviewing courts." Haitian Ctrs. Council, Inc. v. Sale, 823 F. Supp. 1028, 1046 (E.D.N.Y. 1993); see also, La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.").

A review of Section 81, old or current, shows that no authority is granted in the statute for the Regional Director or other official of the BIA to adjudicate rights as between Indians and non-Indians, and order relief from one of them. Under Old and Current Section 81, the Regional Director is empowered to approve or disapprove a contract. Implicitly, for Old Section 81, and

30

explicitly, for Current Section 81, the Regional Director also has the authority to determine the threshold issue of whether a contract is subject to Section 81. But nowhere in either statute does the language contemplate that the Regional Director will adjudicate the rights of the Indian and non-Indian, and make an award. Indeed, in Old Section 81 it is clear that to obtain relief a tribe would have to bring an action in a court of law. (Money "may be recovered by suit in the name of the United States in any court of the United States. . . ."). If either old or Current Section 81 contemplated the BIA making such an award, surely the statutes would have specifically so provided.

The IBIA, though, argues that QEL has pointed to no basis for QEL's claim that the Regional Director could not declare the Management Agreement to be invalid and the proceeds unauthorized.  The IBIA has it wrong.  It is the job of the agency to find authority for the proposition that it can so declare.

"'The scope of an agency's power is measured by statute and may not be expanded by agency fiat.'" Birth Hope Adoption Agency, Inc. v. Ariz. Health Care Cost Containment Sys., 218 F.3d 1040, 1045 (9th Cir. 2000) (quoting Ariz. Health Care Cost Containment Sys. v. Bentley, 928 P. 2d 653, 656 (Ariz. Ct. App. 1996). Where an agency does act outside the scope of its authority, as the Regional Director did here, courts should "restore the status of the parties aggrieved by such unwarranted action." Garfield v. United States ex rel. Goldsby, 211 U.S. 249, 262 (1908).

The IBIA says that all the Regional Director did was to "simply evaluate[] the Agreement under Old Section 81 and state[] the consequences of nonapproval as provided by the statute itself."  (AR 854.)  While the Regional Director certainly has to evaluate an agreement in order to determine whether it is subject to Section 81, there is nothing in the statute that authorizes him

to state the consequences of nonapproval.  Stating the law is a job for the courts, and there is nothing in Section 81 that purports to give that job to the Regional Director.

In the instant case, the most that the Regional Director was authorized to do by Section 81 was determine whether the Management Agreement required Section 81 approval and, if so, approve or disapprove it. QEL respectfully submits that the Court should reverse the IBIA's determination that the Regional Director was authorized  to declaration that the Management Agreement was never valid and that the proceeds were unauthorized.

## V.    The Regional Director's Decision Denied QEL Due Process of Law.

QEL was denied due process because it was deprived of liberty and property interests without notice and without a hearing. It was denied due process because the Regional Director looked only at "evidence" offered by Santo Domingo and gave no factual basis for any of his determinations. QEL was denied due process because of apparent institutional bias on the part of the BIA in favor of tribes. QEL and Kewa entered into the Management Agreement in 1996, and performed under it until at least 2003—seven years. Santo Domingo then submitted the contract to its fiduciary, the Regional Director, to review for the tribe's "protection." Santo Domingo made it known that it thought that the contract was "too lucrative" for QEL (Material Fact No.11), and that it did not want the Regional Director to approve the contract.  (AR 11.) The Regional Director declared the contract void and ordered QEL to disgorge monies "generated" under the contract. The declaration and order were accomplished based solely on the Regional Director's contact with the tribe, with no notice to QEL and with no opportunity for QEL to present its side.

The Fifth Amendment to the United States Constitution protects citizens from deprivations of liberty and property without due process of law. See Bd. of Regents v. Roth, 408 U.S. 564, 569 (1972). These protections especially apply in administrative proceedings. See, e.g.,

Hannah v. Larche, 363 U.S. 420, 442 (1960) ("[W]hen governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which traditionally have been associated with the judicial process.")

In the instant case, QEL had property and liberty interests of which it was deprived by the Regional Director's Decision. QEL had a property interest in the contract that the Regional Director declared void. QEL also had a property interest in monies that the Regional Director ordered QEL to disgorge. And QEL had a liberty interest in its right to contract with Kewa. See, e.g., Roth, 408 U.S. at 572 (liberty encompasses "not merely freedom from bodily restraint but also the right of the individual to contract. . . .").

