IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| QUANTUM ENTERTAINMENT LIMITED, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:07-cv-01295-RMU |
| UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS; | ) ) ) ) | |
| Defendant. | ) ) ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

KRISTOFOR R. SWANSON
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, DC 20044-0663
Tel: 202-305-0248
Fax: 202-305-0506
kristofor.swanson@usdoj.gov

Of Counsel:

JANET SPAULDING
Senior Attorney
U.S. Department of the Interior
Office of the Solicitor
Date: August 8, 2008                    Tulsa Field Office

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      THE IBIA CORRECTLY FOUND OLD SECTION 81 APPLIED TO ITS
        REVIEW OF THE MANAGEMENT AGREEMENT, AND MADE A
        WELL-REASONED CONCLUSION THAT THE AGREEMENT WAS
        SUBJECT TO APPROVAL UNDER SECTION 81 . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      As Applying New Section 81 Would Change The Legal
                Consequence of the Management Agreement, the IBIA
                Appropriately Determined Old Section 81 Should Apply . . . . . . . . . . 3

        B.      The Acting Regional Director and IBIA Properly Found
                The Agreement Required Secretarial Approval Under
                Old Section 81 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                1.      The Acting Regional Director Appropriately Found The
                        Agreement To Be "Relative To" Indian Lands . . . . . . . . . . . . . . . 7

                        i.      Plaintiff's Duties Amounted to Exclusive Control . . . . . . . 8

                        ii.     The Agreement Was Dependent on Tax
                                Benefits Derived From The Pueblo's
                                Status as a Sovereign . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                2.      Old Section 81 Is Not Limited to Agreements That
                        Directly Encumber Property Rights . . . . . . . . . . . . . . . . . . . . . . . 12

                3.      The IBIA Made a Reasoned Determination That The
                        Agreement Was "With a Tribe of Indians". . . . . . . . . . . . . . . . . . 14

II.     THE DEPARTMENT PROVIDED PLAINTIFF ITS REQUISITE DUE
        PROCESS BY GIVING NOTICE AND THE OPPORTUNITY TO BE
        HEARD BEFORE THE IBIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        A.      The Department Gave Plaintiff Notice And The
                Opportunity To Be Heard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        B.      The IBIA Was Not Required to Hold An Evidentiary
                Hearing on Plaintiff's Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

C.      The Department of the Interior's Trust Duties Do Not
        Create A Bias Toward Non-Indian Parties. . . . . . . . . . . . . . . . . . . . . 19

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**INTRODUCTION**

Plaintiff Quantum Entertainment Limited (QEL) brings claims under the Administrative Procedure Act (APA) challenging decisions by the Bureau of Indian Affairs Acting Regional Director for the Southwest Region and Interior Board of Indian Appeals (IBIA) finding a Management Agreement between Plaintiff and the Santo Domingo Pueblo lacked the requisite Secretarial approval and was therefore invalid. The parties submitted cross-motions for summary judgment on June 27, 2008. *See* Def.'s Mot. Summ. J. (Dkt. No. 16); Pl.'s Mot. Summ. J. (Dkt. No. 17). Defendant now responds in opposition to Plaintiff's motion. Under the APA, a court must uphold agency decisions unless they are found to be arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A); *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). Here, both the Acting Regional Director and the IBIA made reasoned determinations in accordance with law and within their discretion. Additionally, by providing Plaintiff the opportunity to be heard before the IBIA, the Department of the Interior ("Department") did not violate Plaintiff's procedural due process rights. Plaintiff's motion for summary judgment should therefore be denied, and Defendant's motion for summary judgment should be granted.

**ARGUMENT**

As an initial matter, Defendant notes that Plaintiff's Brief in Support of Motion for Summary Judgment ("Pl.'s Mem.") (Dkt. No. 17-2) does not dispute the IBIA's determination that Plaintiff lacks standing to challenge the Acting Regional Director's decision not to retroactively approve the QEL Management Agreement. Plaintiff has therefore waived its right to challenge that determination. *See, e.g., Novosteel SA v. United States*, 284 F.3d 1261, 1274

(Fed. Cir. 2002) (holding a party waived an argument by not presenting it in its principal summary judgment brief). Similarly, Plaintiff acknowledged before the IBIA that any demands the Acting Regional Director appeared to make upon Plaintiff were no longer at issue in the appeal, given the parties' agreement that the Bureau of Indian Affairs lacked authority to order such actions. AR0853; AR0533–34. Plaintiff's attempts to now re-allege those actions as unlawful (Pl.'s Mem. at 32; Pl.'s Statement Undisputed Material Facts ¶ 12) should be disregarded.

Further, the IBIA made a reasoned determination that Old Section 81 applied to the QEL Management Agreement by correctly analyzing New Section 81's potential retroactive impact on the Agreement under Supreme Court precedent. The Acting Regional Director reasonably determined the Agreement was "relative to" Indian lands by applying judicially-recognized factors to facts supported by the record. The IBIA also reasonably determined the Agreement was with an Indian Tribe by analyzing the Agreement and record before it. Finally, the Department gave Plaintiff notice and the opportunity to be heard before the IBIA, meeting procedural due process requirements.

