IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| QUANTUM ENTERTAINMENT LIMITED, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:07-cv-01295-RMU |
| UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS, | ) ) ) ) | |
| Defendant. | ) ) ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

This case concerns the validity of a management agreement ("Management Agreement" or "contract") under which Plaintiff Quantum Entertainment Limited ("QEL") performed services between 1996 and 2003 for Kewa Gas Limited ("Kewa"), a corporation chartered by the Pueblo of Santo Domingo ("the Pueblo"). In 2003, nearly seven after the Management Agreement's execution, the Pueblo contacted Defendant United States Department of the Interior Bureau of Indian Affairs ("the Department") to complain about the contract. The Acting Regional Director of the Southwest Region of the Bureau of Indian Affairs ("the Regional Director") responded by declaring the contract void under an 1871 statute, 25 U.S.C. § 81 ("Section 81"), which Congress had substantially amended in 2000. The Department has since conceded that under the version of the statute that was in force when the Regional Director acted ("New Section 81"), the Management Agreement would not have needed approval by the Secretary of the Interior ("the Secretary"), see Joint Stipulation (June 4, 2008) (Doc. 14); Defendant's Memorandum of Points and Authorities in Support of

Defendant's Motion for Summary Judgment at 10 n.4 (June 27, 2008) (Doc. 16-2) [hereinafter Department's Br.] – which means that the Regional Director, under New Section 81, could not have declared the Management Agreement invalid on the ground that the Secretary's approval was never secured. But the Department insists that the Regional Director and the Interior Board of Indian Appeals ("the IBIA") acted "reasonably" and "within their discretion" in (1) applying the original 1871 statute ("Old Section 81") to the 2003 challenge to the Management Agreement and (2) concluding that the Management Agreement was "with [a] tribe of Indians" and "relative to their lands" within the meaning of Old Section 81, even though the contract speaks almost exclusively of the rights and duties of a tribal corporation rather than the tribe itself and says nothing at all about the tribe's "lands."  See Department's Br. at 9.

The Department is wrong. New Section 81 plainly should have governed any attempt to strike down the Management Agreement after the statute's effective date, and neither the Regional Director nor the IBIA had "discretion" to decide otherwise. Yet even judged by the superseded standards of Old Section 81, the contract did not require the Secretary's approval. That the Regional Director fell into error is hardly surprising, given his failure to accord QEL even the barest rudiments of due process – a failing that the Department seeks to justify by reference to an administrative appeal whose merits, in material part, the IBIA declined to consider. The Court should therefore deny the Department's motion for summary judgment and grant QEL's cross-motion instead.

## Facts

For a comprehensive account of the relevant facts drawn from the administrative record, QEL refers the Court to Plaintiff's Statement of Undisputed Material Facts (June 27, 2008) (Doc. 17-2), which was filed in connection with Plaintiff's Motion for Summary Judgment (June 27, 2008) (Doc.

17).  Meanwhile, of the "undisputed facts" alleged by the Department, see Department's Br. at 2 n.1,

QEL disputes at least two.  The first is the assertion that "[i]n authorizing the [Management]

Agreement, the Pueblo's Tribal Council conditioned business operation on the approval of the

Agreement by the Secretary of the Interior."  Department's Br. at 4.  To the contrary, the Tribal

Council merely

> authorized and directed [the Governor of the Pueblo] to execute [the]
> agreement on behalf of the Pueblo, and to do any and all other things
> necessary so as to obtain the approval of the Secretary of the Interior
> to such Agreement (if such approval is required), including agreeing
> to any technical, non-material changes in the terms of such
> Agreement (after consultation with the Pueblo's general counsel) as
> may be required by the Secretary ....

Administrative Record at 130 (May 14, 2008) (Doc. 12) (emphasis added) [hereinafter AR].  Thus,

far from "acknowledg[ing that the Management Agreement] would require Secretarial approval,"

Department's Br. at 13, the Pueblo had no position on the issue when – by a 24-0 vote – the Tribal

Council authorized Kewa to "commence operation of the gasoline distribution business in

accordance with the terms of the Management Agreement, pending its approval by the Secretary."

AR 130.  The Governor of the Pueblo, charged with obtaining the Secretary's approval "if such

approval [was] required," id., apparently never tendered the contract to the Secretary for approval,

see id. at 833-34 – presumably because neither he nor "the Pueblo's general counsel," id. at 130, ever

believed that such approval was required.

    Second, QEL disputes the following description of what happened on appeal from the

Regional Director's decision:

> The IBIA determined the Agreement met [Old] Section 81's
> definition of agreements that required approval, though abstaining
> from determining whether the Agreement was "relative to" Indian

3

> lands. The overall effect was to affirm, though at times on different grounds, the Acting Regional Director's conclusion that the Agreement required Secretarial approval.

Department's Br. at 6. It would be more accurate to say that the IBIA determined that the Management Agreement met one of the elements of Old Section 81's definition of agreements requiring approval – by concluding that the agreement was "with [a] tribe of Indians" – but abstained from inquiring into a second, equally necessary element (that the agreement be "relative to [Indian] lands"). See AR 842-48. The overall effect was to affirm the Regional Director's "with [a] tribe of Indians" decision on the merits, but to affirm his "relative to [Indian] lands" decision by default.