Before depriving QEL of its property and liberty interests, BIA should have given QEL notice and an opportunity to be heard. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). The process that produced the Regional Director's Decision was spectacular in its failure to meet the Mullane requirement. There is nothing in the record indicating that the BIA notified QEL that the Regional Director was considering voiding the seven year old contract to which QEL was a party, let alone a notice telling QEL the issues involved in or the reasons for the Regional Director's consideration. Nor was there notice to QEL informing QEL of the possible ramifications of the Regional Director's Decision, or instructing QEL on how it could gain input into the process. See, e.g., Goldberg v. Kelly, 397 U.S. 254, 267-68 (1970) (welfare recipients entitled to notice "detailing the reasons for a

proposed termination"); <u>Memphis Light, Gas & Water Div. v. Craft</u>, 436 U.S. 1, 19-20 (1978) (customer threatened with termination of service has right to notice of protest procedures).

Obviously, having received no notice, QEL did not have the opportunity for any sort of pre-deprivation hearing. Courts have held that a variety of types of hearings may fulfill the government's due process obligation, from the trial-like rights to present testimony and cross-examine witnesses, in <u>Goldberg</u>, to an opportunity simply to respond to charges, in <u>Goss v. Lopez</u>, 419 U.S. 565 (1975). The type of hearing, whether in the form of writing, oral argument or evidence taking, depends on the nature of the questions that are likely to be addressed at the hearing. <u>See</u> <u>Mathews v. Eldridge</u>, 424 U.S. 319, 333-35, 348 (1976). In the case before the Court, clearly QEL should have had the opportunity to present its view of whether the Management Agreement was subject to Section 81. It should have had the opportunity to present documents and, perhaps, testimony to support the proposition that Kewa and the tribe are distinct entities and to aid the Regional Director in his decision on whether to approve the Management Agreement.

In the case before the Court, QEL received no notice and opportunity for any type of hearing. It is difficult to conceive of any justification for QEL to have been so completely excluded from a decision that resulted in a governmental order that purported to declare invalid a QEL contract and command QEL to surrender its property.

QEL also was denied due process by the Regional Director taking "evidence" only that was offered by Santo Domingo, and by the Regional Director's failure to provide evidentiary support for his Decision. For instance, in determining whether Kewa's Distribution business depended on tribal sovereignty, the Regional Director says only "[W]e note that the reason that Santo Domingo is able to competitively compete in the wholesale gasoline business is that the State of New Mexico has authorized it to receive a tax exemption." (AR 10-11.) The Regional

Director reached that conclusion without informing QEL as to any facts upon which it was based. It appears that the Regional Director simply assumes that the exemption is necessary to allow Kewa to compete in the business, when evidence may have shown that without the exemption Kewa still could be profitable, just not as profitable as with the exemption. The Regional Director reported no facts upon which he based his conclusion, including the annual amount of the exemption claimed by Kewa, Kewa's profit margin both with and without the exemption, the amount of wholesale gasoline competition Kewa has in New Mexico or whether Kewa could compete as a gasoline distributor on non-reservation land.

Indeed, it appears that the only "facts" upon which the Regional Director relied in making any of his determinations in the Decision were the existence of the New Mexico gasoline tax exemption and Santo Domingo's desire to have the contract invalidated.  For example,[8] with respect to the Regional Director's determination that the Management Agreement is with an Indian tribe, the Regional Director does not appear to have taken into account Kewa's relationship with Santo Domingo as a lessee, Kewa's registration with the State of New Mexico as a foreign corporation, Kewa's and the tribe's respective participation in contract negotiations or in arranging and operating the Distribution Business, the relationship of Kewa and tribal management, whether Kewa operated with assets and monies separate from that of the tribe, or whether Kewa held itself out to QEL and the world as an entity separate and distinct from the tribe.

With respect to whether the Management Agreement is relative to Indian land, the Regional Director does not appear to have investigated Kewa's role in the day to day operation

---

[8] By giving examples of facts that the Regional Director did not appear to investigate in making several of his determinations, QEL does not mean to imply that such examples are an exhaustive list of facts relevant to the Director's determinations. Moreover, QEL believes it to be the case that the Regional Director could determine that the Management Agreement is not subject to Section 81 as a matter of law, but that before he could determine that the contract is subject to Section 81, he would need to do more factual investigation.

of the Distribution Business, the amount of control that Kewa exercised over QEL in QEL's operation of the Distribution Business, or the factors mentioned, above, related to the Regional Director's conclusion concerning the New Mexico gasoline tax exemption.

With respect to the Regional Director's conclusion regarding the fairness of the Management Agreement to Kewa, the Regional Director does not appear to have taken into account benefits accrued to Kewa over the seven year course of the contract, whether Kewa was represented by counsel during the negotiation of the contract, the amount of money that Kewa made from the contract, resources devoted by QEL to performing the contract or Kewa's ability to engage successfully in the Distribution Business without QEL's aid.