I.    **The IBIA Correctly Found Old Section 81 Applied To Its Review of The Management Agreement, and Made a Well-Reasoned Conclusion that The Agreement Was Subject To Approval Under Section 81.**

The IBIA appropriately determined Old Section 81 should apply to its review of the QEL Management Agreement because application of New Section 81 would change the Agreement's legal consequences and expectations. Supreme Court precedent therefore holds, absent clear Congressional intent, that New Section 81 should not be applied. In applying Old Section 81, the Acting Regional Director made a reasoned determination that the Agreement was subject to

approval by applying judicially-recognized factors to the facts before him.  Similarly, the IBIA

analyzed the Agreement and the record before it to reasonably determine the Agreement was

"with a Tribe of Indians."

> **A.    As Applying New Section 81 Would Change The Legal Consequence of the Management Agreement, the IBIA Appropriately Determined Old Section 81 Should Apply.**

The IBIA undertook a reasoned analysis and determined Old Section 81 applies to the

Management Agreement.  Applying New Section 81 to the Agreement would attach legal

consequences to a contract that is otherwise invalid, making retroactive application inappropriate

under Supreme Court precedent.

As a default rule, "[r]etroactivity is not favored in the law." *Bowen v. Georgetown Univ.

Hosp.*, 488 U.S. 204, 208 (1988).  Therefore, "congressional enactments and administrative rules

will not be construed to have retroactive effect unless their language requires that result." *Id.*

(emphasis added and citations omitted).  The U.S. Supreme Court in *Landgraf v. USI Film

Products* addressed an apparent contradiction between the rule disfavoring retroactive

application and that requiring a court to apply the law in effect at the time of its decision.  511

U.S. 244, 264 (1994).  The Court noted, however, that the two rules, in fact, do not result in a

contradiction at all.  *Id.*  A new law that has retroactive effect—attaching new legal

consequences to events already completed—will not be applied to events occurring before the

law's enactment.  *Id.* at 280.  Plaintiff argues New Section 81 does not have retroactive effect

because it works to remove burdens, rather than impose new ones.  Pl.'s Mem. at 9–11.[1]  But

Plaintiff takes a one-sided view of Old Section 81.

Old Section 81 was intended to benefit Tribes.  The Supreme Court itself recognizes that

Old Section 81 was "intended to protect the Indians from improvident and unconscionable

contracts."  *In re Sanborn*, 148 U.S. 222, 227 (1893).  Aimed at facilitating Indian self-

determination, New Section 81 constricted Governmental oversight of contracting between

Tribes and non-Tribal parties.  *See* H. Rep. No. 106-501, at 2 (2000), *as reprinted in* 2000

U.S.C.C.A.N. 69, 70.  Limiting oversight, however, is only beneficial where that oversight is no

longer desired.  From Plaintiff's perspective, New Section 81 potentially makes contracting with

Tribes easier by removing a necessary hurdle for enacting a valid agreement.  The Pueblo, on the

other hand, viewed Secretarial approval—both before and after the Section 81 amendment—as a

benefit rather than a burden.  The Pueblo's Council conditioned authorization to operate under

the Agreement on Secretarial approval.  AR0130.  And the Pueblo's 2003 request for BIA

review of the Agreement further underscored the Pueblo's view of Secretarial approval as a

protective benefit.  *See* AR0052.

Thus, under Old Section 81, the Pueblo had both the right and benefit of Secretarial

review and approval of the QEL Management Agreement.  Applying New Section 81 to the

---

[1] As part of its retroactivity argument, Plaintiff claims Old Section 81 should not be applied because New Section 81 removed the "penal" *qui tam* provision from the statute.  Pl.'s Mem. at 10.  Plaintiff's characterization of the *qui tam* provision as "penal" is incorrect.  First, *qui tam* provisions are not penal per se.  *See, e.g., United States ex rel. Neher v. NEC Corp.*, 11 F.3d 136, 137–39 (11th Cir.1993) (applying a three prong test in determining the False Claims Act's *qui tam* provision is remedial and not penal).  Second, courts have painted the Old Section 81 *qui tam* provision as remedial in nature by holding that only Tribal members have standing to bring a *qui tam* claim because only they have a direct interest in the outcome.  *See United States ex rel. Crow Creek Sioux Tribe v. Hattum Family Farms*, 102 F. Supp. 2d 1154, 1157 (D.S.D. 2000).

Agreement now, however, removes that right and benefit.  In the process it would also validate

an agreement that, absent Secretarial approval, is invalid under Old Section 81. *Compare United*

*States ex rel. Crow Creek Sioux Tribe v. Hattum Family Farms*, 102 F. Supp. 2d 1154, 1158

(D.S.D. 2000), *aff'd,* 237 F.3d 919 (8th Cir. 2000), *with GasPlus v. U.S. Dep't of the Interior,*

*Bureau of Indian Affairs*, 510 F. Supp. 2d 18, 27 (D.D.C. 2007).  The after-the-fact application

of New Section 81 would wholly alter the contractual relationship between the parties.  When

evaluating the impact of that alteration, the Court should consider whether it creates

"unanticipated obligations."  *See Bradley v. Sch. Bd. of City of Richmond*, 416 U.S. 696, 720

(1974).  Here, the parties, or at least the Pueblo, anticipated in executing the Agreement that

there would be no obligations absent Secretarial approval.  AR0130.  Applying New Section 81,

however, does create obligations absent Secretarial approval.  *See GasPlus*, 510 F. Supp. 2d at

27.  By changing the legal regime under which the Management Agreement was signed, New

Section 81 attaches new legal consequences to events that have already occurred.  This

retroactive effect means, absent a clear Congressional intent to the contrary, New Section 81

should not be applied to the QEL Management Agreement.  *See Landgraf*, 511 U.S. at 270.  By

applying *Landgraf* to reach that conclusion, the IBIA acted reasonably and in accordance with

law in upholding the Acting Regional Director's determination that Old Section 81 applied to the

Agreement.