### Standard of Review

Pursuant to the Administrative Procedure Act, a reviewing court must

> hold unlawful and set aside agency action, findings, and conclusions found to be –
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> >
> > (B) contrary to constitutional right ... [or] privilege ...;
> >
> > (C) in excess of statutory jurisdiction [or] authority ...; [or]
> >
> > (D) without observance of procedure required by law ....

5 U.S.C. § 706(2). Though this standard of review may be "narrow," Department's Br. at 8 – at least in comparison with a de novo hearing – the review itself should be "thorough, probing, [and] in-depth." GasPlus, L.L.C. v. U.S. Dep't of Interior, 510 F. Supp. 2d 18, 27 (D.D.C. 2007) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971)), appeal dismissed, No. 07-5363, 2008 WL 931162 (D.C. Cir. Mar. 12, 2008).

The Department maintains that the Regional Director and the IBIA "acted reasonably[ and]

4

within their discretion," Department's Br. at 1, 9, and it repeatedly emphasizes that the Regional Director "applied facts in the record before him to judicially-recognized factors," id. at 9-10, as if to suggest that an administrative agency may insulate itself from meaningful review merely by going through the motions. But the cases the Department cites for this easygoing standard of review primarily address the deference owed to an agency as a finder of fact, see Marsh v. Or. Natural Resources Council, 490 U.S. 360, 376-77 (1989), cited in Department's Br. at 8, or as a promulgator of regulations under its own organic statute, see Bowen v. Am. Hosp. Ass'n, 476 U.S. 610, 626 (1986), quoted in Department's Br. at 8-9; Pub. Citizen, Inc. v. FAA, 988 F.2d 186, 188 (D.C. Cir. 1993), cited in Department's Br. at 9. By contrast, "the issue whether [an] agreement require[s] BIA and Secretary approval under section 81 does not raise questions of fact," Barona Group of Capitan Grande Band of Mission Indians v. Am. Mgmt. & Amusement, Inc., 840 F.2d 1394, 1401 (9th Cir. 1987), but rather a "straightforward legal question," GasPlus v. Dep't of Interior, 510 F. Supp. 2d at 24, as to which the Court owes the Department and its officials no particular deference, see Barona Group, 840 F.2d at 1404-05. The question whether New Section 81 or Old Section 81 controls the present lawsuit is likewise a pure issue of federal law. And far from implicating the Department's expertise as a creator of interstitial Indian law through the issuance of rules and regulations of general application, this case concerns the Department's performance as an adjudicator of individual rights under a particular contract.

   What is more,

> the court cannot properly apply a limited standard of review of administrative decisions without the assurance of an impartial and thoroughgoing review by the administrative decisionmaker, with a record that reflects a full opportunity for interested parties to present their evidence, and to rebut unfavorable evidence introduced by the

agency.

Nat'l Rifle Ass'n of Am. v. U.S. Postal Serv., 407 F. Supp. 88, 91 (D.D.C. 1976).  In this case, the

Court can have no such assurances:  the Regional Director issued his decision before QEL even

became aware that a decision had been requested, and the IBIA abstained from determining whether

a major premise of that decision was factually and legally sound.  See infra pt. IV.  In short, there

is every reason for the Court to subject the matter to a "thorough, probing, in-depth review."

GasPlus, 510 F. Supp. 2d at 27 (internal quotation marks omitted).

**Argument**

**I.     The Regional Director and the IBIA Acted Arbitrarily, Capriciously, and Contrary to Law in Evaluating the Management Agreement Under Old Section 81, and Thus in Declaring the Contract Invalid.**

QEL and Kewa entered into the Management Agreement in August 1996, while Old Section

81 was still in force.  See AR 131.  But by March 2003, when the Regional Director was first asked

to pass upon the contract's validity, see id. at 834, New Section 81 had already been on the books

for more than three years, and the parties had been performing under the contract for nearly seven

years.  The Regional Director nevertheless proceeded to analyze the contract under Old Section 81,

without even pausing to consider whether the new statute might apply.  See id. at 36.  The IBIA

invested a little more energy in the question, but ultimately resolved it the same way.  See id. at 840-

42.  Their choice of Old Section 81 was wrong as a matter of law.  And, given their erroneous

construction of Old Section 81, the choice was outcome-determinative – because, under this Court's

decision in GasPlus, application of New Section 81 would have compelled the conclusion that the

contract was effective without the Secretary's approval.  See Doc. 14.

Under the general rule that a court (or an administrative agency) "is to apply the law in effect

at the time it renders its decision," <u>Bradley v. Sch. Bd.</u>, 416 U.S. 696, 711 (1974), the selection of New Section 81 as the relevant law would have been obvious. Indeed, New Section 81 was the statute in effect not just at the time of "decision," but when administrative proceedings were initiated. For three years before that point, in fact, New Section 81 had been governing contractual relationships between Indian tribes and third parties.