The Regional Director makes no findings with respect to these factual matters, and the Decision gives no indication that the Regional Director conducted any investigation with respect to them. Not only, then, was QEL denied input into the Regional Director's decision-making process, from the Decision QEL cannot tell what or how facts may have influenced the Regional Director's Decision. See, e.g., Morrissey v. Brewer, 408 U.S. 471 (1972) (failure to inform of information and evidence relied upon by administrator is denial of due process).

Finally, QEL's due process rights were violated because the Decision was not produced by an apparently unbiased adjudicator, and the right to an unbiased adjudicator is one of the fundamental guarantees of due process. Tumey v. Ohio, 273 U.S. 510, 523 (1927). "Even appeal and a trial de novo will not cure a failure to provide a neutral and detached adjudicator." Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 618 (1993); Ward v. Village of Monroeville, 409 U.S. 57, 61 (1972) (availability of trial de novo does not cure bias of judge at first-tier trial). Moreover, the rigidity of the requirement that the trier be impartial and unconcerned in the result applies more strictly to an administrative adjudication where many of the customary safeguards affiliated with court proceedings have, in

the interest of expedition and efficiency, been relaxed. Nat'l Labor Relations Bd. v. Phelps, 136 F.2d 562 (5th Cir. 1943).

This is not a matter of personal bias on the part of the Regional Director, but of institutional bias on the part of the BIA. The BIA is charged with enforcing the government's trust responsibility to tribes, and occupies a fiduciary role with respect to tribes. In fact, the BIA's duties under Section 81 stem from the government's fiduciary duty toward tribes. Section 81 "'has its origin in the long-standing trust relationship between the federal government and Indian tribes.'" Penobscot Indian Nation v. Key Bank of Me., 112 F.3d 538, 552 (1st Cir. 1997) (quoting Narragansett Indian Tribe v. RIBO, Inc., 686 F. Supp. 48, 50 (D.R.I. 1988)); see also United States ex rel. Harlan v. Bacon, 21 F.3d 209, 212 (8th Cir. 1994); United States ex rel. Shakopee Mdewakanton Sioux Cnty. v. Pan Am. Mgmt. Co., 616 F. Supp. 1200 (D. Minn. 1985).

Courts have recognized different reasons that a trustee could be biased in favor of his ward.

> [T]rustees could act in a biased fashion for several reasons. The most obvious would be in attempting to maximize assets available for the beneficiaries of the trust by making findings to enhance [the other party's] liability. The next would not be so selfless, for if existing under funding was the consequence of the prior decisions of the trustees, those decisions could, if not offset, leave the trustees open to personal liability.

Concrete Pipe, 508 U.S. at 617. Clearly, forcing QEL to disgorge seven years of monies "generated" by the Management Agreement is a windfall in assets to Kewa.

Additionally, fear of liability to tribes could make the BIA and its officials over cautious in rendering decisions that are unfavorable to its wards. The government's role as fiduciary may give rise to governmental liability to a tribe if the government is performing an act pursuant to a statute that places upon it a specific and affirmative duty. See, e.g., Seminole Nation v. United States, 316 U.S. 286 (1942); see also Cobell v. Norton, 240 F.3d 1081, 1099 (D.C. Cir. 2001)

(noting the Secretary's duty in administration of Indian programs: "The Secretary has an overriding duty . . . to deal fairly with Indians. . . . This duty necessarily constrains the Secretary's discretion. When faced with several policy choices, an administrator is generally allowed to select any reasonable option. Yet this is not the case when acting as a fiduciary for Indian beneficiaries as stricter standards apply to federal agencies when administering Indian programs." (internal quotation marks and citations omitted)). See also United States v. White Mountain Apache Tribe, 123 S. Ct. 1126, 1133 (2003).

In the case now before the Court, the BIA is the trustee over the corpus of tribal land, with Santo Domingo as the beneficiary. Under Section 81 the government has the specific and duty to protect the corpus from unconscionable encumbrance. Potential liability of the government for failing in its affirmative duty provides the BIA with incentive to err on the side of caution and enter decisions in favor of tribes.

For QEL to have been denied due process, it is not necessary for the Regional Director to actually have been biased in rendering his Decision. It only need be that circumstances are such that his Decision could give the appearance of bias. Here, the BIA's fiduciary duty and its potential liability for failing in that duty, create an appearance of bias. This appearance is strengthened further by the BIA's failure to give notice to QEL or otherwise to allow QEL any sort of input before the Regional Director's Decision was rendered.

> Justice, indeed, must satisfy the appearance of justice, and this stringent rule may sometimes bar trial even by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. . . . [W]e will assume that the possibility of bias, if only that stemming from [a] trustee['s] statutory role and fiduciary obligation, would suffice to bar the trustee[] from serving as [an] adjudicator[] of [the opposing party's] liability.