    Considering the IBIA holding in *Madison Gas & Electric Co. v. Acting Midwest*

*Regional Director* does not change the reasonableness of the IBIA decision here.  Plaintiff

argues *Madison Gas* supports the conclusion that New Section 81 does not have retroactive

effect.  Pl.'s Mem. at 11–12.  In *Madison Gas*, however, the IBIA explicitly stated it did not

"engage in any protracted analysis of retroactivity." 26 IBIA 74, 78, 2001 WL 328232 at *3

(2001); *cf. United States ex rel. Bernard v. Casino Magic Corp.*, 384 F.3d 510, 513 n.1 (8th Cir.

2004) (refusing to apply New Section 81 to post-amendment review of pre-amendment *qui tam*

action) (citing *United States ex rel. Steele v. Turn Key Gaming, Inc.*, 260 F.3d 971, 973 (8th Cir.

2001)). Here, the IBIA did engage in a retroactivity analysis and reached a reasoned conclusion

that New Section 81 had a retroactive effect and therefore should not be applied.

Finally, the IBIA decision is not based on the mere "assumption" that the Agreement

would be invalid under Old Section 81, as Plaintiff contends. In fact, a large portion of the IBIA

decision discusses how the Agreement is invalid under Old Section 81. *See* AR0844–48.

Certainly, a determination on the validity of the Agreement under Old Section 81 and the

applicability of Old or New Section 81 are unavoidably linked. But it can hardly be said that the

IBIA "assumed" the Agreement to be invalid under Old Section 81. Just because one

determination precedes the other in the IBIA opinion does not make either decision

unreasonable. Instead, the IBIA reasonably upheld the Acting Regional Director's determination

that the QEL Management was invalid under Old Section, and, in accordance with Supreme

Court precedent in *Landgraf*, concluded applying New Section 81 would have retroactive effect.

The IBIA decision was therefore not arbitrary, capricious, or otherwise contrary to law.

> **B.    The Acting Regional Director and IBIA Properly Found The Agreement
> Required Secretarial Approval Under Old Section 81.**

The Acting Regional Director made his determination that the QEL Management

Agreement was "relative to" Indian lands by applying judicially-recognized factors to the facts

before him. Similarly, the IBIA determined the Agreement was "with a Tribe of Indians" by

analyzing the Agreement itself and the record submitted for review. Both the Acting Regional

Director and the IBIA made reasoned conclusions, in accordance with law, that the Management

Agreement was subject to approval under Old Section 81.

> 1.    The Acting Regional Director Appropriately Found The Agreement To Be
> "Relative To" Indian Lands.

Ultimately, the breadth of Old Section 81 is a matter of statutory interpretation.  In

interpreting statutes, the Court is not to substitute its interpretation for a reasonable interpretation

provided by the agency.  *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 866 (1984).  In the

context of statutes intended to benefit Tribes, the D.C. Circuit has recently stressed that "[t]he

governing canon of construction requires that 'statutes are to be construed liberally in favor of

the Indians, with ambiguous provisions interpreted to their benefit.'" *Cal. Valley Miwok Tribe v.

United States*, 515 F.3d 1262, 1266 n.7 (D.C. Cir. 2008) (citations omitted).  Under this

principle, deference to an agency's interpretation is particularly appropriate where it "actually

advances 'the trust relationship between the United States and the Native American people.'" *Id.*

Further, there is no debate that Congress enacted Old Section 81 to benefit Indian Tribes.  *See In

re Sanborn*, 148 U.S. at 227.  Under "the weighty rule that statutes and regulations intended to

benefit Indians be liberally construed in their favor," Old Section 81 should be interpreted

broadly.  *See Star Lake R. Co. v. Lujan*, 737 F. Supp. 103, 109 (D.D.C. 1990) (citations omitted),

*aff'd*, 925 F.2d 490 (D.C. Cir. 1991) (per curiam) (before R. Ginsburg, J., D. Ginsburg, J., and

Henderson, J.).  And, in fact, several courts have applied Old Section 81 broadly under similar

reasoning.  *See Wis. Winnebago Bus. Comm. v. Koberstein*, 762 F.2d 613, 618 (7th Cir. 1985)

("It is obvious from the broad language 'relative to their lands' that Congress intended to cover

almost all land transactions in Indian property."); *Hattum Family Farms*, 102 F. Supp. 2d at

1161–62; *United States ex rel. Shakopee Mdewakanton Sioux Cmty. v. Pan Am. Mgmt. Co.*, 616

-7-

F. Supp. 1200, 1216–17 (D. Minn. 1985).

Here, the Acting Regional Director applied factors identified by the Seventh Circuit in *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 810 (7th Cir. 1993), to determine the QEL Management Agreement was "relative to" Indian lands for purposes of requiring Secretarial approval under Old Section 81. AR0038–40. In so doing, the Acting Regional Director applied the factors identified in one of the few court decisions to find a management agreement did not require Secretarial approval under Old Section 81. Nonetheless, the Acting Regional Director found the QEL Management Agreement to be "relative to" Pueblo lands because it met three of the four *Altheimer* factors. AR0040. In so doing, the Acting Regional Director made a reasoned conclusion by applying judicially-recognized analytical factors to the record before him.