> When [a] statute contains no ... express command [about its application to prior conduct], the court must determine whether the new statute would have retroactive effect, <u>i.e.</u>, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.

<u>Landgraf v. USI Film Prods.</u>, 511 U.S. 244, 280 (1994); <u>accord, e.g.</u>, <u>INS v. St. Cyr</u>, 533 U.S. 289, 321 (2001) (whether statute would "take[] away or impair[] vested rights acquired under existing laws, or create[] a new obligation, impose[] a new duty, or attach[] a new disability, in respect to transactions or considerations already past" (quoting <u>Landgraf</u>, 511 U.S. at 269)). "Retroactive effect," in other words, is a term of art connoting the legal conclusion that a particular statute should not apply to particular conduct predating the statute's enactment unless Congress has clearly declared that it should. A statute "does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law." <u>Landgraf</u>, 511 U.S. at 269 (citation omitted). "Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment." <u>Id.</u> at 269-70. This inquiry, as the Department has observed, "should be informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations." <u>INS v. St. Cyr</u>, 533 U.S. at 321

(internal quotation marks omitted).

Operating on the "unabashedly paternalistic" premise, Department's Br. at 25 (quoting AR 852), that Indians entering into certain business transactions would be cheated out of their property if left to their own devices, Congress enacted Old Section 81 in 1871. The statute required approval by the Secretary of any "agreement ... with any tribe of Indians ... for the payment or delivery of any money or other thing of value ... in consideration of services for said Indians relative to their lands"; it provided that any such contract lacking the Secretary's approval would be "null and void"; and it authorized a qui tam action in the name of the United States to recover any consideration paid to the non-Indian party under the "null and void" contract. See Department's Br. at 7.

Long before the end of the 20th century, however, the paternalistic underpinnings of the statute had begun to show their age. In 1934, for example, Congress passed the Indian Reorganization Act, which "represented a fundamental break with the policy underlying Section 81." Guidiville Band of Pomo Indians v. NGV Gaming, Ltd., 531 F.3d 767, 780 (9th Cir. 2008) (internal quotation marks and brackets omitted). Courts, commentators, and Congress came to realize that "[t]he assumption that some federal government employee knows more about how to run the business affairs of a Tribe than most elected Tribal officials [was], very frankly, ridiculous, especially given the recent revelations of mishandling of trust funds and shredding of records by the federal government." United States ex rel. Crow Creek Sioux Tribe v. Hattum Family Farms, 102 F. Supp. 2d 1154, 1163 (D.S.D.), aff'd per curiam, 237 F.3d 919 (8th Cir. 2000). Before 1996, when QEL and Kewa entered into the Management Agreement, judges charged with enforcing Old Section 81 were openly questioning its wisdom. See, e.g., United States ex rel. Hall v. Tribal Dev. Corp., 49 F.3d 1208, 1218 (7th Cir. 1995) (Flaum, J., concurring). But they recognized that their hands

would be tied "[u]ntil Congress repeal[ed] or amend[ed] the ... statute[]." <u>A.K. Mgmt. Co. v. San Manuel Band of Mission Indians</u>, 789 F.2d 785, 787 (9th Cir. 1986) (quoting <u>Cent. Mach. Co. v. Ariz. State Tax Comm'n</u>, 448 U.S. 160, 166 (1980); emphasis added), <u>cited in</u> Department's Br. at 13; <u>accord</u> <u>Wis. Winnebago Business Comm. v. Koberstein</u>, 762 F.2d 613, 617 (7th Cir. 1985), <u>cited in</u> Department's Br. at 13; <u>Crow Creek Sioux Tribe v. Hattum Family Farms</u>, 102 F. Supp. 2d at 1161.

Years before anyone asked the Regional Director to enforce the statute against QEL, Congress did exactly what the courts said they were waiting for: it repealed Old Section 81 and enacted New Section 81 as a replacement. <u>See</u> S. Rep. No. 106-150 (1999). "In 1999 Congress decided to end Section 81's long history of confusing judges, lawyers, Indian tribes, and tribal business partners, and to bring Section 81's antiquated treatment of Indian tribes in line with modern attitudes towards tribal self-determination." <u>GasPlus v. Dep't of Interior</u>, 510 F. Supp. 2d at 28. In particular, and among its other features, New Section 81 confined the requirement of Secretarial approval to contracts that "encumber[] Indian lands for a period of 7 or more years," 25 U.S.C. § 81(b), and it eliminated the old statute's provisions for qui tam enforcement and a disgorgement remedy.  "[B]y clarifying and significantly reducing the scope of prior Section 81," these amendments were designed "to encourage third parties to enter into business relationships with Indian tribes" and "to reduce Government oversight of Indian economic activity." <u>GasPlus</u>, 510 F. Supp. 2d at 25.  By "removing provisions that were antiquated and unnecessary," <u>Guidiville Band of Pomo Indians v. NGV Gaming</u>, 531 F.3d at 784 (Smith, J., dissenting), New Section 81 "makes clear that Congress now considers self-determination – not paternalism – to be in the Indians' best interest," <u>Guidiville Band</u>, 531 F.3d at 781.