Concrete Pipe, 508 U.S. at 618 (alterations, internal quotation marks and citation omitted).

QEL received no notice and was given no opportunity for a hearing. The Regional Director relied only on information given him by Santo Domingo, provided no factual support in

his Decision for any of his determinations and, indeed, appears not to have developed facts relevant to those determinations. Moreover, there is apparent, if not actual, bias on the part of the BIA in performing its fiduciary duty to Santo Domingo under Section 81. These factors, taken individually or together, amount to a denial of due process to QEL and provide another basis upon which the Regional Director's Decision should be reversed.

The IBIA's primary response to QEL's due process claims appears to be that the Regional Director's Decision was not a final decision and that QEL's due process rights were protected by its ability to appeal to the IBIA for a hearing.  (AR 856.)  But IBIA ignores that it refused to rule on the key issue of whether the Management Agreement was "relative" to tribal land.  On that issue, it relies entirely on the Regional Director's Decision, which was arrived at with all of the due process deficiencies described above.  Moreover, as discussed earlier, the IBIA's failure to rule on whether the Management Agreement was "relative" to tribal land also corrupted its retroactivity analysis by assuming the correctness of the Regional Director's ruling. And certainly the IBIA's <u>assumption</u> that the Management Agreement was subject to Old Section 81 cannot cure the deficiencies of the Regional Director's due process violations.

In short, the fact that the IBIA assumed the answer to the primary question placed before it, and then based the remainder of its opinion on that assumption, keeps the hearing in front of the IBIA from being any meaningful redress for the original due process denial.

**VI.    Conclusion**

QEL respectfully submits that IBIA Decision and the Regional Director's Decision should be reversed and that the Court should enter an order vacating the Decisions and declaring that the Management Agreement is not subject to Section 81. The Regional Director should have used Current Section 81 in analyzing the statute's applicability to the Management Agreement.

Had he done so, BIA admits that the Management Agreement would not be subject to approval thereunder.

Even under Old Section 81, though, the Management Agreement is not required to have Secretarial approval.  The Management Agreement was not with a tribe, and it was not "relative" to tribal land. but, instead, he used Old Section 81.

Finally, the Regional Director denied QEL due process by failing to give QEL notice and a hearing before entering the Decision, by failing to take evidence and develop facts and factual findings in support of the Decision and by making the Decision under an appearance of bias, if not under an actual bias.   The IBIA's assumption regarding the central issues in the case, rather than actually ruling on them, fails to cure the due process denial suffered by QEL at the hands of the Regional Director.

Respectfully submitted,

BRACEWELL & GIULIANI, LLP
Shelby J. Kelley
D.C. Bar Number 464248
Nancy J. Appleby
D.C. Bar Number 470995
2000 K Street, N.W., Suite 500
Washington, DC 20006-1872
Telephone:  (202).828-5800
FAX:  (202).223-1225

-and-

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By:    /s/ Mark A. Smith
        Mark A. Smith (Appearing under Minute Order
        dated 3/11/08, Granting Pro Hac Vice Motion)
        Post Office Box 1888
        Albuquerque, New Mexico 87103
        Telephone: (505).768-7500
        FAX: (505).768-7395

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b)(2)(D) and the Local Rules, I hereby certify that on June 27, 2008, a true copy of the foregoing pleading was filed electronically.  Service of this filing to all parties, including those listed below, will be accomplished by operation of the Court's ECF system, and the parties may access this filing through the Court's system:

Devon Lehman McCune                        Kristofor R. Swanson
U.S. DEPARTMENT OF JUSTICE                 U.S. DEPARTMENT OF JUSTICE
Natural Resources Section                  P.O. Box 663
1961 Stout Street                          Washington, DC 20044
8th Floor                                  Email: kristofor.swanson@usdoj.gov
Denver, CO 80294
Email: devon.mccune@usdoj.gov

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By:    */s/ Mark A. Smith*_____
       Mark A. Smith

41

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
QUANTUM ENTERTAINMENT )
limited, )
 )
 Plaintiff, )
 )
v. )                    Case No. 1:07-cv-01295-RMU
 )
UNITED STATES DEPARTMENT )
OF THE INTERIOR, )
BUREAU OF INDIAN AFFAIRS, )
 )
 Defendant. )
_____)

**[PROPOSED] ORDER**

THIS MATTER, having come before the Court on the parties' cross-motions for

summary judgment, and the Court having considered the motions, the memoranda in support

thereof, and the Administrative Record, IT IS HEREBY ORDERED THAT:

(1)     Plaintiff's Motion for Summary Judgment is GRANTED; and

(2)     Defendant's Motion for Summary Judgment is DENIED.

Signed this _____ day of _____, 2008.


_____
RICARDO M. URBINA
United States District Court Judge