Plaintiff focuses its "relative to" argument on the *Altheimer* factors that consider whether the non-Indian party has exclusive control over the facility and whether operation of the facility depends on the Tribe's sovereignty. *See* Pl.'s Mem. at 15–21. But Plaintiff incorrectly interprets both the case law and the facts behind Plaintiff's operation of the distribution facility.

<em>i.    Plaintiff's Duties Amounted to Exclusive Control.</em>

First, *Altheimer* does not require the non-Tribal party to have exclusive control, as Plaintiff argues. *See* Pl.'s Mem. at 17 ("This similarity with *Altheimer*, alone, is enough to require a ruling that the Management Agreement is not subject to Old Section 81 approval."). None of the *Altheimer* factors are dispositive to finding an agreement is "relative to" Indian lands. *Altheimer*, 983 F.2d at 810. Thus, even if the Acting Regional Director had determined Plaintiff did not have exclusive control over the facility, he still could have reasonably found the agreement was "relative to" the Pueblo's lands. *See, e.g., United States ex rel. Gulbronson v. D*

-8-

*& J Enters.*, No. 93-C-233-C, 1993 WL 767689 *7 (W.D. Wis. Dec. 23, 1993) (finding an agreement "relative to" Indian lands despite no exclusive control). Similarly, despite Plaintiff's contention (Pl.'s Mem. at 16), there is case law standing for the proposition that simply operating a business on Tribal lands amounts to contract being "relative to" those lands. *See Barona Group of Capitan Grande Band of Mission Indians v. Am. Mgmt. & Amusement* 840 F.2d 1394, 1401 (9th Cir. 1987) (holding agreement was "relative to" Indian lands based solely on the right to build and operate); *accord Steele*, 260 F.3d at 979–80 (holding agreement was not "relative to" Indian lands because there was no right to operate the facility).

Further, a comparison between the QEL Management Agreement and other case law discussing the exclusive control factor shows the Acting Regional Director reasonably interpreted *Altheimer*. The District of Minnesota, for example, found lease contracts granting the right to replace gambling machines and marketing and advertising contracts did not amount to "exclusive control" under *Altheimer*. *In re United States ex rel. Hall*, 825 F. Supp. 1422, 1432 (D. Minn. 1993); *see also Gulbronson*, 1993 WL 767689 at *7 (finding contract to select gaming machines did not rise to level of "exclusive control"). The District of Minnesota's interpretation conformed with the facts in *Altheimer*, where the non-Indian party's role under the contract was to sell manufacturing contracts and technical plans, and consult on business operation, production, and marketing. *Altheimer*, 983 F.2d at 811.

The QEL Management Agreement, on the other hand, was much more than a lease agreement or marketing and advertising contract. The Agreement granted Plaintiff the responsibility to negotiate fuel prices; set income maximization policies; hire personnel; and pay legal, accounting, advertising, insurance, tax, permit, license, and other administrative costs.

AR0131–33. And, most importantly, Plaintiff actually directed the day-to-day operation of the

business. AR0131. With that fact, the Acting Regional Director did not act arbitrarily in

determining Plaintiff had exclusive control. *See United States ex rel. St. Regis Mohawk v.*

*President R.C.-St. Regis Management Co.*, No. 02-CV-0845, 2003 WL 25482782 at *7

(N.D.N.Y. May 22, 2003) (interpreting "exclusive control" as the exclusive right to operate at

exclusion of all others). Plaintiff argues it did not have exclusive control of the distribution

facility because it was required to report to the Kewa board of directors. Pl.'s Mem. at 18. This

may be true, but it is by no means dispositive. *See Barona Group*, 840 F.2d at 1404 (finding an

agreement was "relative to" Indian lands despite the Tribe's oversight function). Further,

nothing in the Agreement required Plaintiff to take any direction from the board regarding the

actual operation of the facility. The Pueblo and Plaintiff instead left day-to-day operation in

Plaintiff's exclusive control.

ii.    *The Agreement Was Dependent on Tax Benefits Derived From The Pueblo's Status as a Sovereign.*

Second, the QEL Management Agreement's very existence was indeed dependant on the

Pueblo's status as a sovereign. Plaintiff is correct that the "status as a sovereign" factor is often

met by management contracts for reservation gaming facilities. *See, e.g., Altheimer*, 983 F.2d at

811. The reasoning lies in the fact that a Tribe's sovereignty prevents state gaming laws from

reaching Indian reservations. *See id.* But Plaintiff fails to acknowledge that similar legal

reasoning was behind New Mexico's tax exemption for gas distribution facilities on Indian

reservations.

In 1995, the Supreme Court was presented with the question of whether the State of

Oklahoma could "impose its motor fuels excise tax upon fuel sold by Chickasaw Nation retail

stores on tribal trust land." *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 452–53 (1995). The Court unanimously held that if "an excise tax rests on the tribe or on tribal members for sales made inside Indian country, the tax cannot be enforced absent clear congressional authorization." *Id.* at 459. This principle, combined with the somewhat complex structure of New Mexico tax law,[2] resulted in a tax benefit for gasoline distribution facilities located on Indian reservations. *See* AR0828. The benefit derived directly from the New Mexico Department of Taxation and Revenue determination, based on consideration of the *Chickasaw Nation* opinion, that the State lacked "sufficiently explicit congressional permission for the state to impose its fuel taxes on Indian entities dealing in fuels on tribal lands." AR0605 (Ruling 640-96-7). In fact, the Department of Taxation and Revenue ruling resulted from an inquiry into the applicability of State tax law to a business relationship identical to the one set forth in the QEL Management Agreement. AR0602. Further, the QEL Management Agreement was aimed precisely at taking advantage of the tax benefit. *See* AR0129. The benefit derived from the *Chickasaw Nation* opinion, which in turn was contingent on a Tribe's status as a sovereign. The Acting Regional Director therefore acted more than reasonably in determining the QEL Management Agreement was dependent upon the Pueblo's sovereignty and "relative to" Indian lands.