Why, then, does the Department labor to turn back the clock to 1871, and to apply to a contractual relationship that was ongoing in 2003 a previously repealed statute that had become "antiquated and unnecessary" by 1999?  Why have the Department's officials sought to work a forfeiture against QEL under the superseded statute, in the face of "the principle ... that the government should accord grace to private parties disadvantaged by an old rule when it adopts a new and more generous one"?  Landgraf, 511 U.S. at 276 n.30.  For that matter, why does the Department ignore the teaching of United States ex rel. Bernard v. Casino Magic Corp., 384 F.3d 510 (8th Cir. 2004), cited in Department's Br. at 12-13, in which the court "rel[ied] on the version of [Section 81] that was in effect when the suit was filed"?  384 F.3d at 513 n.1; accord, e.g., Madison Gas & Elec. Co., 36 I.B.I.A. 74 (2001).

The Regional Director never gave his selection Old Section 81 a second thought.  But the IBIA, echoed by the Department in this appeal, argued that the government could not "accord grace" to QEL under New Section 81, see Landgraf, 511 U.S. at 276 n.30, without imposing a corresponding burden on the Pueblo – because "[a]pplying New Section 81 [w]ould make binding an agreement that would have otherwise been invalid."  Department's Br. at 11-12; see AR 840-42. As the Department explains:

> Here, the Secretary never approved the QEL Management Agreement, and it was therefore null and void from day one.... The Agreement, however, would be valid without Secretarial approval under New Section 81.  See GasPlus ....  Thus, as the IBIA concluded, applying New Section 81 to the Agreement now would retroactively create contractual obligations for the Plaintiff and the Pueblo where none previously existed.

Department's Br. at 12.  Thus, the Department reasons, applying New Section 81 would "attach[] new legal consequences to events completed before its enactment."  Landgraf, 511 U.S. at 270; see

10

Department's Br. at 11.

As QEL has previously demonstrated, the Department's argument necessarily assumes that the Management Agreement would have needed the Secretary's approval, and was therefore "null and void," under Old Section 81 – an assumption about which the Department is entirely mistaken, see infra pt. II, but on which, in any event, the IBIA's choice of the relevant law should not have depended, given the IBIA's studied refusal to examine one of the assumption's central premises. See Plaintiff's Brief in Support of Motion for Summary Judgment at 7, 11-13 (June 27, 2008) (Doc. 17-3) [hereinafter QEL's Summary Judgment Br.]. In addition, the argument perversely transforms New Section 81 – a legislative reform designed to liberate Indian economic interests from stifling government oversight, see GasPlus, 510 F. Supp. 2d at 25 – into an instrument of alleged oppression. See QEL's Summary Judgment Br. at 13; cf. GasPlus, 510 F. Supp. 2d at 25 ("That a tribe and its business partner may arrive at a dispute over a particular contract, and thereby acquire divergent legal interests, does not mean that tribal business partners' interests are generally inconsistent with the tribes' or with the objectives of Section 81."); id. at 33 n.5 ("[Enabling] the ... Pueblo ... to escape [its] contractual obligations does not 'benefit Indian tribes' as Defendants suggest. On the contrary, it deprives Indian tribes of the primary benefit that Congress bestowed upon them when it amended Section 81:  less government oversight of their economic activities."). And for good measure, the Department's argument advances the nonsensical notion that Kewa and the Pueblo had a well-founded "reliance" interest in the nonexistence of legal obligations that the parties had performed for seven years before the Regional Director ruled. See Department's Br. at 12-13.

Controlling law, no less than logic, forecloses all such contentions. In McNair v. Knott, 302 U.S. 369 (1937), the Supreme Court considered whether the National Bank Enabling Amendment

served to validate pledge agreements that had been made before the amendment's effective date. After remarking that the amendment "d[id] not expressly exclude existing contracts from its field of operation," id. at 371 – and that "[i]f Congress had desired to limit the remedial grant to subsequent ... contracts, it would doubtless have [said so]," id. – the Court inquired into the fairness of applying the new law to old contracts:

> There is nothing novel or extraordinary in the passage of laws by the federal government and the States ratifying, confirming, validating, or curing defective contracts. Such statutes ... merely remove legal obstacles and permit parties to carry out their contracts according to their own desires and intentions.... <u>Placing the stamp of legality on a contract voluntarily and fairly entered into by parties for their mutual advantage takes nothing away from either of them. No party who has made an illegal contract has a right to insist that it remain permanently illegal. Public policy cannot be made static by those who, for reasons of their own, make contracts beyond their legal powers. No person has a vested right to be permitted to evade contracts which he has illegally made.</u>

Id. at 372-73 (emphasis added).