---

[2] The Pueblo presented a detailed explanation to the IBIA on the intricacies of New Mexico's taxation of gasoline distribution facilities. *See* AR0559–70. In its initial response to the Pueblo's brief, Plaintiff declined to disagree with the Pueblo's description. *See* AR0668–74. The IBIA then provided a second opportunity, and extended the time for Plaintiff to respond. AR0694–95; AR0709. In its subsequent response, though stating issues not addressed should not be considered acquiescence thereto, Plaintiff again declined to dispute the Pueblo's description of New Mexico tax law and its impacts on gasoline distribution facilities located on tribal lands.

2.    <u>Old Section 81 Is Not Limited to Agreements That Directly Encumber Property Rights.</u>

Plaintiff argues that, regardless of *Altheimer*, and as matter of case law and common sense, the QEL Management Agreement is not subject Secretarial approval under Old Section 81. Pl.'s Mem. at 22–23. Plaintiff bases its conclusion on statements by several courts, including in *Gulbronson*, that Old Section 81 should not apply "when there [is] no accompanying danger of the tribe's losing legal or de facto control over the land." 1993 WL767689 at *6; Pl.'s Mem. at 23. But Plaintiff ignores the fact that the *Gulbronson* court found that Old Section 81 <u>did</u> apply to the contract there.[3] *See* 1993 WL767689 at *8. Further, unlike the QEL Management Agreement, the *Gulbronson* agreement did not grant the non-Indian party day-to-day control over the business's operation. *See id.* at *7.

In each of the other cases Plaintiff cites, the court also found the agreement at issue to be subject to Secretarial approval under Old Section 81. And several of the agreements had striking similarities to the QEL Management Agreement. In *Wisconsin Winnebago*, the agreement granted the non-Indian party the right to operate and maintain a business, just like the QEL Management Agreement. 762 F.2d at 614. Similarly, portions of the agreement in *Barona Group* sound identical to the QEL Management Agreement if read with the present facts: "[T]he agreement prohibits the [Pueblo] from operating any other [distribution facilities] on its property

---

[3] Plaintiff also misconstrues the district court's statement, which actually reads: "The legislation was not intended to require the government to oversee <u>every transaction</u> involving services that might cause a non-Indian merely to touch tribal lands when there was no accompanying danger of the tribe's losing legal or de facto control over the land." *United States ex rel. Gulbronson v. D & J Enters.*, No. 93-C-233-C, 1993 WL767689 *6 (W.D. Wis. Dec. 23, 1993) (emphasis added). A reading of the full passage, and the opinion as a whole, shows the court believed there are indeed agreements intended to be subject to Old Section 81 even if they do not divest the Tribe of legal control over the land.

during the term of the agreement . . . [and] gives [QEL] the absolute right to build and control

the [distribution facility] and operation." 840 F.2d at 1403–04.  In *Shakopee*, 616 F. Supp. at

1205, the agreement also did not allow the <u>non-Indian party</u> to encumber the land, which is

contrary to Plaintiff's argument that agreements subject to approval under Old Section 81 must

"create a risk to tribal property."  Pl.'s Mem. at 23.  Finally, the Eighth Circuit opinion Plaintiff

cites did not even address whether an agreement was subject to Old Section 81.  *See Bernard*,

384 F.3d at 510 (ruling on an appeal over damages for an invalid agreement).

Plaintiff is also incorrect to the extent it posits an agreement's tie to legal control of

Tribal property is Old Section 81's sole requirement.  Though transactions involving real

property are clearly within the meaning of "relative to," it does not necessarily follow that all

agreements not involving an exchange in real property are outside its scope.  Finding harmony

between those courts that interpreted Old Section 81 to be linked to the transfer of real property

and those that did not was exactly the *Altheimer* court's aim, and property encumbrance was

only one of the four factors considered.  *See Altheimer*, 983 F.2d at 810–11.  Further, other

courts have followed the *Altheimer* factors. *See Steele*, 260 F.3d at 977; *Hall*, 825 F. Supp. at

1432.  By similarly following *Altheimer* to determine if the QEL Management Agreement was

subject to approval under Old Section 81, the Acting Regional Director acted reasonably and in

accordance with law.

    3.    <u>The IBIA Made a Reasoned Determination That The Agreement Was "With a Tribe of Indians".</u>

Plaintiff spends several pages of its brief discussing the Acting Regional Director's determination that the QEL Management Agreement was "with a Tribe of Indians" for purposes of Old Section 81. Pl.'s Mem. at 25–27. The IBIA, however, reviewed and made a decision regarding whether the Agreement was "with a Tribe of Indians." AR0844. It is therefore the IBIA decision, not the Acting Regional Director's decision, that is before the Court as the Department's determination on the issue. *See* 25 C.F.R. § 2.6(b).