In support of these pronouncements, the Court cited <u>Ewell v. Daggs</u>, 108 U.S. 143 (1883), in which the Court had analyzed a Texas constitutional amendment that had abolished the state's usury laws – laws every bit as paternalistic as Old Section 81. The particular usury statute at issue in <u>Ewell</u> had provided that an agreement to pay more than 12% interest would be "void and of no effect." <u>Id.</u> at 148. The appellant, who sought refuge from such a contract, argued that his rights "[were] to be determined according to the law in force at the time the transaction took place," and that "no subsequent law could make valid a contract originally void." <u>Id.</u> The Court disagreed. After noting that statutes and other legal documents often employ words such as "void and of no effect" "in the sense of voidable merely, that is, capable of being avoided, and not as meaning that

the act or transaction is absolutely a nullity, as if it had never existed, incapable of giving rise to any rights or obligations under any circumstances," id. at 148-49, the Court explained that the Texas usury statute

> was, in its nature, a penal statute inflicting upon the lender a loss and forfeiture .... And it has been ... generally decided that the repeal of such laws, without a saving clause, operate[s] retrospectively, so as to cut off the defense for the future, even in actions upon contracts previously made....
>
> And these decisions rest upon solid ground. Independent of the nature of the forfeiture as a penalty, which is taken away by a repeal of the act, the more general and deeper principle on which they are to be supported is, that the right of a defendant to avoid his contract is given to him by statute, for purposes of its own, and not because it affects the merits of his obligation; and that whatever the statute gives, ... as long as it ... [has not] passed into a completed transaction, may, by a subsequent statute, be taken away.... The benefit which he has received as the consideration of the contract, which, contrary to law, he actually made, is just ground for imposing upon him, by subsequent legislation, the liability which he intended to incur....

Id. at 150-51.

Ewell was decided just a dozen years after the enactment of Old Section 81, and it remains good law today. See, e.g., Bokum v. First Nat'l Bank in Albuquerque, 106 N.M. 143, 149, 740 P.2d 693, 699 (1987). Its import in the present case is clear. A statute that legitimizes previously unlawful contracts, and that abrogates provisions for their forfeiture, does not "take[] away or impair[] vested rights," Landgraf, 511 U.S. at 269, because "[n]o person has a vested right to be permitted to evade contracts which he has illegally made," McNair, 302 U.S. at 373. It "creates [no] new obligation[s]," Landgraf, 511 U.S. at 269, because it imposes nothing more than the liability inherent in the contract itself, which the complainant fully intended to incur, see Ewell, 108 U.S. at

13

151. It therefore has no "retroactive effect," and a court should not hesitate to apply it to contracts entered into before its enactment. New Section 81 is just such a statute. The Regional Director and the IBIA committed palpable legal error by refusing to give it effect. The Court's correction of that error will dispose of the entire case. See Doc. 14.

## II.    Even Under Old Section 81, the Management Agreement Would Not Have Needed Secretarial Approval.

Applying Old Section 81 more than three years after its repeal, the Regional Director concluded that it required the parties to obtain the Secretary's approval of the Management Agreement – and that, in the absence of such approval, the contract "ha[d] never been legally valid." AR 40. These conclusions were just as erroneous as the Regional Director's decision to disregard New Section 81. The Secretary's approval of the contract simply was not required by Old Section 81.

### A.    The Management Agreement was not "relative" to Indian lands.

Only contracts "in consideration of services for ... Indians relative to their lands," see Department's Br. at 7, are within the scope of Old Section 81. The Regional Director declared Altheimer & Gray v. Sioux Manufacturing Corp., 983 F.2d 803 (7th Cir. 1993), to be "the leading case" on the "relative to [Indian] lands" criterion, see AR 37, and the IBIA abstained from considering the issue at all, see id. at 846-48. But the Department, perhaps in recognition that Altheimer does not support the Regional Director's conclusions, now suggests that the Court apply another cluster of cases altogether, as opposed to Altheimer's "narrower" and "more conservative" approach. See Department's Br. at 17-19, 21-22. The Department's alternative line of authority begins with Wisconsin Winnebago Business Committee v. Koberstein, 762 F.2d 613 (7th Cir. 1985),

14

from which the Department derives the principle that "the broad language 'relative to their lands' [demonstrates] Congress['s] inten[t] to cover almost all land transactions with Indian property." Department's Br. at 17-18 (quoting Wis. Winnebago, 762 F.2d at 618). But as this Court has observed, Congress itself begged to differ with Wisconsin Winnebago's appraisal of congressional intent. In Congress's view, Wisconsin Winnebago had abridged Indians' freedom to contract "by doubtful inference," and it exemplified an "overly broad reading of [Old] Section 81 ... that had swept within the statute's purview all shape and manner of contracts that had only attenuated ties to tribal lands." GasPlus, 510 F. Supp. 2d at 31-32. Congress not only amended Section 81 to deal with cases like Wisconsin Winnebago, but believed that Wisconsin Winnebago had been wrongly decided under the old statute. See id. at 32. Resurrecting its discredited reasoning here only compounds the Regional Director's error in applying Old Section 81 three years after the statute's repeal.