Specific to the IBIA determination, and contrary to Plaintiff's contentions, the holdings in *Altheimer*, *Pueblo of Santa Ana*, and *Inecon* do not support Plaintiff's argument that the QEL Management Agreement was not with the Pueblo. First, *Altheimer* actually directly discounts Plaintiff's arguments, as the Seventh Circuit found the contract was with an Indian Tribe. *Altheimer*, 983 F.2d at 811. Like the QEL Management Agreement, the *Altheimer* agreement expressly recognized the Tribe as a party, and both parties acted as if the tribe was party to the agreement. *Id.* at 808–09. Second, as the IBIA noted, *Santa Ana* is irrelevant because the IBIA did not base its decision on whether the Pueblo and Kewa were the same legal entity. *Pueblo of Santa Ana v. Hodel*, 663 F. Supp. 1300, 1305 (D.D.C. 1987); AR0843. Third, *Inecon* is distinguishable because the Tribe's sole obligation there was not to interfere in the contract. *Inecon Agricorp. v. Tribal Farms, Inc.*, 656 F.2d 498, 501 (9th Cir. 1981). Here, the Pueblo gave up valuable consideration by committing not to participate in any competing gas distribution business within the State. AR0137; AR0845. These distinctions, combined with the other factors listed by the IBIA (AR0844–46), led to a reasoned conclusion that the QEL Management Agreement was "with a Tribe of Indians" for purposes of Old Section 81.

Thus, both the Acting Regional Director and the IBIA acted reasonably and in accordance with law in determining the Agreement was Subject to Old Section 81. Plaintiff's motion for summary judgment should therefore be denied, and Defendant's motion for summary judgment should be granted.

## II.    THE DEPARTMENT PROVIDED PLAINTIFF ITS REQUISITE DUE PROCESS BY GIVING NOTICE AND THE OPPORTUNITY TO BE HEARD BEFORE THE IBIA.

Plaintiff's due process arguments specifically challenge the Acting Regional Director's initial determination that the QEL Management Agreement was void under Old Section 81. Pl.'s Mem. at 32–39. Even assuming the Acting Regional Director's letter constituted a final agency determination on the issue, any direct due process challenge to the Acting Regional Director's decision is moot. The Department of the Interior's internal review procedures have remedied any lost opportunity to be heard before the Acting Regional Director. This Court therefore cannot grant Plaintiff any meaningful relief regarding the Acting Regional Director's decision. *See GasPlus*, 510 F. Supp. 2d at 34.

Further, any due process challenge to the IBIA decision is without merit because the IBIA has not deprived Plaintiff of any protected interest. First, the IBIA has not impacted Plaintiff's right to contract. Plaintiff was and still is free to contract with the Pueblo. By voiding an agreement not made in accordance with law, the IBIA has in no way limited Plaintiff's ability to contract with whomever it likes. Second, Plaintiff lacks a property interest because, under Old Section 81, the QEL Management Agreement was never valid in the first place. *See Orange v. Dist. of Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995); *Kirkland v. St. Vrain Valley School Dist. No. Re-1J*, 464 F.3d 1182, 1190 (10th Cir. 2006). Lacking an interest, there is nothing for the Government to deprive, and Plaintiff lacks standing to bring a procedural due process claim.

-15-

Even assuming standing, the Complaint still does not state a Constitutional cause of action. Plaintiff alleges its "right of review arises under the federal Administrative Procedures Act." Compl. ¶ 3. Although some review of "colorable constitutional claims" is available under the APA, *see Lincoln v. Vigil*, 508 U.S. 182, 195 (1993) (citing *Webster v. Doe*, 486 U.S. 592, 603–04 (1998)), that review should only consider whether the IBIA's determination that Plaintiff received due process was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Following that standard, the IBIA correctly determined the proceedings before it granted Plaintiff the requisite opportunity to be heard. Given the nature of the issue on appeal to the IBIA, no evidentiary hearing was required. Additionally, nothing regarding the Government's trust duty toward Tribes results in bias toward non-Indian parties.

**A.      The Department Gave Plaintiff Notice and the Opportunity to be Heard.**

Due process requires notice and the opportunity to be heard before a final, binding determination is made that impacts a party's rights. Plaintiff itself recognizes: "'[W]hen governmental agencies adjudicate or make <u>binding determinations</u> which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which traditionally have been associated with the judicial process.'" Pl.'s Mem. at 33 (quoting *Hannah v. Larche*, 363 U.S. 420, 442 (1960)) (emphasis added). Department of the Interior regulations withhold finality from an agency decision until the opportunity for appeal within the Department is no longer available. *See* 25 C.F.R. § 2.6(b). Thus, the Department's final, binding determination here is the IBIA decision. The Department gave Plaintiff notice and the opportunity to be heard before making that final decision.

-16-

The Acting Regional Director informed Plaintiff that the QEL Management Agreement was invalid because it had not been approved by the Secretary and notified Plaintiff of the opportunity for appeal to the IBIA . AR0040.  In response, Plaintiff appropriately filed an appeal.  AR0031–35.  Once before the IBIA, Plaintiff took full advantage of its opportunity to be heard.  *See* AR0172; AR0302; AR0382; AR0424; AR0532; AR0738; AR0786; AR0825.

Plaintiff argues that it was deprived of due process because the IBIA abstained from ruling on the Acting Regional Director's determination that the Agreement was "relative to" Indian lands.  Pl.'s Mem. at 39.  But abstaining from ruling on an issue does not equate to a denial of an opportunity to be heard.  Similarly, just because Plaintiff is unhappy with the results of the IBIA decision does not mean its due process rights were denied.