In a further effort to avoid the "conservative" leanings of Altheimer, the Department directs the Court's attention to A.K. Management Co. v. San Manuel Band of Mission Indians, 789 F.2d 785 (9th Cir. 1986), Barona Group of Capitan Grande Band of Mission Indians v. American Management & Amusement, Inc., 840 F.2d 1394 (9th Cir. 1987), and United States ex rel. Steele v. Turn Key Gaming, Inc., 260 F.3d 971 (8th Cir. 2001). See Department's Br. at 18-19. "In [all such cases], the tribe gave over an absolute right to construct, maintain and operate [a] bingo facility." Turn Key Gaming, 260 F.3d at 979. The Department asserts that the Management Agreement "explicitly granted [QEL] those [same] privileges." Department's Br. at 19. The assertion is baseless. While the Management Agreement certainly gave QEL the right (and the duty) to operate and maintain the gasoline distribution business, see AR 131-32 – as well as the right to "[s]upervise and pay, out of

[Kewa's] funds, any and all construction authorized by [Kewa] to build or expand" the business, id. at 133 – none of those rights were "absolute," Turn Key Gaming, 260 F.3d at 979, or "exclusive," Barona Group, 840 F.2d at 1403; A.K. Mgmt., 789 F.2d at 787.  Instead, Kewa controlled the purse strings, Kewa held veto power over all capital and operating budgets and all construction plans, Kewa employed all personnel, Kewa retained ownership of the business's books and records and intellectual property, and Kewa was entitled to regular consultation with – and reports from – QEL. See QEL's Summary Judgment Br. at 17-18 (citing AR 132-33, 135, 137).  In addition, while each of the cases invoked by the Department concerned a contractor's absolute rights with respect to a "facility" or a "property," the rights conferred on QEL pertained to a "business" rather than to tribal land.  See id. at 22-23.  The Management Agreement did not begin to empower QEL to control Indian lands.  It did not even mention Indian lands.

In any event, the cases running from Wisconsin Winnebago to Turn Key Gaming are largely beside the point.  The Regional Director based his theory of "relativ[ity]" on Altheimer, see Department's Br. at 19, and it is against the standards articulated by that case that his reasoning must be judged.  Altheimer identifies "the following factors [as] important in determining whether a management contract is relative to Indian lands:"

> 1) Does the contract relate to the management of a facility to be located on Indian lands?  2) If so, does the non-Indian party have the exclusive right to operate that facility?  3) Are the Indians forbidden from encumbering the property?  4) Does the operation of the facility depend on the legal status of an Indian tribe being a separate sovereign?

983 F.2d at 811.  There is no dispute about the first of these factors:  the Management Agreement concerned a gasoline distribution business whose physical facilities were to be located on the

16

Pueblo's land. "Unlike the bingo hall cases, however, the facility ... was wholly owned by the Tribe." Id. Moreover, as the Regional Director himself recognized, mere "physical contact with tribal land" is insufficient to establish a contract "relative to" such land. AR 37 (internal quotation marks omitted).

Regarding the second factor, the Department contends that the Regional Director "reasonably concluded [that] the Agreement gave [QEL] the exclusive right to operate the facility." Department's Br. at 20. Not true. Instead, the Regional Director viewed QEL's right of control as "nearly exclusive." AR 39. And not even that qualified conclusion was "reasonable." See QEL's Summary Judgment Br. at 17-18. Nor did it fulfill the "exclusive control" aspect of the Altheimer test. See id. at 16-17.

The Regional Director himself conceded that as to the third Altheimer factor, the Management Agreement contained "no provisions limiting the Pueblo or [Kewa's] rights to encumber the property." AR 39. But the Department takes another run at this factor in the present proceeding by arguing that the contract's noncompete clause was an "encumbrance" because it "prevented the Pueblo from participating in the operation of another distribution facility." Department's Br. at 20-21. The Department's argument cannot withstand scrutiny. Even under Turn Key Gaming – the case that the Department cites for its "encumbrance" theory, see id., and that it prefers to the "more conservative" Altheimer test, see id. at 18-19, 22 – the critical question is "whether by an agreement a tribe transferred a property interest in tribal lands." Turn Key Gaming, 260 F.3d at 978; cf., e.g., GasPlus, 510 F. Supp. 2d at 29 ("[N]owhere in the Management Agreement is GasPlus given any legal right or interest in the ... Pueblo's real property."). The Pueblo's agreement not to engage in "any other gas distribution business within the state of New