### B.    The IBIA Was Not Required to Hold An Evidentiary Hearing on Plaintiff's Appeal.

Plaintiff now argues that it should have been given the opportunity for an evidentiary hearing before the Department's final determination on the Management Agreement.  *See* Pl.'s Mem. at 34.  Plaintiff, however, fails to acknowledge that evidentiary hearings in administrative proceedings are only required in limited situations where, for example, essential government benefits, services necessary to modern life, or freedom from incarceration are at stake.  The Supreme Court elicited this distinction in *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970), holding that city officials had violated welfare recipients' due process rights by not providing notice of termination and a hearing.  The Court noted welfare benefits provide the recipient with "essential food, clothing, housing, and medical care."  *Id*. at 264.  Eliminating those essential

necessities without a pre-deprivation hearing created a "desperate" situation.[4]  *Id.*  But the Court also noted that the need to avoid deprivation of essential services is "not present in the case of the blacklisted government contractor, the discharged government employee, the taxpayer denied a tax exemption, or virtually anyone else whose governmental entitlements are ended."  *Id.*  Thus, an evidentiary hearing, even when government benefits are at stake, is not always required before an agency decision.  *Id.* at 263.  Further contrary to Plaintiff's argument, the Court also pointed out that, even where an evidentiary hearing is required, "a complete record and a comprehensive opinion, which would serve primarily to facilitate judicial review and to guide future decisions, need not be provided at the pre-termination stage."  *Id.* at 267.

Here, Plaintiff's claims do not rise to the level of those in *Goldberg* for several reasons.  First, Plaintiff's claims do not involve termination of a government entitlement, let alone essential necessities of life.  Second, Plaintiff did receive its opportunity to be heard before the IBIA before the Department's final determination on the Management Agreement.  Finally, Department of the Interior regulations actually granted Plaintiff the opportunity to request an evidentiary hearing before the IBIA.  Title 43 C.F.R. § 4.337(a) authorizes the IBIA to require a hearing if the record indicates a need to resolve a genuine issue of material fact.  A party requesting a hearing under § 4.337(a) must affirmatively show the existence of a factual controversy, the resolution of which is necessary for a decision in the appeal.  *Bernard v. Acting Great Plains Regional Director*, 46 IBIA 28, 44, 2007 WL 4303063 *11 (2007) (citation omitted).  Here, Plaintiff never even attempted to request such a hearing.  Additionally,

---

[4] The underlying federal regulation in *Goldberg v. Kelly*, 397 U.S. 254, 257 n.3 (1970), also required a "fair hearing" before termination.

Department of the Interior regulations also would have allowed the IBIA to consider any documents Plaintiff submitted that were outside of the Acting Regional Director's administrative record. *See* 25 C.F.R. § 2.21(a). Plaintiff made no such submissions. Plaintiff therefore passed on the opportunity to present additional factual information to the IBIA, and, given the nature of the issues, no separate evidentiary hearing was required.

### C. The Department of the Interior's Trust Duties Do Not Create A Bias Toward Non-Indian Parties.

Additionally, neither the Acting Regional Director nor IBIA decisions on the QEL Management Agreement were tainted by any identifiable bias. Plaintiff's contention that the Federal Government's fiduciary relationship with Indian Tribes somehow biases the Government toward Tribes in making Section 81 determinations fails. The Department of the Interior's fiduciary relationship with federally-recognized Tribes is defined by relevant statutes and regulations. *See Cobell v. Norton*, 240 F.3d 1081, 1098–99 (D.C. Cir. 2000). But nothing within the Government's role as a trustee prevents it from taking actions that comply with law but are not, on their face, in favor of a Tribe. *See, e.g., Nevada v. United States*, 463 U.S. 110, 128 (1983) ("The Government does not 'compromise' its obligation to one interest that Congress obliges it to represent by the mere fact that it simultaneously performs another task for another interest that Congress has obligated it by statute to do.").

Even if Plaintiff's institutional bias argument had merit, however, it is legally flawed for two reasons. First, the mere "incentive" to act in one party's favor is not enough to show a violation of due process. Instead, "[a]ctual bias or a high probability of bias must be present before due process concerns are raised." *Marshall v. Cuomo*, 192 F.3d 473, 484 (4th Cir. 1999) (citing *Withrow v. Larkin*, 421 U.S. 35, 46–53 (1975)). Here, Plaintiff has shown no evidence

-19-

that the Acting Regional Director was actually biased in favor of the Pueblo.

Second, the Acting Regional Director was not acting in a judicial or quasi-judicial capacity. Plaintiff relies primarily on *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602 (1993), for its bias argument. In *Concrete Pipe*, however, the Supreme Court actually found there to be no violation of procedural due process because the trustee was not acting as an adjudicator. *Id.* at 619–20, 636. Just as in *Concrete Pipe*, the Acting Regional Director's actions here bore "the hallmarks of an assessment, not an adjudication." *Id.* at 619. The Acting Regional Director was simply assessing the applicability of Old Section 81 to the QEL Management Agreement. If the statute applied, the Agreement was void as a matter of law.

Plaintiff's bias argument also fails as a matter of simple reasoning. If taken to its logical conclusion, Plaintiff's argument results in BIA Regional Directors being "forced to recuse themselves in every case" where they act within their Congressionally mandated oversight of Tribal contracting. *See Greenberg v. Bd. of Governors of the Fed. Reserve Sys.*, 968 F.2d 164, 167 (2d Cir. 1992). This would effectively eviscerate the Government's oversight and trust functions all together.