Mexico," AR 137, in no way resembles the transfer of a property interest in tribal lands. It no more "encumbers" tribal property by preventing the Pueblo from building a gas distribution business than a contract to sell a particular piece of Indian sculpture "encumbers" tribal property by preventing the Pueblo from using its land to display the art. A noncompete covenant does not "closely touch and concern any real property." Keller v. Cal. Liquid Gas Corp., 363 F. Supp. 123, 125, 127 (D. Wyo. 1973). Arguably it does not even prohibit the Pueblo from allowing a competing gas distribution business to operate on tribal land. See, e.g., Hardesty Co. v. Williams, 368 F.3d 1029, 1030-32 (8th Cir. 2004) (holding that lease of property to plaintiff's competitor did not violate noncompete clause virtually identical to covenant in Management Agreement); Ferrellgas Partners, Inc. v. Barrow, No. 4:03-CV-107, 2006 WL 372602, at *1-3, 11 (M.D. Ga. Feb. 16, 2006) (holding that signer of noncompete clause did not "engage in" or become "interested in" competing business merely by selling land to plaintiff's competitor); but cf. Tabet v. Sprouse-Reitz Co., 75 N.M. 645, 646-48, 409 P.2d 497, 498-500 (1966) (reasoning that a commercial lease contained an "implicit" covenant forbidding landlord from renting nearby space to tenant's competitor). But certainly such a covenant does not forbid the Pueblo from "encumbering" tribal lands within the meaning of Altheimer. Cf., e.g., GasPlus, 510 F. Supp. 2d at 30 ("Had the Tribe wished to mortgage the land (or facilities) during the term of the contract, the Management Agreement would have given GasPlus no power to stop the transaction or place a cloud on the title.").

In concluding that the circumstances satisfied the fourth Altheimer factor – "[whether] the operation of the facility depend[ed] on the legal status of an Indian tribe being a separate sovereign," 983 F.2d at 811 – the Regional Director declared that "the reason that [the Pueblo] is able to competitively compete in the wholesale gasoline business is that the State of New Mexico has

18

authorized it to receive a tax exemption under state law in order to help provide funding to the Pueblo for tribal government needs." AR 39-40. If the Regional Director had any evidence supporting this economic analysis, he neglected to cite it – and QEL never received an opportunity to rebut it. But in any event, the Regional Director's rationale strayed far from the principles that underlie Altheimer. As the Regional Director himself appeared to recognize, any competitive advantage enjoyed by the Pueblo in the wholesale gasoline business was a function of New Mexico law, not tribal sovereignty; the state had the sole power to extend the tax break or take it away. Nor did the operation of the Pueblo's gasoline distribution business "depend" on the tax break – let alone on the Pueblo's ownership of land – in the sense that the business's "very existence" would have been impossible without it. Altheimer, 983 F.2d at 811 (quoting United States ex rel. Shakopee Mdewakanton Sioux Cmty. v. Pan Am. Mgmt. Co., 616 F. Supp. 1200, 1218 (D. Minn. 1985), appeal dismissed, 789 F.2d 632 (8th Cir. 1986)). Gasoline distribution businesses exist throughout New Mexico, on and off tribal lands. That the Pueblo's state-law tax exemption may have made its own gasoline operations more profitable than they would have been otherwise does not demonstrate that tribal sovereignty was indispensable to the enterprise. See QEL's Summary Judgment Br. at 19-21.

Of the four Altheimer factors, then, only one – the contract's relation to the management of a facility to be located on Indian lands – was actually present in the case at hand. That factor, standing alone, cannot justify the Regional Director's decision to classify the Management Agreement as one "relative to [Indian] lands." See AR 37-38. Because the Management Agreement was not "relative" to Indian lands, Old Section 81 did not condition the contract's validity on Secretarial approval. The Regional Director's contrary conclusion was "not in accordance with law."

5 U.S.C. § 706(2)(A).

**B.     The Management Agreement was not with an Indian tribe.**

Only contracts "with [a] tribe of Indians" come within the ambit of Old Section 81.  See Department's Br. at 7.  Thus, even if the Management Agreement had been "relative to [Indian] lands" – which it was not, see supra pt. II(A) – the fact that it was between QEL and a tribal corporation registered to do business in New Mexico is an independently sufficient ground for concluding that Old Section 81 did not require Secretarial approval of the contract.  The Pueblo, while a nominal party to the contract, had only a minor role with respect to it – and the Pueblo's meager obligations under the contract were, at any rate, severable from the corporation's.  Thus, as QEL has argued elsewhere, the Regional Director's wholesale invalidation of the Management Agreement was wrong for this reason, too.  See QEL's Summary Judgment Br. at 23-30.

**III.     Whether Under New Section 81 or Old Section 81, the Department Had No Authority to Declare that the Management Agreement "Ha[d] Never Been Legally Valid."**

The issuance of a declaratory judgment is a quintessentially judicial act.  In the present case, the Regional Director took it upon himself to declare that "the management agreement has never been legally valid and any monies received by QEL pursuant to the[] agreement[] were unauthorized." AR 40.  The Department can point to no statutory or regulatory authorization for that sort of pronouncement. See Department's Br. at 23.  Accordingly, in addition to reaching erroneous legal conclusions about the rights of the parties under the Management Agreement, see supra pts. I-II, the Regional Director and the IBIA both acted "in excess of statutory jurisdiction [or] authority," 5 U.S.C. § 706(2)(C), by undertaking to adjudicate such rights in the first place.  See QEL's Summary Judgment Br. at 30-32.