Here, Plaintiff was under no obligation to contract with a federally-recognized Indian Tribe. And, at the time it chose to contract, both the Government's trust relationship with Tribes and Old Section 81's applicability to management agreements were well known. It is therefore incongruous for Plaintiff to have made an informed business decision to enter into a contract with the Pueblo and now complain of institutional bias simply because the Department acted in accordance with a Congressionally established statutory scheme. For this reason alone,

Plaintiff's bias argument should be dismissed.  This, in addition to the Department providing

Plaintiff notice and opportunity to be heard, and the absence of facts or interests that would

require an evidentiary hearing, means the Department provided Plaintiff with requisite due

process.  Plaintiff's motion for summary judgment should therefore be denied, and Defendant's

motion for summary judgment should be granted.

## CONCLUSION

For the foregoing reasons, and those presented in Defendant's opening brief, Plaintiff's

motion for summary judgment should be denied, and Defendant's motion for summary judgment

should be granted.


Respectfully submitted this 8th day of August, 2008,


RONALD J. TENPAS
Assistant Attorney General

By:    */s/ Kristofor R. Swanson*

KRISTOFOR R. SWANSON
(Colo. Bar No. 39378)
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, DC 20044-0663
Tel: 202-305-0248
Fax: 202-305-0506
kristofor.swanson@usdoj.gov


OF COUNSEL:

JANET SPAULDING
Senior Attorney

-21-

U.S. Department of the Interior
Office of the Solicitor
Tulsa Field Office
Tulsa, OK 74145

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2008, Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment and Defendant's Response to Plaintiff's Statement of Undisputed Material Facts were filed with the United States District Court for the District of Columbia's electronic filing system, to which the following attorneys are registered to be noticed:

Shelby J. Kelley
shelby.kelley@bracewellgiuliani.com

Nancy J. Appleby
nancy.appleby@bgllp.com

Charles K. Purcell
kpurcell@rodey.com


　　　_/s/ Kristofor R. Swanson_
Kristofor R. Swanson

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| QUANTUM ENTERTAINMENT LIMITED,<br><br>           Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS;<br><br>           Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 1:07-cv-01295-RMU<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Civil Rule 7.1(h), Defendant hereby responds to Plaintiff's Statement of Undisputed Material Facts. Judicial review of this action is governed by the Administrative Procedure Act (APA), 5 U.S.C. § 551, *et seq.* In all APA cases, the district court sits as an appellate tribunal. *Univ. Med. Ctr. of So. Nev. v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999) (citing *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1225–26 (D.C. Cir. 1993)). Judicial review is normally confined to the administrative record, and does not contemplate factual development by the district court. *Cmty. for Creative Non-Violence v. Lujan*, 908 F.2d 992, 998 (D.C. Cir. 1990).

With respect to the factual statements in each numbered paragraph of Plaintiff's Statement (Dkt. No. 17-2), all facts in this action are contained in the certified administrative record. Material facts are those identified through citation to the administrative record in the parties' summary judgment briefs and other moving papers. To the extent Plaintiff's Statement misconstrues the record, Defendant controverts those portions of the Statement. To the extent

Plaintiff's Statement refers to matters outside the record, the Court should disregard those references.  Defendant responds specifically to Plaintiff's Statement as follows:

1.      In Paragraph 12 of its Statement, Plaintiff states the Acting Regional Director "ordered" Plaintiff to take several actions.  The Acting Regional Director's letter, however, actually "demanded" that Plaintiff take several steps to remedy actions taken under an invalid contract.  AR0040.  As both Plaintiff and the Bureau of Indian Affairs acknowledged before the IBIA, the Bureau lacks the enforcement authority to order Plaintiff to take those actions.  *See* AR0533–34; AR0853.

2.      Regarding Paragraph 21 of Plaintiff's Statement, Defendant agrees that the Management Agreement did not grant Plaintiff any right to acquire or encumber Indian land.  The Agreement did, however, grant Plaintiff day-to-day operation and control of the gas distribution facility.  AR0131.  Further, the Agreement also prevented the Pueblo from entering into any other similar business arrangements on its reservation or elsewhere in the State.  AR0137.

Respectfully submitted this 8th day of August, 2008,

RONALD J. TENPAS
Assistant Attorney General

By:      */s/ Kristofor R. Swanson*

KRISTOFOR R. SWANSON
(Colo. Bar No. 39378)
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, DC 20044-0663
Tel: 202-305-0248

- 2 -

Fax: 202-305-0506
kristofor.swanson@usdoj.gov

OF COUNSEL:

JANET SPAULDING
Senior Attorney
U.S. Department of the Interior
Office of the Solicitor
Tulsa Field Office
Tulsa, OK 74145

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                  )
QUANTUM ENTERTAINMENT             )
LIMITED,                          )
                                  )
        Plaintiff,                )
                                  )
v.                                )     Case No. 1:07-cv-01295-RMU
                                  )
UNITED STATES DEPARTMENT          )
OF THE INTERIOR,                  )
BUREAU OF INDIAN AFFAIRS;         )
                                  )
        Defendant.                )
_____  )
```

**[PROPOSED] ORDER**

Before the Court are the parties' cross-motions for summary judgment.  Having

considered both motions, the memoranda in support thereof, and the Administrative Record,

IT IS HEREBY ORDERED THAT:

(1)     Plaintiff's Motion for Summary Judgment is DENIED; and

(2)     Defendant's Motion for Summary Judgment is GRANTED.


Signed this _____ day of _____, 2008.

By the Court:


_____
RICARDO M. URBINA
United States District Judge