**IV.    The Department Has Denied QEL Due Process of Law.**

In its own motion for summary judgment, QEL demonstrated that the Regional Director trammeled QEL's procedural due process rights by entertaining an ex parte complaint about the Management Agreement – a complaint voiced by a ward of the Department, toward whom the Regional Director was therefore institutionally predisposed – and then by purporting to invalidate the Management Agreement, without warning QEL that such action was contemplated and without affording QEL any opportunity to be heard.  See QEL's Summary Judgment Br. at 32-39.  The Department's sole defense to this charge (aside from the assertion that the contract was null and void from the start under Old Section 81, so that QEL never acquired a property interest meriting constitutional protection, see Department's Br. at 27) appears to be that the IBIA's review of the Regional Director's decision remedied any deficiencies in the original proceeding and ultimately provided QEL with all the process that was due.  Though the Department variously argues that the IBIA itself complied with the Constitution's command, that the Regional Director's decision was harmless because it was not final, and that QEL's challenges to the Regional Director's decisionmaking process are "moot," see Department's Br. at 28-31, all three arguments amount to the same claim – namely, that the Department's channels of internal review eventually meted out every ounce of process to which QEL was entitled.

The conspicuous difficulty with this contention is that the IBIA completely abstained from deciding one of the central issues in the case – whether the Management Agreement was "relative to [Indian] lands" under Old Section 81.  See supra pt. II(A).  The IBIA "d[id] not address or express any view on the merits of this issue, and instead dismiss[ed] this portion of the appeal, allowing the Regional Director's determination on this particular issue to become effective."  AR 848.  In other

words, the IBIA elected to "assume" that the Regional Director had correctly decided the issue. Id. The IBIA did so not because QEL had failed to avail itself of the process that was offered, but rather because a decision on the issue in QEL's favor might have "undermine[d] the litigating position of the Department" in the GasPlus case. See id. at 846-48.

The IBIA may well have been "[s]tuck between a rock and a hard place," Department's Br. at 22, and abstention may well have been in the Department's best interests. But in commending itself for its own prudence, the Department seems to forget that an IBIA review of the case on its merits was the only thing standing between QEL and a permanent denial of administrative due process. Allowing the Regional Director's decision on a crucial issue to "become effective" without reviewing it was hardly a blueprint for a meaningful appeal. That course of inaction gives a cynical ring to the Department's present argument that "[o]nce before the IBIA, [QEL] received its opportunity to be heard through extensive briefing." Id. at 29. An "opportunity to be heard" counts for nothing if no one is listening. An audience that listens without responding is no more worthwhile.

QEL recognizes its tenuous standing to raise these due process claims, and it acknowledges that the Court may well decline to address them. See GasPlus, 510 F. Supp. 2d at 34. But regardless whether the abridgment of QEL's due process rights is susceptible of redress, it is an important part of the story of the case, because it further demonstrates the Department's arbitrary and capricious handling of this matter. The Court should therefore rule that the Department acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## Conclusion

For the foregoing reasons, as well as the reasons set forth in support of QEL's motion for

22

summary judgment, the Court should deny the Department's motion and grant QEL's.[1]

Respectfully submitted,

BRACEWELL & GIULIANI, LLP
Shelby J. Kelley
D.C. Bar Number 464248
Nancy J. Appleby
D.C. Bar Number 470995
2000 K Street NW, Suite 500
Washington, D.C. 20006-1872
Telephone:  (202) 828-5800
Facsimile:  (202) 223-1225

- and -

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.


By:    /s/ Charles K. Purcell
    Charles K. Purcell (Appearing under Minute Order
        dated July 18, 2008, granting pro hac vice motion)
Post Office Box 1888
Albuquerque, New Mexico 87103
Telephone:  505-765-5900
Facsimile:  505-768-7395
kpurcell@rodey.com

---

[1]QEL has elected to forego further prosecution of its appeal from the Regional Director's refusal to approve the Management Agreement retroactively.  See Department's Br. at 23-26.

23

We hereby certify that, by means
of the CM/ECF system, we have
filed this brief electronically and
served it on

> Kristofor R. Swanson
> U.S. Department of Justice
> P.O. Box 663
> Washington, D.C. 20044
> kristofor.swanson@usdoj.gov
>
> Devon Lehman McCune
> U.S. Department of Justice
> Natural Resources Section
> 1961 Stout Street
> 8th Floor
> Denver, Colo. 80294
> devon.mccune@usdoj.gov

this 8th day of August, 2008.


   /s/ Charles K. Purcell
Charles K. Purcell

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| QUANTUM ENTERTAINMENT LIMITED, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:07-cv-01295-RMU |
| UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS, | ) ) ) ) | |
| Defendant. | ) ) ) | |

**[PROPOSED] ORDER**

Before the Court are the parties' cross-motions for summary judgment. The Court having

considered both motions, the memoranda in support thereof, and the Administrative Record, IT IS

HEREBY ORDERED THAT:

(1) Defendant's Motion for Summary Judgment is DENIED; and

(2) Plaintiff's Motion for Summary Judgment is GRANTED.

Signed this _____ day of _____, 2008.

By the Court:

_____

RICARDO M. URBINA
United States District Judge